John T. Jasnoch (CA 281605)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: 619-233-4565
Fax: 619-233-0508
jjasnoch@scott-scott.com

*Counsel for Plaintiffs*

[Additional counsel on signature page.]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| JOHN SUDDETH and SARA PERKINS, | Case No.: _____ |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| META PLATFORMS, INC., INSTAGRAM, LLC, FACEBOOK OPERATIONS, LLC, and WHATSAPP, LLC, | |
| Defendants. | |

1    Plaintiffs John Suddeth and Sara Perkins (collectively, "Plaintiffs") complain upon

2    knowledge as to themselves and their own actions and upon information and belief as to all other

3    matters against Defendants Meta Platforms, Inc. ("Meta"), Instagram, LLC ("Instagram"),

4    Facebook Operations, LLC ("Facebook"), and WhatsApp, LLC ("WhatsApp") as follows:

5                          **SUMMARY OF ALLEGATIONS**

6    1.    This action arises from Defendants' unlawful, deceptive, and unauthorized use of

7    financial professionals' names, images, voices, and personas in paid advertisements and related

8    promotional content disseminated on Facebook, Instagram, and/or WhatsApp from at least January

9    1, 2023 through the present (the "Class Period"), inducing investment in fraudulent, thinly traded

10   China-based securities (the "Chinese Stock Scams").  Defendants' conduct violates, *inter alia*, the

11   Lanham Act §43(a), 15 U.S.C. §1125(a) (false endorsement/association), the California Right of

12   Publicity (Cal. Civ. Code §3344 and common law), the California Unfair Competition Law (Cal.

13   Bus. & Prof. Code §17200), the Florida Right of Publicity (Fla. Stat. §540.08), and the Florida

14   Deceptive and Unfair Trade Practices Act ("FDUTPA") (Fla. Stat. §501.201 *et seq.*), as well as

15   analogous state statutes and common law.

16   2.    Meta operates and monetizes an integrated advertising and messaging ecosystem—

17   Facebook and Instagram for ad distribution and targeting, as well as WhatsApp for group

18   communications—where paying advertisers micro-target users and funnel them into private

19   WhatsApp groups. Throughout the Class Period, a plague of scammers purchased and ran sponsored

20   ads on Facebook and Instagram impersonating real financial professionals like Plaintiffs, falsely

21   suggesting those professionals endorse specific securities; the ads then directed users to WhatsApp

22   "investment" groups administered by the scammers.

23   3.    Meta's own Terms, Community Standards, and Advertising Policies state

24   impersonation, false or misleading ads, and coordinated scams are prohibited and will be removed

25   or blocked.[1] California and Florida law likewise prohibit the unauthorized commercial use of a

26

27   _____

28   [1]    META, *How Meta enforces its policies*, https://transparency.meta.com/enforcement/
     [https://perma.cc/8RV4-QNZW].

                          - 1 -
                        COMPLAINT

person's identity and false endorsements in advertising.[2]   Despite these legal prohibitions and Meta's contractual representations, Defendants systematically approved, delivered, amplified, and profited from ads and related promotional content that misappropriated Class members' identities to sell fraudulent securities schemes.

4.     Class members like Plaintiffs—licensed investment advisers, planners, brokers, and other financial professionals—did not consent to the use of their names, likenesses, voices, or personas in Meta-served ads or WhatsApp solicitations, nor did they authorize any endorsement of the promoted securities.   The impersonation ads and group solicitations were designed to and caused consumer confusion, diverted prospective clients, damaged goodwill, as well as exposed Class members to reputational harm, regulatory inquiries, and lost business opportunities.

5.     On or about June 11, 2025, a bipartisan coalition of state Attorneys General ("AGs") publicly warned Meta that paid impersonation ads and WhatsApp investment groups were being used to perpetrate widespread fraud against U.S. consumers, including through fake endorsements by financial figures.[3] Nevertheless, during July 2025 and thereafter, Meta continued to serve or allow materially identical impersonation ads and funnels to proliferate.   Each placement, delivery, and amplification of an impersonation ad—before and after Meta's notice—constitutes an unauthorized commercial use, false endorsement, and violation of Meta's own stated policies.

6.     During the Class Period, Meta delivered these impersonation ads and funnels to millions of U.S. users, generating substantial advertising revenues while inflicting concrete injuries on Class members, including loss of current and prospective clients, diversion of time and resources to counteract the impersonations, reputational and brand dilution, and ongoing risk of future impersonations.   Many Class members would have taken additional protective measures—or demanded platform-level protections—had they known Meta was approving and profiting from impersonation ads.

---

[2]     *See* Cal. Civ. Code §3344; Fla. Stat. §540.08.

[3]     N. Ass'n of Att'ys Gen., *42 State and Territory Attorneys General Urge Meta to Take Action Against Investment Scam Ads* (2025), https://www.naag.org/press-releases/42-state-and-territory-attorneys-general-urge-meta-to-take-action-against-investment-scam-ads/ [https://perma.cc/5YG3-3AHQ].

7.    The full scope of Defendants' misconduct, including scam advertiser identities, is concealed and lies within Defendants' exclusive possession.  Given the surreptitious and secretive nature of Defendants' conduct, more evidence supporting the allegations in this Complaint will be uncovered after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

8.    This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C §1332(d) because the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative class members defined below, and minimal diversity exists because the majority of putative class members are citizens of a state different than Defendants.

9.    This Court has general personal jurisdiction over Defendants because their principal place of business is in California.  Additionally, Defendants are subject to specific personal jurisdiction in this state because a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in this state.

10.    Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because a substantial portion of the conduct described in this Complaint was carried out in this district.  Furthermore, Defendants Meta, Instagram LLC, Facebook Operations LLC, and WhatsApp LLC are headquartered in this district and subject to personal jurisdiction in this district.

## PARTIES

**A.    Plaintiffs**

11.    Plaintiff John Suddeth is a natural person and citizen of the State of Florida and a resident of Collier County.

12.    Plaintiff Sara Perkins is a natural person and citizen of the State of Florida and a resident of Collier County.

**B.    Defendants**

13.    Defendant Meta is a Delaware corporation, organized and existing under the laws of the State of Delaware, with its principal place of business at 1 Meta Way, Menlo Park, California 94025.  Meta is the successor issuer to, and parent holding company of, Facebook.

14.     Defendant Instagram is a Delaware limited liability company, organized and existing under the laws of the State of Delaware, with its principal place of business located at 1 Meta Way, Menlo Park, CA 94025. Instagram is a wholly owned subsidiary of Meta.

15.     Defendant Facebook is a Delaware limited liability company, organized and existing under the laws of the State of Delaware, with its principal place of business located at 1 Meta Way, Menlo Park, CA 94025.  Facebook is a wholly owned subsidiary of Meta.

16.     Defendant WhatsApp is a Delaware limited liability company, organized and existing under the laws of the State of Delaware, with its principal place of business at 1 Meta Way, Menlo Park, CA 94025.  WhatsApp is a wholly owned subsidiary of Meta.

## SUBSTANTIVE ALLEGATIONS

17.     Meta operates one of the largest integrated social networking and digital advertising ecosystems in the world.  Founded in 2004 as Facebook, Meta has since expanded into multiple products and services used by billions of people globally, positioning itself as an indispensable conduit for online communication, content distribution, and paid commercial promotion.

18.     Meta's core consumer products include Facebook and Instagram, which host user profiles, pages, and feeds where paid advertisements can be inserted and algorithmically optimized, and WhatsApp, an end-to-end encrypted messaging service that supports one-to-one chats and large group conversations.  Meta centrally manages paid advertising through its Business/Ads Manager and related APIs, allowing advertisers to create, budget, target, and deliver campaigns across Facebook, Instagram, and "click-to-message" placements that intentionally funnel users into WhatsApp chats and groups (collectively, the "Platforms").

19.     Meta represents that its Platforms are intended to help people connect and help legitimate businesses reach customers.[4]  To that end, Meta publishes Terms, Community Standards, and Advertising Policies that prohibit impersonation, false or misleading statements, and fraudulent

---

[4]     META, *OUR MISSION Build the future of human connection and the technology that makes it possible*, https://www.meta.com/about/company-info/ [https://perma.cc/69Q7-LJ6C].

or deceptive practices.[5]  Meta also states that it will remove or restrict content, accounts, and advertisements that violate these rules, and that it provides reporting tools for swift enforcement.[6]

20.     In practice, paid ads on the Platforms are created through standardized workflows in Ads Manager: an advertiser selects an objective (e.g., traffic, conversions, or click-to-WhatsApp), uploads creative assets (text, images, or video), chooses audience parameters (demographics, interests, behaviors, and lookalikes), sets budget and bid strategy, and designates placements across feeds, Stories/Reels, and other surfaces.  Meta reviews ads through automated and human processes and then delivers and optimizes them using machine-learning systems that maximize reach, engagement, or downstream actions (including initiating WhatsApp chats and joining WhatsApp groups).

21.     During the period relevant to this action, criminal actors exploited these same Meta tools to run paid impersonation advertisements that unlawfully used the names, images, voices, and personas of financial professionals and advisors.  These ads deceptively suggested that the impersonated professionals endorsed specific thinly traded, China-based securities and then routed users via links or "send message" buttons into WhatsApp investment groups administered by the scammers, where additional misrepresentations and pressure tactics induced victims to buy the promoted stocks.

22.     The impersonation ads and related WhatsApp group solicitations were neither isolated nor accidental.  They reflected coordinated campaigns that repeatedly used the identities of financial professionals without consent, misled users as to source, sponsorship, and approval, and contravened Meta's published prohibitions on impersonation, fraud, and deceptive practices. Despite Meta's public commitments and reporting mechanisms, these campaigns were approved,

---

[5]     META, *Transparency Center*, https://transparency.meta.com/ [https://perma.cc/QBK5-JQ9H].

[6]     META, *Taking action*, https://transparency.meta.com/enforcement/taking-action/ [https://perma.cc/45BW-SKKJ].

delivered, and optimized as paid media on Facebook and Instagram, and were completed through WhatsApp groups operating on Meta's infrastructure.

23.    Meta's Platforms collectively reach vast audiences in the United States, and Meta's ad systems delivered the impersonation campaigns at scale.  As a result, financial professionals and advisors across the country suffered uniform injuries, including unauthorized commercial exploitation of their identities, loss of goodwill, diversion of prospective clients, reputational harm from false associations with fraudulent stock schemes, and the continuing risk of future impersonation facilitated by Meta's advertising and messaging tools.

24.    Further, Meta's Terms/Policies promise that impersonation, fraud, and deceptive ads are prohibited, and will be removed or restricted.[7]  Financial professionals joined and remained on the platforms, and engaged clients there, in reasonable reliance on those commitments.  Meta's failure to enforce those commitments—especially after notice—frustrated users' reasonably expected benefits and breached the implied covenant by privileging ad revenue over safety.

**I.    META'S PAID IMPERSONATION ADS AND WHATSAPP FUNNELS TARGETED U.S. INVESTORS USING FINANCIAL PROFESSIONALS' IDENTITIES**

25.    Throughout the Class Period, there has been a surge of paid advertisements on Facebook and Instagram that impersonate financial professionals, and funnel users into WhatsApp "investment" groups which promote thinly traded, China-based securities.  These ads regularly feature the name, image, likeness, or voice of real advisors without consent and misrepresent that those professionals endorse the promoted stocks.

26.    The impersonators' ad campaigns follow a standardized playbook: scammers purchased sponsored placements through Meta's Ads Manager, uploaded creative assets falsely depicting or quoting a known advisor, and selected click-to-WhatsApp or similar objectives so that victims who tapped the ad were automatically routed to a WhatsApp chat or group administered by

---

[7]    META, *Policies*, https://transparency.meta.com/policies/ [https://perma.cc/5XYZ-RSB3].

the scammers.  Within those chats, organizers disseminated scripted "analyst notes," fabricated testimonials, and coordinated "buy" signals to inflate share prices.

27.    The ads and group messages were designed to mimic authenticity.  Creatives used studio-quality headshots, forged logos, and edited video clips to suggest affiliation with reputable firms.  In WhatsApp, admins posed as the impersonated professionals or their "assistants," addressing members by name, promising exclusive access to "institutional-grade" research, and directing immediate purchases of targeted tickers.  These campaigns misappropriated Class members' identities to create a false imprimatur and to induce rapid trading activity.

28.    On May 15, 2025, The Wall Street Journal ("WSJ") published an investigation titled "Criminal Scams Flood Instagram and Facebook --- Meta profits from ads for fake puppies, phony bargains," reporting that regulators, banks, and Meta's own internal documents identify Meta as a cornerstone of the internet-fraud economy.[8]  The article recounts that nearly half of all Zelle scams at JPMorgan in 2023-2024 originated on Meta; UK and Australian regulators have logged similar levels; and a 2022 internal analysis found ~70% of newly active advertisers were promoting scams, illicit goods, or "low quality" products.[9]  It further details how Meta permits eight and 32 automated "strikes" for financial fraud before banning ad accounts.[10]

29.    The WSJ report attributes Meta's persistent under-enforcement to financial incentives.[11]  Employees said the company is reluctant to add impediments for ad-buying clients who drove $160 billion in advertising revenue (22% increase from 2023 to 2024 and Meta's principal revenue source).[12]  Meta also abandoned plans to verify advertisers (akin to political-ad rules) out of concern it would lose revenue from marketers unable or unwilling to pass identity checks.  In short, according to the WSJ report, Meta chose to preserve its advertising juggernaut at

---

[8]    Exhibit A.
[9]    *Id.*
[10]    *Id.*
[11]    *Id.*
[12]    *Id.*

- 7 -

the expense of robust scam prevention, even as criminal networks exploited Facebook and Instagram at scale.

30.    In response to mounting complaints and public outcry about impersonation-driven investment scams, Meta acknowledged the existence of fraudulent advertising and WhatsApp abuse, but represented that only a small fraction of ads violated policy, and that detection systems might experience "false negatives."[13]   Despite these assurances, paid impersonation ads and derivative WhatsApp groups continued to run, exploiting the same misappropriated identities and causing continuing harm to financial professionals and investors alike.

31.    On or about June 5, 2025, a bipartisan coalition of state AGs transmitted a detailed written notice and demand letter to Meta's senior leadership (including the company's Chief Legal Officer) warning that Meta's advertising and messaging products were being systematically exploited for securities fraud.[14]   The AGs specifically identified paid impersonation advertisements on Facebook and Instagram that funneled users into WhatsApp investment groups, described the use of well-known financial figures' names and likenesses without consent, and urged Meta to take immediate corrective action—including stricter advertiser verification, proactive screening/takedowns of financial-promotion ads, and adequate restitution pathways for victims.[15] The letter placed Meta on explicit notice that U.S. consumers and professionals were being deceived by impersonation-driven schemes operating on Meta's platforms.[16]

32.    Despite receiving this multi-state enforcement notice, Meta continued to approve, deliver, and optimize materially identical impersonation ads, and click-to-WhatsApp funnels during

---

[13]    *Id.*

[14]    Letter from Letitia James et al. to J. Gillian Newstead (Jun. 5, 2025) https://www.naag.org/wp-content/uploads/2025/06/Letter-to-Meta-re-Scam-Investments-_FINAL.pdf [https://perma.cc/694Q-7QPF].

[15]    *Id.*

[16]    *Id.*

COMPLAINT

July 2025 and onward. These included a campaign that misappropriated Plaintiffs' identities to promote Pheton Holdings Ltd. ("Pheton," or Ticker: "PTHL").

33.     Complaints and reports from affected professionals and users followed, yet substantially similar social media advertising ("creatives") and group channels reappeared under new ad accounts and group names, demonstrating that Meta failed to implement the reasonable, platform-level safeguards requested by the AGs. Meta's ongoing publication and monetization of these impersonation ads after notice further support Plaintiffs' claims for false endorsement, right of publicity, unfair practices, unjust enrichment, and injunctive relief compelling robust advertiser verification and prompt takedowns of financial impersonation content.

34.     Evidence shows the campaigns were systemic rather than isolated: materially identical creatives were re-uploaded under new ad accounts when prior ads were removed, WhatsApp groups were cloned and re-named to evade user reports, and ad targeting repeatedly focused on U.S. users with interests in finance or trading. Even after specific impersonation reports were filed, substantially similar ads and funnels reappeared, indicating recurring approval, delivery, and optimization on Meta's platforms.

35.     In September 2025, it was reported that the Securities and Exchange Commission ("SEC") launched a new task force to investigate both foreign issuers and U.S. intermediaries implicated in these Chinese microcap pump-and-dump schemes.[17]

36.     Critically, the impersonation scheme does not distinguish among professionals based on notoriety or audience size. Local and regional advisors were, and continue to be, impersonated alongside nationally recognized figures, exposing all to reputational injury, client confusion, regulatory inquiries, and diversion of prospective business. Class members did not consent to any use of their names, images, likenesses, voices, or professional credentials in Meta-served ads or

---

[17]     Press Release, SEC, *SEC Announces Formation of Cross-Border Task Force to Combat Fraud* (Sept. 5, 2025), https://www.sec.gov/newsroom/press-releases/2025-113-sec-announces-formation-cross-border-task-force-combat-fraud [https://perma.cc/HSN8-GFDB].

WhatsApp solicitations, and each unauthorized use constituted a separate act of misappropriation and false endorsement.

## II.     META UNLAWFULLY MISAPPROPRIATED PLAINTIFFS' IDENTITIES

37.     Plaintiffs are licensed financial professionals who, during the Class Period, maintained professional presences on Facebook, Instagram, and/or WhatsApp.  Each Plaintiff was impersonated without consent in paid advertisements and related promotional content that falsely suggested they endorsed Pheton and steered users into WhatsApp "investment" groups used to perpetrate a pump-and-dump scheme.

38.     Plaintiff Suddeth is a Florida-based financial and investment professional who maintains a professional presence on Meta platforms.  Plaintiff Suddeth has over 35 years of experience in investment management and has held the Chartered Financial Analyst ("CFA") designation since 1996.  The CFA designation is globally recognized and attests to a charterholder's success in a rigorous and comprehensive study program in the field of investment management and research analysis.  Plaintiff Suddeth is registered with the Florida Office of Financial Regulation and with the Financial Industry Regulatory Authority ("FINRA").

39.     Multiple sponsored ads promoting PTHL ran on Meta's platforms using Plaintiff Suddeth's name, headshot, and fabricated quotes, and invited users to "join my WhatsApp research group."  Below is a screenshot from one of the WhatsApp groups impersonating Plaintiff Suddeth:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16    40.    As described herein, Meta targeted and delivered these impersonation ads which

17  funneled users into WhatsApp groups controlled by scammers, thereby misappropriating Suddeth's

18  identity on multiple occasions to advance the PTHL pump-and-dump scheme.

19    41.    Plaintiff received notice on LinkedIn from a U.K. based investment professional that

20  his professional likeness was being used in WhatsApp's chatroom for a pump-and-dump scheme.

21  Plaintiff Suddeth attempted multiple communications to WhatsApp regarding the illegal activity,

22  with no response from WhatsApp around the event.  He identified at least one U.S. telephone

23  number that was associated with the impersonator(s).  Plaintiff Suddeth called the number itself,

24  which returned as not available (+1 (480) 764-0085).  Plaintiff Suddeth reported this number to

25  Meta but received no response.

26    42.    Plaintiff Sara Perkins is a Florida-based financial and investment professional who

27  maintains a professional presence on the Platforms.  Plaintiff Perkins has over a decade of

28

experience as a financial professional and has worked since 2017 as a client advisor. Plaintiff Perkins is an Investment Advisor Representative of Naples Global Advisors, LLC registered with the Florida Office of Financial Regulation and FINRA, an accreditation granted for passing the Series 65 Exam.

43.     Plaintiff Perkins was similarly impersonated in a series of ads promoting PTHL displaying her likeness and credentials, falsely claiming exclusive knowledge of an imminent catalyst for PTHL. After users clicked "Message," they were auto-routed to WhatsApp chats where scammers—posing as "Adviser B" or "Adviser B's assistant"—issued coordinated "buy" prompts for PTHL. Meta's approval and delivery of these ads, as well as funnels to WhatsApp, unlawfully exploited Plaintiff Perkins' persona to solicit trades. Below is a screenshot from one of the WhatsApp groups impersonating Plaintiff Perkins:



44.     At no time did Plaintiffs consent to the use of their names, images, voices, credentials, or professional personas in Meta-served ads or WhatsApp solicitations, nor did they authorize any endorsement of Pheton.  Plaintiffs notified Meta of the impersonations when discovered; nonetheless, substantially similar creatives and group funnels reappeared.  Plaintiffs never agreed to Meta publishing paid content falsely attributing investment recommendations to them, or use of their identities to funnel users into WhatsApp groups.

45.     Plaintiffs wish to continue maintaining professional accounts on Facebook or Instagram.  However, absent equitable relief, including an injunction prohibiting Meta from approving, delivering, or optimizing impersonation ads and from facilitating derivative WhatsApp funnels, Plaintiffs remain at ongoing risk of renewed identity theft, reputational harm, client confusion, and diversion of prospective business tied to future manipulative campaigns (including, without limitation, schemes modeled on the Pheton scheme described herein).

46.     Those steps were thwarted by Meta's failure to timely remove or block the ads and by the scammers' ephemeral infrastructure (e.g., unreachable U.S. number), which is consistent with a coordinated scheme using paid placements to impersonate financial professionals and WhatsApp group funnels to orchestrate PTHL trades.

47.     Plaintiffs have obtained screenshots of certain communications in some of the WhatsApp groups where impersonators were using Plaintiffs' stolen identities to promote scam companies.  These screenshots show coordinated WhatsApp channels branded with Plaintiffs' names and likenesses that were used to funnel and direct U.S. investors into purchases of Pheton. The channels were administered by impostors posing as Plaintiffs or their "teams," and were linked to from paid Facebook/Instagram ads.

48.     Within these channels, uniform trading scripts were disseminated to members—promoting immediate market-buy orders, prescribing short holding windows, and touting inside information around blockbuster drugs, and extraordinary profit projections—all calculated to generate rapid buying of PTHL.

COMPLAINT

49.     The operation leveraged broadcast-only groups (where "only admins can send messages") to push synchronized instructions and promotional talking points, while one-to-one chats were used to apply individualized pressure and "coach" victims through order entry.

50.     Members were repeatedly asked to disclose portfolio positions and screenshots to verify compliance and to facilitate coordination across the group—an approach consistent with a pump-and-dump orchestration rather than bona fide investment research.

51.     The channels invoked manufactured credibility through faux technical analysis and purported corporate "developments," designed to convey inevitability of price appreciation and to suppress concerns about volatility or risk.

52.     The impersonation content cross-promoted across chats carried both Plaintiffs' identities, reinforcing the false impression of a professional investment "team" and directing users to scheduled "updates" intended to time buying and selling of PTHL.

53.     The materials include two distinct U.S. telephone numbers embedded next to the impersonated profiles—further evidencing a domestic contact point used to administer or legitimize the scheme, thus demonstrating that the operation targeted U.S. investors on Meta's platforms.

54.     Collectively, the screenshots demonstrate a standardized playbook: paid Meta ads misappropriated Plaintiffs' identities to recruit members, admin-controlled broadcasts and scripted direct messages drove coordinated PTHL purchases, investors were induced to reveal account details, and the campaign was structured to inflate price and volume ahead of a planned exit—all causing reputational, business, and brand harm to Plaintiffs and similar financial professionals.

55.     This is a pervasive problem affecting numerous financial professionals, not just the Plaintiffs here.  For example, on December 9, 2024, the Washington State Department of Financial Institutions put out a consumer alert notifying that Kevin Simpson, the founder of Capital Wealth Planning LLC, was being impersonated pursuant to this scam.[18]  Thereafter, on February 18, 2025,

---

[18]     WASH. STATE DEP'T OF FIN. INSTS., *WhatsApp group impersonating Capital Wealth Planning, LLC appears to be engaged in fraud* (2024) https://dfi.wa.gov/consumer/alerts/whatsapp-group-impersonating-capital-wealth-planning-llc-appears-be-engaged-fraud [https://perma.cc/8TC8-MX4A].

the Washington state regular issued an update advising that advisors associated with Circle Advisors, Inc., WealthMark Advisory Group, LLC, and Sequoia Financial Group were being impersonated.[19]  The June 11, 2025 state AG letter highlights that Joe Kernen of CNBC, Joshua Brown of Ritholtz Wealth Management, Andrew Ross Sorkin of the New York Times, Tom Lee of Fundstrat, Deven McLaughlin of Park Avenue Securities, Joe Terranova of Virtus Investment, Cathie Wood of ARK Investment Managements, Chamath Palihapitiya of Social Capital, Liz Ann Sonders of Charles Schwab & Co., Inc., Savita Subramanian of Bank of America Merrill Lynch, and Karen Finerman of CNBC and Metropolitan Capital were all being impersonated on Meta's platforms.[20]

56.    The website StopNasdaqChinaFraud.com similarly provides examples of scammers using Meta's platforms to impersonate financial professionals.  On that website, investors and victims have provided hundreds of screenshots of investment professionals being impersonated to promote Chinese companies.  For example, screenshots show that financial professionals Aleks Spellman of Summer Street Capital[21] and Ryan Burbach of Friday Financial[22] were impersonated to promote the fraudulent PTHL stock.

57.    In sum, Defendants' impersonation machinery has inflicted concrete and continuing harms on Plaintiffs—licensed financial professionals whose livelihoods depend on credibility, candor, and client trust.  By hijacking Plaintiffs' names, images, and professional personas to peddle

---

[19]    WASH. STATE DEP'T OF FIN. INSTS., *WhatsApp groups impersonating Registered Investment Advisor firms, appears to be engaged in fraud* (2025), https://dfi.wa.gov/consumer/alerts/whatsapp-groups-impersonating-registered-investment-advisor-firms-appears-be [https://perma.cc/7D5F-WV4A].

[20]    Letter from Letitia James et al. to Jennifer Gillian Newstead (Jun. 11, 2025), https://ag.ny.gov/sites/default/files/letters/letter-to-meta-re-investment-scams-on-facebook-and-whatsapp-letter-2025.pdf [https://perma.cc/6KWX-BMH2].

[21]    Edwin Dorsey, THE BEAR CAVE (2025) https://www.stopnasdaqchinafraud.com/sncf/ffd77bf6-aaef-4ac1-9367-b631cd601639 [https://perma.cc/7T3U-53WW].

[22]    Edwin Dorsey, THE BEAR CAVE (2025) https://www.stopnasdaqchinafraud.com/sncf/664b5b19-29a2-423b-84fc-aaf6816f3919 [https://perma.cc/975C-PLVG].

a fraudulent PTHL "strategy," Defendants have falsely associated Plaintiffs with unlawful promotions; diverted prospective clients; triggered client confusion, complaints, and lost business; forced costly mitigation efforts (monitoring, takedowns, reputational repair, and counsel); exposed Plaintiffs to regulatory and brand risk; and diluted the hard-won goodwill they built over years of compliant practice.  Beyond the individual damage, the scheme has eroded public confidence in the advisor-client relationship, and in market integrity itself: investors who encounter counterfeit "advice" bearing real professionals' identities are less able to distinguish legitimate guidance from manipulation, undermining efficient price formation, compliance cultures, and the fair functioning of U.S. securities markets.

58.    Defendants' liability arises from: (a) commercial advertising they sold, delivered, optimized, and monetized; (b) misappropriation and false endorsements (the Lanham Act, California Right of Publicity, and Florida Right of Publicity) that fall within intellectual-property regimes not immunized by 47 U.S.C. §230(c)(1); and (c) Meta's own conduct and promises— including its Terms, Community Standards, and Advertising Policies—breached by approving and optimizing impersonation ads and funnels.  Defendants also materially contributed to the illegality by providing creative templates, automated ad-copy tools, "lookalike"/interest targeting, and click-to-WhatsApp placements that transformed and operationalized the deception at scale; by designating and amplifying the ads as "Sponsored"; and by under-enforcing repeat-offender and verification controls after notice.  These allegations sound in Defendants' commercial advertising conduct and policy breaches, not merely third-party publication, and therefore are outside Section 230's protection.

## CLASS ACTION ALLEGATIONS

59.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

All financial professionals in the United States whose names, images, voices, likenesses, credentials, branding, or professional personas were used without consent in paid advertisements or related promotional content on Meta's platforms (including Facebook, Instagram, and/or click-to-WhatsApp campaigns and

WhatsApp groups) to promote securities or investment opportunities during the period from at least January 1, 2023 through the present (the "Class Period").[23]

60.     "Financial Professional" means any natural person who, during the Class Period, held themselves out to the public and/or was engaged for compensation in providing investment, securities, or financial-planning related advice or services, including, but not limited to, investment adviser representatives, principals or owners of registered investment advisers, broker-dealer registered representatives, portfolio managers, financial planners (e.g., CFP), charterholders acting in an advisory capacity (e.g., CFA), CPAs or attorneys providing investment advisory services, research analysts whose opinions are marketed to investors, insurance producers or agents selling variable/registered products, and persons publishing paid investment recommendations or model portfolios.

61.     Excluded from each Class are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

62.     **Ascertainability:** Membership of the Class is defined based on objective criteria, and individual members will be identifiable from Defendants' records.

63.     **Numerosity:** The exact number of members of the Class is unknown and unavailable to Plaintiffs at this time, but individual joinder in this case is impracticable.  The Class likely consists of thousands of individuals, and their membership can be identified through Defendants' records.

---

[23]     Plaintiffs have defined the Class based on currently available information and hereby reserve the right to amend the definition of the Class, including, without limitation, the Class Period.

64.    **Predominant Common Questions:** The Class's claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members.  Common questions for the Class include, but are not limited to, the following:

a.    whether Meta approved, delivered, optimized, and/or monetized paid advertisements and related promotional content that impersonated financial professionals on Facebook, Instagram, and/or WhatsApp (including click-to-WhatsApp funnels);

b.    whether the challenged ads, pages, channels, and groups used Class members' names, images, likenesses, voices, credentials, or branding without consent;

c.    whether Meta's conduct constitutes false endorsement/association under the Lanham Act §43(a);

d.    whether Meta's conduct violates right-of-publicity/misappropriation laws (e.g., Cal. Civ. Code §3344 and common law; Fla. Stat. §540.08) and/or unfair and deceptive practices statutes (e.g., California Unfair Competition Law ("UCL"), FDUTPA);

e.    whether Meta breached its Terms of Service, Community Standards, and Advertising Policies by allowing impersonation, fraud, or deceptive practices.

f.    whether Meta was unjustly enriched by revenues from the impersonation ads and whether disgorgement/restitution is appropriate on a class-wide basis; and

g.    whether injunctive and declaratory relief requiring enhanced advertiser verification, proactive impersonation filtering, prompt takedowns, and related safeguards is appropriate for the Class as a whole.

65.    **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the proposed Class.  Plaintiffs and Class members' claims arise from the same course of conduct by Meta—namely, approving, delivering, optimizing, and monetizing paid impersonation ads and related WhatsApp funnels that misappropriated financial professionals' identities to promote securities.  Like all Class members, Plaintiffs were subjected to unauthorized use of their names, images, likenesses, voices, credentials, and professional personas.

66.    **Adequate Representation:** Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class.  They have retained competent counsel, who are

experienced in complex litigation and class actions, including privacy violations. Plaintiffs have no interest that is antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Class.

67.    **Substantial Benefits:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

68.    Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS

69.    California's substantive law applies to the claims of Plaintiffs and the Class. Meta's user agreements for Facebook, Instagram, and WhatsApp contain governing-law and forum-selection clauses (for U.S. users) that select California law and a California forum for disputes arising out of use of the services.

70.    By choosing California law for the resolution of disputes in the agreement, Meta concedes that it is appropriate for this Court to apply California law to the instant dispute.

71.    Further, California's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Class under the Due Process Clause, U.S. CONST. amend. XIV, §1, and the Full Faith and Credit Clause, U.S. CONST. art. IV, §1. California has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs and all Class members, thereby creating state interests that ensure that the choice of California state law is not arbitrary or unfair.

72.    Defendants' U.S. headquarters and principal place of business is in California. Defendants also own property and conduct substantial business in California. Therefore, California

has an interest in regulating Defendants' conduct under its laws. Defendants' decision to reside in California and avail itself of California's laws, and to engage in the challenged conduct from and emanating out of California, renders the application of California law to the claims herein constitutionally permissible.

73.    California is also the state from which Defendants' alleged misconduct emanated. This conduct similarly injured and affected Plaintiffs and all other Class members.

74.    The application of California laws to the Class is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiffs and the proposed Class, and California has a greater interest in applying its laws here than any other interested state.

## FRAUDULENT CONCEALMENT

75.    Any applicable limitation periods are tolled due to Defendants' concealment of their approval and optimization of impersonation ads and the identity of scam advertisers; by the ephemeral nature of WhatsApp broadcasts and ad accounts; and by the asymmetric information within Meta's exclusive custody (Ad Library incompleteness; internal enforcement logs). Plaintiffs acted diligently upon discovery of the impersonations and seek equitable tolling until Defendants produce the concealed data.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**False Endorsement/False Association**
**Lanham Act §43(a) - 15 U.S.C. §1125(a)**
**(On Behalf of Plaintiffs and the Class)**

76.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

77.    Plaintiffs and Class members are financial professionals who maintain goodwill, professional personas, and source-identifying attributes (including names, images, voices, credentials, and branding) that signify to consumers the source, sponsorship, or approval of advisory services and investment content.

78.     During the Class Period, Defendants, through Facebook, Instagram, and WhatsApp advertising and messaging products, published and disseminated paid advertisements and related promotional content that used Plaintiffs' and Class members' identities without consent, falsely suggesting that Plaintiffs and Class members sponsored, approved, were affiliated with, or endorsed the promoted investment opportunities, including, but not limited to, Pheton and other thinly-traded securities.

79.     The challenged impersonation ads and funnels were commercial advertising or promotion in interstate commerce: they were bought and paid for via Meta's ads platform; targeted users across state lines; and were designed to induce purchases of securities or related services.

80.     The use of Plaintiffs' and Class members' names, likenesses, voices, credentials, and professional branding in the challenged ads and WhatsApp channels was likely to cause, and did cause, consumer confusion, mistake, or deception as to the affiliation, connection, association, sponsorship, or approval of the advertised securities, promotions, groups, or services, within the meaning of 15 U.S.C. §1125(a)(1)(A).

81.     Defendants knew or should have known that the ads and related messaging misappropriated real financial professionals' identities and created a false impression of endorsement, including after receiving specific notice from state AGs, user complaints, and media reports concerning impersonation-driven investment schemes on the Platforms; nevertheless, Defendants approved, delivered, optimized, and monetized materially identical impersonation ads and click-to-WhatsApp funnels.

82.     Plaintiffs and Class members have suffered irreparable harm to their professional and brand reputations; goodwill; suffered diversion of prospective clients and business opportunities; client confusion and increased compliance risk; and have expended time and money on identity monitoring, initiating ad takedowns, and remediation efforts.  Plaintiffs and Class members have also suffered economic damages, including lost revenue and corrective advertising expenses to clear up client confusion and rebuild professional reputations.

83.    Defendants have been unjustly enriched by obtaining advertising revenues and other commercial benefits from the false-endorsement campaigns.  Defendants' conduct was willful and in bad faith, warranting enhanced and exemplary relief.

84.    Defendants' conduct constitutes false endorsement/association and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

85.    Pursuant to 15 U.S.C. §1116, Plaintiffs and the Class are entitled to injunctive relief, including but not limited to orders requiring Defendants to: (a) cease publishing, delivering, or optimizing advertisements or content that uses financial professionals' identities without verified consent; (b) implement advertiser identity verification for financial-promotion ads; (c) deploy pre-publication impersonation filters for ads that use personal names, headshots, voices, or professional credentials; (d) maintain effective notice-and-takedown and repeat-offender policies; and (e) undertake corrective notices to mitigate consumer confusion.

86.    Pursuant to 15 U.S.C. §1117(a), Plaintiffs and the Class seek Defendants' profits, actual damages (including the cost of corrective advertising), and costs of the action; and, because this is an exceptional case given Defendants' willful misconduct, reasonable attorneys' fees. Plaintiffs also seek pre- and post-judgment interest as allowed by law.

87.    Plaintiffs and the Class have no adequate remedy at law for the ongoing loss of control over their professional identities and goodwill.  They therefore request entry of appropriate equitable and injunctive relief to prevent further violations.

**SECOND CLAIM FOR RELIEF**
**Unfair Competition – Cal. Bus. & Prof. Code §17200, *et seq.***
**(On Behalf of Plaintiffs and the Class)**

88.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

89.    An "unlawful" business act is an act that violates some other law or regulation.[24] Thus, the "unlawful" prong of the UCL borrows violations of other laws and makes those unlawful

---

[24] *Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1383.

1    practices actionable under the UCL.[25]   Virtually any law or regulation—federal or state, statutory

2    or common law—can serve as the predicate for an "unlawful" business act claim under the UCL.[26]

3           90.    Here, Meta has engaged in unlawful business acts and practices within the meaning

4    of the UCL by failing to disclose Meta's platforms were misusing Plaintiffs' identities without their

5    consent.   Specifically, among other things, by approving, delivering, optimizing, and monetizing

6    paid impersonation advertisements and related promotional content that misappropriates financial

7    professionals' identities and falsely implies endorsement or affiliation.   These acts are "unlawful"

8    because they violate other laws that the UCL borrows and makes independently actionable,

9    including the Lanham Act §43(a), 15 U.S.C. §1125(a) (false endorsement/association), California's

10   statutory and common-law right of publicity (Cal. Civ. Code §3344), and, for subclass members as

11   pled, FDUTPA (Fla. Stat. §501.201 *et seq.*) and analogous state statutes.

12          91.    Meta also engaged in unlawful acts by violating its own Terms of Service,

13   Community Standards, and Advertising Policies that prohibit impersonation, fraud, and deceptive

14   practices—policies incorporated into user agreements and constituting enforceable promises—

15   while continuing to profit from the very ads these policies forbid.   Meta's violations are

16   independently actionable under the UCL's "unlawful" prong as predicate contract breaches and as

17   unfair/deceptive practices.

18          92.    Meta further engaged in unfair business acts and practices under any recognized test

19   of "unfairness":

20          (a) **Tethering test:** Meta's conduct contravenes the legislative policies embodied in Cal.

21   Civ. Code §3344, the Lanham Act, and state consumer-protection statutes that protect the public

22   and professionals from impersonation, false endorsement, and deception;

23          (b) **Balancing test:** The gravity of harm—widespread deception of investors, reputational

24   injury to licensed advisors, diversion of clients, and erosion of market integrity—far outweighs any

25   countervailing utility of Meta's challenged conduct; and

---

[25] *Id.*

[26] *Id.*

COMPLAINT

(c) **FTC/consumer-injury test:** The injury is substantial, not outweighed by benefits to consumers or competition, and not reasonably avoidable where Meta's paid ads and WhatsApp funnels masqueraded as authentic professional guidance.

93.     Meta also engaged in fraudulent business acts and practices.  Meta's publication and optimization of imposter professional endorsements and scripted WhatsApp funnels were likely to deceive reasonable consumers by falsely representing that real, licensed financial professionals sponsored or approved the promoted securities (including PTHL).  The deception was material and systematic, designed to induce immediate trading activity.

94.     Meta's misconduct persisted after notice, including the multi-state AGs notice and repeated complaints by impersonated professionals and users, yet materially identical ads and funnels reappeared.  Meta's continued publication and monetization of impersonation ads after such notice further supports liability under the UCL's unlawful, unfair, and fraudulent prongs.

95.     Plaintiffs and Class members lost money or property as a result of Meta's UCL violations, including, but not limited to: diversion of prospective clients and engagements; expenditures on mitigation, monitoring, takedowns, and corrective communications; brand and goodwill damage requiring paid remediation; and other business losses proximately caused by Meta's practices.

96.     The public interest is served by enjoining Meta's practices.  The impersonation-driven schemes undermine investor protection, the advisor-client relationship, and confidence in U.S. markets.  Injunctive relief will prevent ongoing and future harm to the public and to the professional community.

97.     Plaintiffs, individually and on behalf of the Class, seek all relief authorized by the UCL, including a public injunction requiring Meta to: (i) implement advertiser identity verification for financial-promotion ads; (ii) deploy pre-publication impersonation filters and human review for ads using personal names, headshots, voices, or professional credentials; (iii) enforce repeat-offender and prompt takedown protocols for impersonation content and click-to-WhatsApp funnels; (iv) issue corrective notices and improve Ad Library transparency for financial ads; and (v)

restitution/disgorgement of all monies wrongfully obtained by Meta from the challenged impersonation campaigns, with pre- and post-judgment interest and costs as permitted by law.

98.     Plaintiffs have no adequate remedy at law for the ongoing loss of control over their identities, goodwill, and client relationships and therefore request broad equitable and injunctive relief in addition to restitution to prevent further violations.

**THIRD CLAIM FOR RELIEF**
**Right of Publicity / Misappropriation of Name and Likeness**
**Cal. Civ. Code §3344 and California Common Law**
**(On Behalf of Plaintiffs and the Class)**

99.     Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

100.     Plaintiffs and Class members are financial professionals whose names, photographs, voices, credentials, branding, and professional personas carry commercial value and signify source, sponsorship, approval, and professional goodwill.

101.     During the Class Period, Defendants—through paid advertisements on Facebook and Instagram and related click-to-WhatsApp funnels and WhatsApp channels—knowingly used Plaintiffs' and Class members' names, images, likenesses, voices, credentials, and branding without consent for commercial purposes, including advertising and promoting securities, investment "groups," and related services.

102.     Defendants' unauthorized uses were directly connected to advertising or solicitation, including sponsored placements, ad creatives, landing flows, and admin-controlled WhatsApp broadcasts designed to induce users to transact in the promoted securities and to join fee-generating groups or services.

103.     Plaintiffs and Class members did not authorize any of the foregoing uses and did not consent to endorse, sponsor, or be affiliated with the promoted securities, groups, or services. Defendants' conduct misappropriated Plaintiffs' and Class members' identities and traded on their goodwill for Defendants' and third parties' commercial benefit.

104.     Defendants' conduct does not fall within any statutory or common law exception or defense, including Cal. Civ. Code §3344(d).     The challenged uses were paid commercial

- 25 -
COMPLAINT

advertisements and solicitations, not news, public affairs, sports broadcasts, or expressive works, and were not incidental or de minimis.

105.    As a direct and proximate result of Defendants' misappropriation, Plaintiffs and Class members have suffered injury, including loss of control over their identities, reputational and brand harm, diversion of clients and prospective business, increased compliance and regulatory risk, and expenditures for monitoring, takedowns, and corrective communications.  Defendants have been unjustly enriched by revenues and other benefits derived from the unauthorized uses.

106.    Defendants' violations were willful and intentional.  Defendants approved, delivered, optimized, and monetized materially identical impersonation ads and funnels after receiving notice from state AGs, victims, and public reporting, but nonetheless continued profiting from and disseminating the fraud campaigns despite repeated complaints.

107.    Defendants' conduct constitutes violations of Cal. Civ. Code §3344(a) and California common law misappropriation.

108.    Pursuant to Cal. Civ. Code §3344(a), Plaintiffs and the Class seek: (a) statutory damages (no less than $750 per violation under §3344); (b) actual damages, including corrective advertising costs; (c) Defendants' profits attributable to the violations; (d) punitive/exemplary damages for willful misconduct; and (e) costs and reasonable attorneys' fees as permitted by law, together with pre- and post-judgment interest.

109.    Plaintiffs and the Class further seek injunctive relief, including orders requiring Defendants to: (i) cease publishing, delivering, or optimizing advertisements and content that use financial professionals' identities without verified, written consent; (ii) implement advertiser identity verification and pre-publication impersonation filters for ads using personal names, headshots, voices, or professional credentials; (iii) enforce repeat-offender and prompt takedown protocols; and (iv) issue corrective notices sufficient to dispel confusion and mitigate ongoing harm. Plaintiffs and the Class have no adequate remedy at law for the continued loss of control over their identities and goodwill.

**FOURTH CLAIM FOR RELIEF**
**Right of Publicity / Misappropriation of Name or Likeness**
**Fla. Stat. §540.08 (Florida Subclass)**

110.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

111.    Plaintiffs and the Florida Subclass members are financial professionals whose names, portraits/photographs, voices, credentials, branding, and professional personas have independent commercial value and signify source, sponsorship, approval, and professional goodwill in the marketplace.

112.    During the Class Period, Defendants—through paid advertisements on Facebook and Instagram and related click-to-WhatsApp funnels and WhatsApp channels—knowingly used and published Florida Subclass members' names, portraits/photographs, likenesses, voices, credentials, and branding for purposes of trade and advertising without consent, including to promote securities, "investment groups," and related services such as the Pheton scheme.

113.    Defendants' challenged uses were commercial in nature and directly connected to advertising or solicitation, including sponsored placements, ad creatives, landing flows, "admin-only" broadcast channels, and scripted direct messages designed to induce users to transact and to join fee-generating groups—activities squarely within Fla. Stat. §540.08(1)'s prohibition on publishing a person's name or likeness for trade or advertising purposes without consent.

114.    Plaintiffs and the Florida Subclass members did not authorize any such uses and did not consent to endorse, sponsor, or be affiliated with the promoted securities, groups, or services. Defendants' conduct misappropriated their identities and traded on their goodwill for Defendants' and third parties' commercial benefit.

115.    No statutory exception applies.  The challenged uses were paid commercial advertisements and solicitations, not news reporting, public-affairs coverage, or incidental uses protected by Fla. Stat. §540.08(3).  Nor were they part of an expressive work or transformative use; they were straightforward marketing and sales inducements.

116.    Defendants acted willfully and intentionally, continuing to approve, deliver, optimize, and monetize materially identical impersonation ads and funnels after receiving notice from state AGs, impersonated professionals, and users that such ads and WhatsApp channels were exploiting real advisors' identities.

117.    As a direct and proximate result of Defendants' violations of Fla. Stat. §540.08, Plaintiffs and the Florida Subclass have suffered injury, including (a) loss of control over their names and likenesses; (b) reputational and brand harm; (c) diversion of clients and prospective business; (d) increased compliance and regulatory risk; and (e) out-of-pocket expenditures for monitoring, takedowns, and corrective communications.  Defendants have been unjustly enriched by advertising revenues and related benefits derived from the unauthorized impersonations.

118.    Pursuant to Fla. Stat. §540.08, Plaintiffs and the Florida Subclass seek injunctive relief enjoining Defendants from publishing, delivering, optimizing, or otherwise using financial professionals' names, portraits/photographs, voices, likenesses, or credentials for trade or advertising purposes without verified, written consent; and requiring Defendants to implement advertiser identity verification, pre-publication impersonation filters for ads using personal identifiers, robust notice-and-takedown and repeat-offender policies, and corrective notices sufficient to dispel confusion.

119.    Plaintiffs and the Florida Subclass further seek damages for losses and injuries resulting from the unauthorized uses, including actual damages and an amount that would have been a reasonable royalty for lawful licensing of their identities, together with disgorgement of profits attributable to the violations, punitive/exemplary damages for willful misconduct as permitted by law, and costs.  Plaintiffs also seek pre- and post-judgment interest.

120.    Plaintiffs and the Florida Subclass have no adequate remedy at law for the continuing loss of control over their identities and goodwill and therefore request entry of appropriate equitable and injunctive relief in addition to monetary relief.

### FIFTH CLAIM FOR RELIEF
### Unjust Enrichment/Restitution

121.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

122.    Through the approval, delivery, optimization, and monetization of paid impersonation advertisements and related click-to-WhatsApp funnels that misappropriated financial professionals' identities and falsely suggested their endorsement or affiliation, Defendants received and retained monetary benefits—including advertising fees, increased engagement/traffic, data-monetization value, and associated revenues—at the expense of Plaintiffs and the Class.

123.    These benefits were conferred upon Defendants by virtue of the unauthorized use of Plaintiffs' and Class members' names, images, likenesses, voices, credentials, and professional personas in commercial promotions disseminated across Defendants' platforms, and by the resulting diversion of investor attention and business opportunities premised on that misappropriation and false endorsement.

124.    Defendants' retention of these benefits is unjust and inequitable because the revenues were generated by unlawful and deceptive campaigns that violated Plaintiffs' statutory and common-law rights (including false endorsement and right of publicity), contravened Defendants' own Terms, Community Standards, and Advertising Policies, and persisted after Defendants had notice—from AGs, victims, and public reporting—of impersonation-driven investment scams on their platforms.

125.    Equity and good conscience require that Defendants disgorge all sums unjustly obtained from the challenged impersonation campaigns and any appreciation, proceeds, or other traceable benefits derived therefrom, and that such amounts be restored to Plaintiffs and the Class or held in constructive trust for their benefit.

126.    The measure of restitution includes, without limitation: (a) advertising fees and other direct revenues paid to Defendants for the impersonation ads and funnels; (b) the value of incremental impressions, clicks, conversions, and data harvested from those campaigns; and (c) any downstream monetization reasonably attributable to the impersonation-driven engagement.

127.    Plaintiffs and the Class lack an adequate remedy at law for Defendants' unjust retention of these benefits because legal damages do not fully address Defendants' wrongful enrichment, the loss of control over Plaintiffs' identities and goodwill, or the public interest in preventing platforms from profiting from impersonation-based fraud.

128.    Accordingly, Plaintiffs and the Class seek restitution and disgorgement of all monies and benefits unjustly retained by Defendants, the imposition of a constructive trust over such funds, accounting as necessary to identify and quantify the ill-gotten gains, pre- and post-judgment interest, and such other equitable relief as the Court deems just and proper (including public-injunctive measures to prevent further unjust enrichment from impersonation advertising).

### SIXTH CLAIM FOR RELIEF
**Breach of Contract**
**On Behalf of Plaintiffs and a User Subclass**

129.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

130.    Plaintiffs and members of a User Subclass (financial professionals who maintained Facebook, Instagram, and/or WhatsApp accounts during the Class Period) entered into binding agreements with Meta (the Terms of Service/Use and incorporated Community Standards, Advertising Standards, and related platform policies).  Under those agreements, Meta prohibits impersonation, fraud, and deceptive practices, represents that it will remove or restrict content, accounts, and advertisements that violate those rules, and provides reporting mechanisms for enforcement.

131.    Meta breached its contractual obligations by approving, delivering, optimizing, and monetizing paid impersonation advertisements and related click-to-WhatsApp funnels that used Plaintiffs' and Class members' names, images, likenesses, voices, credentials, and branding without consent; by failing to remove or timely restrict the challenged ads, pages, channels, and groups after notice (including regulatory notice from state Attorneys General and user reports); and by systematically under-enforcing the very impersonation and anti-fraud policies Meta incorporates into its contracts with users.

132.     Meta also breached the implied covenant of good faith and fair dealing by exercising its contractual discretion (over ad review, delivery, enforcement, and repeat-offender controls) in a manner that unfairly frustrated Plaintiffs' and the User Subclass's reasonable contractual expectations—namely, that Meta would not publish paid ads impersonating them, would police prohibited deception, and would not profit from misappropriations of their identities on Meta's own advertising and messaging products.

133.     As a direct and proximate result of Meta's breaches, Plaintiffs and the User Subclass suffered damages, including loss of goodwill and professional brand value; diversion of clients and prospective business; time and expense spent on monitoring, takedowns, and corrective communications; and other business injuries.   Plaintiffs also face ongoing risk of renewed impersonation absent injunctive relief.  In addition, Meta obtained revenues and other benefits from the challenged campaigns that would not have accrued but for its contractual breaches.

134.     Plaintiffs and the User Subclass have performed all conditions precedent or their performance has been excused.  Any contractual limitations or disclaimers asserted by Meta are unconscionable, inapplicable to willful policy violations, or otherwise unenforceable as to the misconduct alleged.

135.     Plaintiffs, on behalf of themselves and the User Subclass, seek: (a) compensatory damages; (b) specific performance/injunctive relief requiring Meta to implement advertiser identity verification for financial-promotion ads, pre-publication impersonation filters for ads using personal identifiers (names, headshots, voices, credentials), robust repeat-offender and prompt takedown protocols, and corrective notices; (c) restitution/disgorgement of benefits Meta obtained as a result of its breaches; (d) pre- and post-judgment interest; and (e) costs and any other relief the Court deems just and proper.

COMPLAINT

**SEVENTH CLAIM FOR RELIEF**
**Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**
**Fla. Stat. §501.201 *et seq.***
**(Asserted on behalf of Plaintiffs and Florida Subclass)**

136.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

137.    Plaintiffs and members of the Florida Subclass are "persons" within the meaning of Fla. Stat. §501.203(7) who, during the Class Period, maintained professional presences on Facebook, Instagram, and/or WhatsApp and were harmed in trade or commerce by Defendants' acts and practices.

138.    Defendants engaged in trade or commerce within the meaning of Fla. Stat. §501.203(8) by selling, delivering, optimizing, and monetizing paid advertisements and related promotional content on Facebook and/or Instagram (including click-to-WhatsApp funnels) to users in Florida and by operating WhatsApp channels used to solicit Florida users.

139.    Defendants committed unfair or deceptive acts or practices in violation of Fla. Stat. §501.204(1), including but not limited to:

a.    approving, delivering, optimizing, and monetizing paid advertisements that impersonated Florida Subclass members and falsely suggested their sponsorship, approval, or affiliation with securities promotions (including PTHL);

b.    publishing and amplifying promotional content that misappropriated the Florida Subclass members' names, images, likenesses, voices, credentials, and branding without consent;

c.    representing through Terms, Community Standards, and Advertising Policies that impersonation and deceptive ads are prohibited and will be removed, while failing to enforce those rules and continuing to profit from the very conduct those rules forbid; and

d.    continuing the foregoing practices after notice from state AGs, victims, and public reporting that impersonation-driven financial scams were operating on the Platforms.

140.    These acts and practices are deceptive because they are likely to mislead reasonable consumers into believing that real, licensed financial professionals endorse or are affiliated with the

promoted securities and groups, and are unfair because the resulting injuries to consumers and to the Florida Subclass are substantial, not outweighed by countervailing benefits, and not reasonably avoidable.

141.    Defendants' FDUTPA violations proximately caused injury to Plaintiffs and the Florida Subclass, including actual damages such as: loss of goodwill and professional brand value; diversion of clients and prospective engagements; lost revenue and opportunities; and out-of-pocket costs for monitoring, takedowns, and corrective communications.

142.    Plaintiffs and the Florida Subclass also face ongoing risk of renewed impersonation and deception absent court-ordered changes to Defendants' ad verification, review, and enforcement practices.

143.    Pursuant to Fla. Stat. §501.211(1), Plaintiffs and the Florida Subclass seek injunctive and declaratory relief to enjoin Defendants' unfair and deceptive practices, including orders requiring: (a) advertiser identity verification for financial-promotion ads; (b) pre-publication impersonation filters and human review for ads using personal identifiers (names, headshots, voices, credentials); (c) robust repeat-offender and prompt takedown protocols for impersonation content and click-to-WhatsApp funnels; and (d) corrective notices to mitigate confusion.

144.    Pursuant to Fla. Stat. §501.211(2), Plaintiffs and the Florida Subclass seek actual damages caused by Defendants' FDUTPA violations, together with pre- and post-judgment interest.

145.    Under Fla. Stat. §501.2105, Plaintiffs and the Florida Subclass are entitled to an award of reasonable attorneys' fees and costs as prevailing parties.

146.    Plaintiffs and the Florida Subclass have no adequate remedy at law for the continued loss of control over their identities, goodwill, and client relationships and therefore request the equitable and injunctive relief described above in addition to monetary relief.

COMPLAINT

**EIGHTH CLAIM FOR RELIEF**
**Violation of the Declaratory Judgment Act**
**28 U.S.C. §2201, *et seq.***
**(On Behalf of Plaintiffs and the Class)**

147.    Under the Declaratory Judgment Act, 28 U.S.C. §2201, this Court is authorized to declare the rights and legal relations of the parties and to grant further necessary relief pursuant to 28 U.S.C. §2202.  The Court also has broad equitable authority to restrain ongoing torts and violations of federal and state law described in this Complaint.

148.    An actual, justiciable controversy exists regarding Defendants' approval, delivery, optimization, and monetization of paid impersonation advertisements and related click-to-WhatsApp funnels that misappropriate financial professionals' identities and falsely suggest endorsement/affiliation—conduct alleged herein to violate, *inter alia*, Lanham Act §43(a), 15 U.S.C. §1125(a), California Right of Publicity (Cal. Civ. Code §3344 and common law), FDUTPA (Fla. Stat. §501.201 *et seq.*), Fla. Stat. § 540.08, California's Unfair Competition Law (Cal. Bus. & Prof. Code §17200 *et seq.*), and contractual obligations arising from Meta's Terms and incorporated policies.

149.    Plaintiffs and Class members continue to suffer injury—including ongoing loss of control over their identities, reputational and brand harm, client confusion and diversion, increased compliance risk, and recurring mitigation costs—because materially similar impersonation ads and funnels persist or are reasonably likely to recur absent judicial relief.  Defendants have continued or will continue to profit from such campaigns unless enjoined.

150.    Pursuant to 28 U.S.C. §2201, the Court should enter a declaration that, among other things:

a.    Defendants' publication and monetization of paid advertisements and related content that use financial professionals' names, images, likenesses, voices, credentials, or branding without consent and that falsely imply endorsement/affiliation violate Lanham Act §43(a), Cal. Civ. Code §3344/common law, Fla. Stat. §540.08, and constitute unlawful, unfair, and/or fraudulent practices under the UCL;

b.    Defendants' failure to enforce their Terms, Community Standards, and Advertising Policies—after notice from state AGs, victims, and public reporting—constitutes breach of contractual promises to users and/or a breach of the implied covenant of good faith and fair dealing; and

c.    Defendants' ongoing and threatened conduct causes and will continue to cause harm to Plaintiffs and the Class.

151.    The Court should also award corresponding injunctive relief under 28 U.S.C. §2202 and the Court's equitable powers, requiring Defendants to: (i) cease publishing, delivering, optimizing, or monetizing advertisements or content that use financial professionals' identities without verified, written consent; (ii) implement advertiser identity verification for financial-promotion ads; (iii) deploy pre-publication impersonation filters and enhanced human review for ads using personal identifiers (names, headshots, voices, credentials, firm logos); (iv) enforce prompt takedown and repeat-offender policies for impersonation content and related click-to-WhatsApp funnels; and (v) issue corrective notices to mitigate confusion.

152.    Absent a declaration and injunction, Plaintiffs and the Class will suffer irreparable injury—including continuing loss of control over their identities and goodwill, erosion of client trust, and market-wide confusion—for which no adequate remedy at law exists.

153.    The balance of hardships favors Plaintiffs and the Class: the burden on Defendants to comply with governing law and their own stated policies (through identity verification, filtering, and enforcement) is minimal compared to the substantial harm to professionals and investors caused by impersonation-driven schemes.

154.    A declaratory judgment and injunction will serve the public interest by protecting the advisor-client relationship, promoting truthful advertising, reducing investor deception, and supporting market integrity by preventing platforms from facilitating or profiting from impersonation-based financial scams.

155.    Plaintiffs therefore respectfully request a declaration consistent with the foregoing and further necessary relief under 28 U.S.C. §2202, including the public-injunctive measures described above, together with such other and further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and the proposed Class respectfully request that the Court enter an order:

A.      certifying this case as a class action on behalf of the Class defined above, appointing Plaintiffs as representatives of the Class, and appointing their counsel as class counsel;

B.      declaring that Defendants' actions, as set out above, violate the Lanham Act;

C.      declaring that Defendants' actions, as set out above, violate California's Business & Professions Code cited herein;

D.      declaring that Defendants' actions, as set out above, violate California's and Florida's right of publicity laws;

E.      declaring that Defendants' actions, as set out above, breached contractual obligations and the implied covenant of good faith and fair dealing;

F.      requiring Defendants to cease publishing, delivering, optimizing, or monetizing any advertisement or content that uses a financial professional's name, image, likeness, voice, credentials, branding, or persona without verified, written consent;;

G.      awarding damages, including nominal, statutory, and punitive damages where applicable, to Plaintiffs and the Class in the amount to be determined at trial;

H.      awarding Plaintiffs and the Class their costs of suit, including reasonable attorneys' and experts' fees and expenses;

I.      awarding Plaintiffs and the Class pre-and post-judgment interest, to the extent allowable;

J.      awarding such other further injunctive and declaratory relief as is necessary to protect the interests of Plaintiffs and the Class; and

K.      awarding such other and further relief as the Court deems reasonable and just.

1

## DEMAND FOR JURY TRIAL

2        Plaintiffs demand a trial by jury for all issues so triable.

3    Dated:  October 7, 2025                    **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

4                                               /s/ John T. Jasnoch
                                                John T. Jasnoch (CA 281605)
5                                               600 W. Broadway, Suite 3300
                                                San Diego, CA 92101
6                                               Tel.: 619-233-4565
                                                Fax: 619-233-0508
7                                               jjasnoch@scott-scott.com

8                                               Tom Grady (*pro hac vice forthcoming*)
                                                **GradyLaw**
9                                               720 Fifth Avenue South, Suite 200
                                                Naples, Florida 34102
10                                              tgrady@gradylaw.com

11                                              *Counsel for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28