John T. Jasnoch (CA 281605)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: 619-233-4565
Fax: 619-233-0508
jjasnoch@scott-scott.com

*Counsel for Plaintiffs*

[Additional counsel on signature page.]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| JOHN SUDDETH and SARA PERKINS, | Case No. 5:25-cv-08581 |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| v. | |
| META PLATFORMS, INC., INSTAGRAM, LLC, FACEBOOK OPERATIONS, LLC, and WHATSAPP, LLC, | |
| Defendants. | |

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................... 1

I.      STATEMENT OF ISSUES TO BE DECIDED ........................................ 1

II.     STATEMENT OF FACTS........................................................................ 1

III.    LEGAL STANDARD .............................................................................. 3

IV.     ARGUMENT ........................................................................................... 3

        A.      Section 230 Does Not Bar Plaintiffs' Claims................................. 3

        B.      Plaintiffs' Claims Are Adequately Alleged.................................... 9

        C.      Leave to Amend Should be Freely Given ..................................... 24

CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdul-Jabbar v. Gen. Motors Corp.*,
  85 F.3d 407 (9th Cir. 1996)..................................................................................................11

*Allen v. National Video, Inc.*,
  610 F. Supp. 612 (S.D.N.Y. 1985)........................................................................................10

*Anderson v. TikTok, Inc.*,
  116 F.4th 180 (3d Cir. 2024)..........................................................................................4, 6, 7

*Anthony v. Yahoo*,
  421 F. Supp. 2d 1257 (N.D. Cal 2006) ..............................................................................8, 18

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................................3

*Astiana v. Hain Celestial Grp., Inc.*,
  783 F.3d 753 (9th Cir. 2015)...................................................................................................22

*Barnes v. Yahoo! Inc.*,
  570 F.3d 1096 (9th Cir. 2009)..............................................................................................4, 5

*Calise v. Meta Platforms, Inc.*,
  103 F.4th 732 (9th Cir. 2024) (R. Nelson, J., concurring) ................................................. *passim*

*Cappello v. Walmart Inc.*,
  394 F. Supp. 3d 1015 (N.D. Cal. 2019) .................................................................................15

*Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*,
  169 So.3d 164 (Fla. Dist. Ct. App. 2015)................................................................................18

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
  20 Cal. 4th 163 (1999)......................................................................................................14, 16

*Comunale v. Traders & Gen. Ins. Co.*,
  50 Cal. 2d 654 (1958)..............................................................................................................21

*Doe v. Internet Brands, Inc.*,
  824 F.3d 846 (9th Cir. 2016)..............................................................................................4, 6

*Downing v. Abercrombie & Fitch*,
  265 F.3d 994 (9th Cir. 2001)..............................................................................................10, 11

*Eastwood v. Superior Court*,
  149 Cal. App. 3d 409 (Ct. App. 1983) ...................................................................................12

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) (en banc)....................................................................................8, 9

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
   76 F.3d 259 (9th Cir. 1996)...............................................................................................................10

*Forrest v. Meta Platforms, Inc.*,
   737 F. Supp. 3d 808 (N.D. Cal. June 17, 2024) ............................................................3, 7, 13

*Fraley v. Facebook, Inc.*,
   830 F. Supp. 2d 785 (N.D. Cal. 2011) ..........................................................................................4

*FTC v. LeadClick Media, LLC*,
   838 F.3d 158 (2d Cir. 2016)..............................................................................................................8

*Guz v. Bechtel Nat'l Inc.*,
   24 Cal. 4th 317 (2000)........................................................................................................................21

*Lectrodryer v. SeoulBank*,
   77 Cal. App. 4th 723 (2000)........................................................................................................22, 23

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ............................................................................................................................12

*Lona's Lil Eats, LLC v. DoorDash, Inc.*,
   2021 WL 151978 (N.D. Cal. Jan. 18, 2021) ............................................................................16

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*,
   658 F.3d 936 (9th Cir. 2011)............................................................................................................10

*McQuirk v. Donnelley*,
   189 F.3d 793 (9th Cir. 1999)............................................................................................................21

*Newcombe v. Adolf Coors Co.*,
   157 F.3d 686 (9th Cir. 1998)............................................................................................................12

*Oasis W. Realty, LLC v. Goldman*,
   51 Cal. 4th 811 (2011)........................................................................................................................19

*Sands v. Wynn Las Vegas, LLC*,
   2010 WL 2348633 (D. Nev. June 9, 2010) ..............................................................................23

*Siino v. Foresters Life Ins. & Annuity Co.*,
   133 F.4th 936 (9th Cir. 2025)..........................................................................................................23

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011).............................................................................................................3

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
   240 F.3d 832 (9th Cir. 2001)............................................................................................................11

*TracFone Wireless, Inc. v. GSM Grp., Inc.*,
555 F. Supp. 2d 1331 (S.D. Fla. 2008)....................................................................................19

*U-Haul Int'l, Inc. v. Jartran, Inc.*,
793 F.2d 1034 (9th Cir. 1986)................................................................................................12

*Waits v. Frito-Lay, Inc.*,
978 F.2d 1093 (9th Cir. 1992)..............................................................................................9, 11

**Statutes**

15 U.S.C. § 1125(a)............................................................................................................ *passim*

28 U.S.C. §2201 .......................................................................................................................23

47 U.S.C. §230

(e)(2)................................................................................................................................3, 8

(f)(3) ....................................................................................................................................7

Cal. Civ. Code §3344 ....................................................................................................12, 14, 15

(a) .....................................................................................................................................14

(a)(1) .................................................................................................................................13

Fla. Stat. §501.204(1) ...............................................................................................................17

Fla. Stat. §540.08......................................................................................................................12

(1) .....................................................................................................................................13

(3) .....................................................................................................................................14

Fla. Stat. §501.201....................................................................................................................17

**Other Authorities**

Jeff Horwitz, *Meta created 'playbook' to fend off pressures to crack down on
scammers, documents show*, REUTERS (Dec. 31, 2025)........................................................25

Jeff Horwitz, *Meta is earning a fortune on a deluge of fraudulent ads, documents
show*, REUTERS (Nov. 6, 2025) ...........................................................................................25

Jeff Horwitz, *Meta's "Trusted Experts" helped me run scam ads on Facebook and
Instagram*, REUTERS (Dec. 15, 2025)..................................................................................25

Jeff Horwitz, Meta tolerates rampant ad fraud from China to safeguard billions in revenue,
REUTERS (Dec. 15, 2025)....................................................................................................25

Plaintiffs John Suddeth and Sara Perkins ("Plaintiffs") respectfully submit their opposition to Defendants Meta Platforms, Inc. ("Meta"), Instagram, LLC ("Instagram"), Facebook Operations, LLC ("Facebook"), and WhatsApp, LLC's ("WhatsApp") (collectively, the "Defendants") Motion to Dismiss (the "Motion" or "Mot.") (ECF No. 29).

### INTRODUCTION

This case arises from an epidemic of impersonation scams on Meta's social media platforms, in which fraudsters used Plaintiffs' identities, including their names, likenesses, and professional credentials, in paid advertisements to lend credibility to fraudulent investment schemes. Meta both profited from these impersonation ads and actively enabled them. It approved the ads, targeted them to users, and ignored red flags despite its own policies forbidding such impersonation. Meta continued running these scam ads even after 42 state Attorneys General ("AGs") urged it to act. As a result, Plaintiffs suffered serious harm to their professional reputations and businesses.

Meta now seeks dismissal by invoking Section 230 of the Communications Decency Act. However, Section 230 provides no immunity for Meta's own misconduct in actively facilitating these unlawful ads. Moreover, Plaintiffs' claims involve the unauthorized commercial use of their personas and false endorsements, which fall outside Section 230's protections. Because the Complaint's well-pleaded allegations show that Meta knowingly aided these scams for profit, the motion to dismiss should be denied.

### I.    STATEMENT OF ISSUES TO BE DECIDED

The issues to be decided are whether Plaintiffs sufficiently alleged facts, taken as true with all reasonable inferences drawn in their favor, to state claims for relief in the Complaint[1].

### II.    STATEMENT OF FACTS

Plaintiffs John Suddeth and Sara Perkins are licensed financial professionals with established reputations in the investment community. ¶¶37-38, 42. Beginning in 2023, fraudsters unleashed a wave of "impersonation" ads on Meta's platforms, targeting users nationwide. ¶¶1-2, 6. These sponsored Facebook and Instagram advertisements featured the names, photos, and credentials of

---

[1]    All references to the Complaint are hereafter indicated by "¶" or "¶¶" and the cited paragraph(s) therein.

OPPOSITION TO MOTION TO DISMISS

real investment advisors to lend credibility to fraudulent stock schemes. ¶¶1-2, 43. The ads typically urged viewers to join a WhatsApp chat or group for an "investment opportunity," implying that the trusted professional would be providing guidance there. ¶¶2, 39. In reality, those WhatsApp groups were run by scammers to promote fraudulent investment schemes. ¶¶1-2.

Plaintiffs never consented to the use of their identities in any advertisements or promotions on Meta's platforms. ¶44. The impersonation ads were designed to confuse: by incorporating Plaintiffs' likenesses and professional titles, the ads falsely suggested that Plaintiffs themselves were vouching for the investment. ¶¶2, 4. As a result Plaintiffs suffered loss of business opportunities, saw client trust erode, and were forced to spend time and money on damage control. ¶82.

Meta played an integral role in this scheme. Meta operates one of the world's largest digital advertising networks, comprised of Facebook, Instagram, and WhatsApp. Meta's Ads Manager tools allow advertisers to micro-target users based on personal data, and Meta earns revenue for every ad displayed. ¶¶17-18. Here, scammers took full advantage. They paid Meta to push the impersonation ads to millions of users, and Meta's algorithms delivered these ads broadly "to millions of U.S. users," generating "substantial advertising revenues" for Meta. ¶6. Meta had both the ability and the contractual right to stop such ads, and its own policies forbid impersonation and deceptive marketing. ¶¶19, 24, 58, 91, 124, 130-31. Yet Meta approved the ads and left them running even after users reported them as scams. ¶¶3, 22, 94. Meta would remove a fraudulent ad or ban a scam account, only to allow the same illicit content to resurface via a new account or slightly tweaked ad. Meta's under-enforcement was no accident. Meta had strong financial incentives to turn a blind eye. Internal and external reports indicate that for years Meta resisted cracking down on lucrative scam ads, even instructing employees to "ignore violations" by certain high-spending advertisers. ¶¶28-29. In mid-2025, 42 AGs across the U.S. formally urged Meta to take action against these investment scam ads. ¶31. Meta, however, continued business as usual. In July 2025, even after the AG warning, Plaintiffs' identities were still being misused in materially identical Facebook ads and WhatsApp "funnel" groups. ¶32. Every instance of Meta's ad delivery and amplification was an "unauthorized commercial use" of Plaintiffs' personas, a "false endorsement," and a violation of Meta's assurances to its users and the public. ¶5.

OPPOSITION TO MOTION TO DISMISS

Meta monetized the trust that Plaintiffs had built with the public by selling that trust to scammers.  ¶¶29, 103.  Plaintiffs and the class members—whose professional identities carry goodwill and market value—saw that value exploited without their permission.  ¶¶100-101. Consequently, Plaintiffs and class members have experienced significant, ongoing harm.  ¶105.

## III.    LEGAL STANDARD

At this stage, the Complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  Plaintiffs do not need to substantiate their claims at this point in the litigation, and Plaintiffs' Complaint "may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im* plausible [sic]." *Starr v. Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011).

## IV.    ARGUMENT

### A.    Section 230 Does Not Bar Plaintiffs' Claims

#### 1.    Meta's Status as an ICS Provider Does Not Provide Blanket Immunity

That Meta operates an "interactive computer service" ("ICS") platform (Facebook/Instagram/WhatsApp) is not a license for Meta to ignore or facilitate illegal activity.  ¶58. Section 230 was meant to encourage service providers to police objectionable content in good faith, not to give them an all-purpose escape hatch to profit from harmful content.  *Calise v. Meta Platforms, Inc.,* 103 F.4th 732, 747 (9th Cir. 2024) (R. Nelson, J., concurring) (warning that broad Section 230 immunity, when a platform has economic incentives to tolerate unlawful content, encourages "willful blindness" rather than good-faith policing).  As the Ninth Circuit cautioned, Section 230 immunity "is not limitless." *Id.* at 736.  The statute itself contains important limitations. For example, it does not apply to federal intellectual property claims (47 U.S.C. §230(e)(2)) or to enforcement of a platform's own contractual obligations.  Thus, while Meta may be an ICS provider, it cannot use Section 230 as an impenetrable shield against liability for the specific misconduct alleged here. *Calise*, 103 F.4th at 736 (*quoting Barnes v. Yahoo! Inc.,* 570 F.3d 1096, 1100 (9th Cir. 2009)); *Forrest v. Meta Platforms, Inc.,* 737 F. Supp. 3d 808, 816 (N.D. Cal. June 17, 2024) (Section

- 3 –

230 is an affirmative defense, and a complaint should not be dismissed at 12(b)(6) unless the defendant shows an "airtight" immunity).

This lawsuit does not treat Defendants as mere publishers of third-party content. ¶58; *Doe v. Internet Brands, Inc.,* 824 F.3d 846, 851 (9th Cir. 2016) (holding that Section 230 did not bar a claim where imposing liability would not treat the website as the "publisher or speaker" of content provided by another). Plaintiffs' claims target Meta's affirmative acts and omissions, which go well beyond the role of a passive publisher. ¶¶17-20, 28-34, 40, 43, 46, 57-58. In *Hepp v. Facebook*, the Third Circuit held that the "intellectual property limitation to immunity under CDA" applies to state right of publicity laws. 14 F.4th 204, 204 (3d Cir. 2021). The court determined that a newscaster's statutory right-of-publicity claim arose under a law "pertaining to intellectual property," placing it within Section 230(e)(2)'s carve-out and outside Section 230's immunity. *Id*. at 210-11 (state-law right of publicity claim "pertain[s] to intellectual property" and thus is not barred by Section 230's immunity). Likewise, courts have found that a website is not immune when it violates someone's publicity or privacy rights by using their image. For example, in the Facebook "Sponsored Stories" case, the court held that Facebook could be treated as a content creator of ads that used users' names and likenesses without consent, and thus was "not at this stage entitled to CDA immunity." *Fraley v. Facebook, Inc.,* 830 F. Supp. 2d 785, 802 (N.D. Cal. 2011). This is especially true where the platform actively profits from the misuse of someone's identity. Accordingly, Section 230 offers no shield against publicity-rights claims where the platform itself actively curates and monetizes the use of Plaintiffs' likenesses.

**2.      Plaintiffs Do Not Seek to Treat Meta as a "Publisher or Speaker"**

Section 230 immunity applies only if a claim would require treating the defendant as the publisher or speaker of information provided by someone else. In other words, the claim must be premised on the defendant's editorial decisions (e.g., whether to publish, withdraw, or alter content). *Barnes,* 570 F.3d at 1101-1102. Here, Plaintiffs' claims do not fit that description. Plaintiffs are not suing Defendants for failing to remove someone else's content or for merely allowing third-party speech on its platform. Rather, Plaintiffs seek to hold Meta liable for its own conduct and promises in connection with the fake ads. ¶¶19-20, 28-34, 40, 43, 46, 57-58. *Anderson v. TikTok, Inc.,* 116

- 4 –

F.4th 180 (3d Cir. 2024).  As the Ninth Circuit explained in *Calise*, Section 230 did not shield Meta from a breach-of-contract claim because that claim arises from Meta's own promises in terms of service rather than from its role as a publisher of third-party content.  103 F.4th at 742-743.

Several of Plaintiffs' claims are based on Meta's own undertakings and misrepresentations, rather than on any editorial function.  For example, the breach of contract claim alleges that Meta violated duties it assumed under its Terms of Service and related policies.  ¶¶130-131.  Meta expressly promised users (including Plaintiffs) that it "prohibits impersonation, fraud, and deceptive practices" on its platforms and that it will "remove or restrict content, accounts, and advertisements that violate those rules."  ¶130.  Meta broke that promise by allowing, and profiting from, the very conduct it had agreed to prevent, and Plaintiffs seek to hold Meta accountable for that breach.  Enforcing Meta's contractual promises does not treat Meta as a "publisher" of someone else's content.  It treats Meta as a party who failed to do what it promised to do.  Section 230 does not immunize such claims.  *Calise*, 103 F.4th at 742 (holding that Section 230(c)(1) "does not apply" to the platform's breach-of-contract and related covenant claims, because the duty at issue stems from the platform's own promises rather than its role as a publisher of third-party content).  In *Barnes,* the Ninth Circuit recognized that if a platform makes a specific promise to a user (in *Barnes*, a promise to remove certain material, and here, a promise to police impersonation and fraud), a claim for breaching that promise "would not treat [the defendant] as a publisher or speaker of third-party content".  570 F.3d at 1107-08 (platform's promise to remove content gave rise to an enforceable obligation not barred by Section 230).  Thus, Plaintiffs' contract-based claims are not barred by Section 230.

Similarly, Plaintiffs' statutory consumer protection claims (under California's Unfair Competition Law ("UCL") and Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA")) are not premised on Meta's role as a mere publisher either.  These claims are based on Meta's own business practices, specifically its misrepresentations and omissions about platform safety and its failure to combat known scams.  ¶¶19-20, 28-34, 40, 43, 46, 57-58.  For instance, Meta's Terms and public statements gave users a false sense of security that impersonation and fraud were vigorously combated.  ¶¶3, 19, 24.  In reality, Meta allowed imposter ads to proliferate unchecked.  ¶¶3, 6, 22-

OPPOSITION TO MOTION TO DISMISS

23, 28-34, 40, 43, 46, 57-58. The UCL's "fraudulent" prong focuses on Meta's deceptive conduct. This theory does not treat Meta as the speaker of the scam ads; instead, it treats Meta as the party that misled users about the platform's protections. Similarly, the UCL's "unlawful" prong is tethered to Meta's violations of duties under various laws (Lanham Act, publicity rights, etc.) and its breaches of contract. Enforcing these duties holds Meta accountable for its own conduct, not for the scammers' speech. Plaintiffs are not suing Meta for simply hosting third-party content. They are suing Meta for purposefully or knowingly allowing and profiting from a scheme that Meta had the ability (and duty) to prevent. ¶¶ 3, 5-6, 22-23, 28-34, 40, 43, 46, 57-58; *Anderson*, 116 F.4th at 190.

Plaintiffs' injuries flow from Meta's overall conduct in approving scam ads en masse, failing to enforce policies, and prioritizing revenue, rather than from any specific defamatory or otherwise unlawful statement by a third party. ¶¶6, 23, 133. Plaintiffs also seek injunctive relief requiring Meta to change its own processes (for example, by implementing identity verification for advertisers and effective takedown protocols). ¶¶33, 45, 85, 96-97, 109, 118, 135, 143, 151-55. This underscores that Meta is being held to account for its own business conduct. Accordingly, Section 230's publisher-or-speaker requirement is not met here.

In *Doe*, the Ninth Circuit held there was no Section 230 immunity for failing to warn users about how third parties were targeting and luring victims through the platform, because providing a warning "would not require [the website] to remove any user content or otherwise affect how it publishes or monitors such content." 824 F.3d at 851. The duty existed due to the website's knowledge of criminal misuse of its platform and could be fulfilled without altering or removing user posts. Similarly, in the recent *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.* MDL, the court refused to apply Section 230 to a negligent-failure-to-warn claim, reasoning that the "duty arises not from [the platforms'] publication of [content], but from their knowledge, based on public studies or internal research, of the ways that their products harm" users. 702 F. Supp. 3d 809, 834 (N.D. Cal. 2023). In other words, when a platform knows about a systemic risk or ongoing scheme on its service, Section 230 does not shield it from liability for standing by and doing nothing.

- 6 –

OPPOSITION TO MOTION TO DISMISS

### 3.        Defendants Materially Contributed to the Illegal Content of the Ads

Meta cannot hide behind the notion that the scam ads were solely "information provided by another information content provider." Mot. at 6. While the initial ad content came from third-party scammers, Meta's involvement went well beyond that of a passive transmitter. ¶¶3, 5-6, 19-20, 28-34, 40, 43, 46, 57-58. Under the Communications Decency Act ("CDA"), any company that is "responsible, in whole or in part, for the creation or development" of the offending content is deemed an "information content provider" of that content, and not immune. 47 U.S.C. §230(f)(3). Defendants actively participated in developing and propagating the unlawful impersonation ads. ¶¶22, 40. Meta's extensive involvement shows the ads were not solely "provided by another"; Meta was integral to their creation, targeting, and success. In *Forrest*, the court observed that allegations of Meta's "active involvement" in shaping the scam ads and "supercharg[ing] [their] ability to [reach] vulnerable viewers" created a factual dispute. *Forrest*, 737 F. Supp. 3d at 816. This prevented Meta, at the pleading stage, from showing that the ads were "exclusively provided by another" source. *Id.*

Meta created the audience and context for these ads by designing algorithms that decide who sees an advertisement and when. ¶¶18, 34, 75, 93, 122, 148. In this case, Meta's system actively optimized the reach of the scam posts by using Plaintiffs' trusted professional identities as bait to maximize ad clicks and user engagement. *Anderson,* 116 F.4th at 184 (holding that when a platform itself targets, curates, or amplifies harmful content through algorithms that decide who sees an advertisement and when the platform, is engaging in its own conduct). In doing so, Meta materially contributed to the effectiveness and illicit nature of the content. An impersonation ad only succeeds if it reaches a trusting audience. Meta's microtargeting tools ensured that the fake endorsements were delivered to the users most likely to be deceived. By algorithmically amplifying the false message, Meta developed the content by shaping and enhancing its visibility and impact. *Id.* at 184 (holding that a platform's algorithmic recommendations were the platform's own "expressive activity" rather than information "provided by another," and thus not subject to Section 230 immunity). This situation goes far beyond the passive forum that Section 230 was meant to protect. A website that contributes to the illegality of the content, as opposed to merely editing or screening

- 7 –

it, is not immune. *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1167-68 (9th Cir. 2008) (en banc); *FTC v. LeadClick Media, LLC,* 838 F.3d 158, 174 (2d Cir. 2016) (website that participated in the development of deceptive content was an "information content provider" and not entitled to Section 230 immunity).

Meta also assumed an editorial role despite knowing that the content was unlawful. The Complaint details how Meta was alerted by numerous sources (users, news reports, state AGs) that these ads were scams misusing real people's identities. Despite this knowledge, Meta continued to approve and distribute "materially identical impersonation ads" and even allowed repeat offenders to relaunch campaigns under new accounts. ¶¶28, 31, 33-34. Meta purposefully chose to continue developing the fraudulent content on its platform, a far cry from an unwitting intermediary. Courts have denied immunity where a platform's own tools or decisions contributed to the illegality of the content (for instance, where a platform knowingly facilitates illicit transactions or tailors content in an unlawful manner). *See Fair Hous. Council*, 521 F.3d at 1167-68; *see Also Anthony v. Yahoo,* 421 F. Supp. 2d 1257, 1262-63 (N.D. Cal 2006). Here, Meta actively solicited advertisers known for scam ads, provided them with training and support, and ignored policy violations. ¶¶24, 28-34, 46, 57-85. This conduct makes Meta a co-contributor to the illicit content. *Calise,* 103 F.4th at 741. As the Ninth Circuit emphasized in *Fair Hous. Council*, immunity applies only if the interactive computer service does not contribute to the illegality of the content. 521 F.3d at 1166. Here, Meta's actions of purposefully or knowingly approving the imposter ads, targeting them for maximum impact, and profiting from each deceptive impression were essential to the ads' illegality.

In sum, Meta was not a neutral publisher of content provided by others. It was an active participant and content provider in the wrongful scheme. Section 230(c)(1) does not immunize Meta for content to which it materially contributed. Moreover, Section 230(c)(1) has an exception stating that "[n]othing in this section shall be construed to limit or expand any law pertaining to intellectual property," which means that Plaintiffs' Lanham Act claim (Count I) is outside the scope of Section 230 altogether. 47 U.S.C. §230(e)(2). The same is true for the California and Florida publicity-rights claims (Counts III and IV), as those claims involve intellectual property rights in one's name and likeness. *Hepp*, 14 F.4th at 210-11 (holding that a state-law right-of-publicity claim "pertain[s]

- 8 –

to intellectual property," placing it within Section 230(e)(2)'s carve-out and outside Section 230 immunity). At a minimum, Section 230 does not bar those claims. And as to the other claims, Meta cannot meet the second and third prongs of the immunity test.

Accordingly, the Court should reject Meta's sweeping Section 230 defense. This case falls within well-recognized exceptions holding online platforms are accountable for their own wrongful acts despite their ICS status. Meta may not escape responsibility by labeling itself a mere passive intermediary when it profited from and helped propagate the wrongdoing at issue. *Fair Hous. Council*, 521 F.3d at 1166. Therefore, Section 230 poses no obstacle to adjudicating Plaintiffs' claims on their merits. *Calise,* 103 F.4th at 747.

### B.    Plaintiffs' Claims Are Adequately Alleged

#### 1.    Plaintiffs Adequately Allege a Lanham Act False Endorsement Claim

Count I asserts a claim under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), for false endorsement/false association. The Lanham Act prohibits using a person's name, likeness, or other indicia of identity in commerce if it is likely to cause confusion as to the affiliation, sponsorship, or endorsement of goods or services. *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1109-10 (9th Cir. 1992) (unauthorized use of a celebrity's identity in advertising was actionable under Lanham Act Section 43(a) as a false endorsement likely to mislead consumers into believing the celebrity endorsed the product). The Complaint details how Meta's conduct led to consumer confusion through false endorsements in commerce. ¶¶4-5, 33, 36, 45, 57. Meta's platforms published and disseminated paid advertisements that "used Plaintiffs' and Class members' identities without consent, falsely suggesting [Plaintiffs] sponsored, approved, were affiliated with, or endorsed the promoted investment opportunities." ¶78. These ads were classic commercial promotions, paid placements on social media aimed at inducing the purchase of a security by touting a supposed endorsement from a trusted advisor. The Complaint explicitly alleges that the use of Plaintiffs' names, images, credentials, and professional brands in these ads was likely to cause confusion (and did cause confusion) among the public "as to the affiliation, connection, association, sponsorship, or approval" of the advertised services. ¶¶80-81. On the face of the pleading, all elements of a false endorsement claim are present: (1) unauthorized use of a plaintiff's identity; (2) in a commercial advertisement;

- 9 –

and (3) causing a likelihood of consumer confusion about the plaintiff's endorsement of a product. *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1007-08 (9th Cir. 2001) (use of plaintiffs' names and photographs in a catalog without consent was a commercial use actionable under Section 43(a) because it likely caused consumers to believe the plaintiffs endorsed the products).

Meta suggests that it cannot be liable under the Lanham Act because the scam advertisements were created by third parties. The Lanham Act's false endorsement provision, however, is not so narrow. The Complaint makes clear that Meta actively used Plaintiffs' identities in commerce by delivering, targeting, and monetizing the impersonation ads, thereby directly benefiting from the misuse. ¶¶22-23, 83, 105. The Lanham Act imposes liability on "any person" who uses a false or misleading representation of another's persona in commerce if it is likely to cause confusion. *Allen v. National Video, Inc*., 610 F. Supp. 612, 625, 628 (S.D.N.Y. 1985) (a retailer's use of a Woody Allen look-alike in its ads stated a false-endorsement claim because it could confuse consumers into thinking Allen endorsed the business; and even if a third party created the content, the advertiser's active use of the persona for profit made it liable). Here, Meta was a key player in the false endorsement. It used Plaintiffs' names and likenesses in commerce by selling and distributing the ads containing them. ¶¶2, 17-20. Meta provided the forum and the delivery mechanism by which the misrepresentation (Plaintiffs' supposed endorsement) reached consumers. ¶25. Meta also reaped a direct commercial benefit from that misrepresentation in the form of ad revenue and increased user engagement. ¶¶29, 33, 83, 114, 117, 121-28, 133. Meta was sufficiently entwined with the promotion of the false message, such that the Lanham Act applies. *See Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 264-65 (9th Cir. 1996) (holding swap meet operator contributorily liable under Section 43(a) for vendors' trademark infringements when it continued providing services and reaping financial benefits despite knowing of ongoing sales of counterfeit goods); *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc*., 658 F.3d 936, 942 (9th Cir. 2011) (liability extends to online intermediaries that "continued to supply its services to one who it knew or had reason to know was engaging in trademark infringement," and such knowledge may be shown by willful blindness).

The Complaint also demonstrates that a likelihood of confusion and harm exists. ¶¶4-5, 23, 30, 32-33, 36, 45, 54, 57, 82, 96, 109, 147-55. While Defendants complain that the Complaint

- 10 –

identifies only two specific WhatsApp chat groups and does not specifically identify any allegedly deceptive ad, the Complaint explicitly alleges a *widespread, ongoing scheme* of "impersonation ads and related WhatsApp group solicitations," stressing that these were "neither isolated nor accidental" but rather repeated campaigns exploiting many advisors' identities. ¶22. The Complaint provides well-pled facts showing actual confusion or likelihood of confusion among consumers. ¶¶4-5, 27, 33, 36, 45, 57, 93, 82. The impersonation ads were crafted to make ordinary social media users believe that legitimate financial experts were backing the advertised stocks. The Complaint indicates that this confusion did in fact occur, citing that consumers were deceived and that Plaintiffs had to dispel misunderstandings among investors who saw the ads. ¶¶80, 82. Such allegations are sufficient to state a claim. *Downing*, 265 F.3d at 1007-08 (using the plaintiffs' names and surfing photograph in a clothing catalog for marketing purposes without consent constituted use in commerce, and plaintiffs raised a triable issue that consumers would likely be misled into thinking they endorsed the clothing line); *Abdul-Jabbar v. Gen. Motors Corp.,* 85 F.3d 407, 412-13 (9th Cir. 1996) (unauthorized use of Kareem Abdul-Jabbar's former name in a television car commercial was actionable under Section 43(a) as it misled consumers to believe he endorsed the car); *Waits*, 978 F.2d at 1108-11 (recognizing a Section 43(a) false endorsement claim where a distinctive celebrity voice was imitated in an advertisement without permission, finding likelihood of consumer confusion as to the singer's sponsorship or approval of the product).

Plaintiffs also allege cognizable harm from the false endorsements. ¶¶5, 33, 36, 76-87. Plaintiffs suffered personal and professional injuries: "irreparable harm to their professional and brand reputations; . . . [loss of] prospective clients and business opportunities; client confusion and increased compliance risk; and . . . economic damages, including lost revenue and corrective advertising expenses." ¶82. These are actual injuries from confusion caused by the ads. The Lanham Act allows recovery for such damages, and even if damages were not fully quantifiable at this stage, the harm to reputation and goodwill is the classic irreparable harm that false association claims are meant to address. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (holding that loss of prospective customers, damage to professional reputation, and injury to goodwill are forms of harm that can be recovered under the Lanham Act and are considered

- 11 –

irreparable because they cannot be readily quantified); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131-32 (2014) (to fall within Lanham Act's protection, a plaintiff must allege "an injury to a commercial interest in reputation or sales" flowing directly from the deception of consumers); *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1040-42 (9th Cir. 1986).

The Complaint further alleges that Meta acted with knowledge or willful blindness to the false endorsements. ¶¶5, 33, 36, 40, 44, 46, 57, 76-87. By June 2025 at the latest, when dozens of state AGs put Meta on formal notice, Meta "knew or should have known" that these ads were misappropriating real professionals' identities and creating a false impression of endorsement. ¶¶31, 81, 106, 139. Yet Meta continued approving and optimizing "materially identical impersonation ads" even after this notice, and after user complaints and media coverage of the scams. ¶¶5, 32, 81, 94, 106, 116.

In summary, Plaintiffs have plausibly alleged a violation of Lanham Act Section 43(a). Meta's platform was used to create a false association between Plaintiffs and the scam investments, and Meta played an active role in that wrongful association. The motion to dismiss Count I should be denied.

**2.      Plaintiffs Adequately Allege Misappropriation of Name or Likeness**

Counts III and IV assert claims for unauthorized use of Plaintiffs' names, likenesses, and identities for commercial purposes under California law (Cal. Civ. Code §3344 and California common law) and Florida law (Fla. Stat. §540.08). The elements generally require: (1) use of plaintiff's name, photograph, or identity; (2) for a commercial purpose or advantage (e.g. in advertising); (3) absence of consent; and (4) resulting injury. *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 692 (9th Cir. 1998); *Eastwood v. Superior Court,* 149 Cal. App. 3d 409, 417 (Ct. App. 1983). Plaintiffs have adequately pled each of these elements under both California and Florida law.

Here, the Complaint alleges that during the relevant period Meta "knowingly used Plaintiffs' and Class members' names, images, likenesses, voices, credentials, and branding without consent for commercial purposes, including advertising and promoting securities, investment 'groups,' and related services." ¶101. Meta carried out these uses through paid advertisements on Facebook and Instagram and through associated WhatsApp communications that were part of the promotional

- 12 –

funnel.  ¶¶2, 4-7, 17-58, 75.  In California, the statutory claim explicitly encompasses the use of a person's "name, . . . photograph, or likeness . . . on or in products, merchandise, . . . or for purposes of advertising or selling . . . without . . . consent."  Cal. Civ. Code §3344(a)(1).  The ads at issue here fall within that description as they were paid advertisements in which Plaintiffs' names and photos were featured to lend credibility to a service being sold.  Florida's statute similarly prohibits "publish[ing], print[ing], display[ing] or otherwise publicly us[ing] for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without . . . consent."  Fla. Stat. §540.08(1).  Again, that is exactly what occurred: Meta published and displayed Plaintiffs' names and photos in ads for commercial and advertising purposes without consent.

Meta's motion argues that the infringing content originated from third parties.  Mot. §II.B.  But that is not a basis for dismissal as the misappropriation claims reach anyone who uses or facilitates the use of a person's identity for commercial gain. *Forrest*, 737 F. Supp. 3d at 816 (in a similar fake-ads case, the court found that Meta's profit from ads exploiting the plaintiff's identity demonstrated use "to [Meta's] advantage", Meta allegedly "profited more" from ads featuring the plaintiff's name and likeness, which was "enough to adequately plead that the alleged misappropriation was to Meta's advantage").  Here, Defendants provided the platform and collected the revenue from the unauthorized use of Plaintiffs' personas.  In effect, Meta rented out Plaintiffs' names to scammers by providing ad space and distribution, all without Plaintiffs' permission.  Courts have recognized that media companies or advertisers can be liable for right-of-publicity violations if they are actively involved in the exploitation. *Id.*  The Complaint describes Meta's involvement as knowing and intentional.  ¶¶5, 33, 36, 40, 44, 46, 57, 76-87, 99-120.  Meta reviewed and approved the ad content containing Plaintiffs' identities, and targeted that content to susceptible users.  ¶¶6, 18, 22, 40, 53, 79.  This constitutes a "use" by Meta for purposes of the misappropriation tort.  In sum, prong (1) and (2) of the misappropriation claims, use of identity and commercial purpose, are adequately pled.

Plaintiffs plainly allege they never consented to Defendants using their names or images in ads for investment schemes.  ¶¶4, 22, 25, 31, 36-37, 44, 59, 64, 101, 103, 109, 112-14.  Thus, the

- 13 –

OPPOSITION TO MOTION TO DISMISS

"without consent" element is satisfied.

The Complaint further details the harms caused to Plaintiffs by the unauthorized use of their identities. ¶¶3, 22-58, 99-120. These include loss of control over their persona, damage to reputation and "brand" goodwill, diversion of clients and business, increased regulatory/compliance risks, and costs in monitoring and responding to the situation. For California's statutory claim, actual damages are alleged (and in any event Cal. Civ. Code §3344 provides for statutory damages of $750 per incident). For the common-law claim and Florida claim, these reputational and economic injuries also suffice to allege damages. The Complaint goes on to allege that Meta was unjustly enriched, reaping advertising fees and valuable engagement from the misappropriation. ¶¶33, 83, 121-28.

While California and Florida publicity laws have exemptions for certain uses, the Complaint affirmatively pleads that no such exception applies here, because the challenged uses were paid commercial advertisements and "not news, public affairs, sports broadcasts, or expressive works, and were not incidental or de minimis." ¶104. Likewise, the uses were not part of any news reporting or covered by any exemption (Fla. Stat. §540.08(3)), but were marketing solicitations. ¶115.

The Complaint also alleges that Meta's violations were willful and intentional, as Meta continued the same pattern of approving impersonation ads after being warned and after receiving direct complaints. ¶¶5, 33, 36, 40, 44, 46, 57, 76-87, 99-120. For instance, even after state AGs highlighted the issue in June 2025, Meta "nonetheless continued profiting from and disseminating the fraud campaigns despite repeated complaints." ¶¶94, 106. These allegations support Plaintiffs' claims for punitive or exemplary damages under Cal. Civ. Code §3344(a) and under common law.

**3.      Plaintiffs Adequately Allege an Unfair Competition Law (UCL) Claim**

Count II asserts that Meta's conduct violated California's UCL, Bus. & Prof. Code §17200 *et seq*. The UCL prohibits business acts or practices that are unlawful, unfair, or fraudulent, and Plaintiffs invoke all three prongs. Any one of these prongs is sufficient to sustain a UCL claim, and here the Complaint supports each prong with detailed factual allegations. *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.,* 20 Cal. 4th 163, 180 (1999) (explaining that Section 17200 "is written in the disjunctive" such that a business practice need only meet one of the three criteria, unlawful, unfair or fraudulent, to be considered unfair competition). Meta's motion to dismiss the UCL claim

- 14 –

lacks merit.  Plaintiffs plausibly allege that Meta's practices were unlawful (because they violated multiple other laws and Meta's own promises), unfair (because they offend established public policies and cause substantial harm outweighing any benefit), and fraudulent (because they misled consumers about material facts).

The UCL's unlawful prong "borrows" violations of other laws and makes them independently actionable.  *Cappello v. Walmart Inc.*, 394 F. Supp. 3d 1015, 1023 (N.D. Cal. 2019) (denying motion to dismiss UCL claims under the "unfair" and "unlawful" prongs).  Here, the Complaint identifies several predicate violations that render Meta's conduct "unlawful" under Section 17200.  These include: (i) Lanham Act Section 43(a) (false endorsement); (ii) statutory and common-law right of publicity; (iii) Florida's FDUTPA; and even (iv) Meta's own contractual obligations, the breach of which can serve as an unlawful predicate (since breach of contract in this context also constitutes an unfair/deceptive business practice).  ¶¶90-91.  Plaintiffs have adequately pled each of those underlying violations: the Lanham Act, common law publicity rights, FDUTPA, and breach of contract.

Additionally, the Complaint notes that Meta's practice of profiting from impersonation ads violated Meta's own integrated policies, which form part of the user agreement.  ¶¶3, 24.  Meta promised it would not allow impersonation or fraud (a promise, which when broken, is unlawful as a breach of contract).  ¶¶24, 58, 91, 150.  Meta also assured users they could report such content for swift removal, but Meta's systemic under-enforcement made that assurance hollow.  ¶¶130-131.  By borrowing these contract and policy violations, the UCL unlawful prong captures Meta's misconduct even if no specific statute directly addresses it.

Courts have articulated several tests for "unfair" conduct in consumer cases, and Plaintiffs' allegations meet all of them.  First, under the "tethering" test, an act is unfair if it offends a public policy tethered to specific constitutional, statutory or regulatory provisions.  *Capello,* 394 F. Supp. 3d at 1023-24.  Here, Meta's impersonation-ad scheme contravenes the established policies of laws like Cal. Civ. Code §3344 (protecting individuals from identity theft for commercial gain), the Lanham Act's false endorsement provisions, and other consumer protection statutes that forbid deceptive endorsements.  By knowingly enabling false endorsements, Meta acted counter to those

- 15 –

declared policies. This satisfies the UCL's tethering test. ¶92.

Next, under the balancing test (weighing the harm to consumers against the utility of defendant's conduct), Meta's conduct is plainly unfair. *Id.* The Complaint details the harm caused by Meta's practices at Plaintiffs' expense, including "widespread deception of investors, reputational injury to licensed advisors, diversion of clients, and erosion of market integrity." ¶92. Conversely, any "utility" or benefit of Meta's conduct (allowing virtually unfiltered paid ads for profit) is minimal or illegitimate. Meta's only benefit was increased advertising revenue, which cannot justify facilitating fraud on such a scale. The harm to consumers and to the professional community vastly outweighs any benefit of Meta's lax approach.

Finally, under the Federal Trade Commission ("FTC") "Section 5" test, which asks whether conduct causes substantial consumer injury to consumers not outweighed by benefits and not reasonably avoidable, Meta's conduct also qualifies as unfair. *Cel-Tech Commc'ns*, 20 Cal. 4th at 185-86. The injury here is substantial: as documented by the FTC and others, consumers nationwide lost money and investment professionals suffered reputational harm and business losses as a result of these scams. The injury was not avoidable, because Meta's platforms presented the imposter scams as legitimate advice. Even a wary consumer could be deceived by seeing a known expert's face in an ad. There were no countervailing benefits to consumers or competition from allowing fake endorsements to flourish, only detriment. Indeed, the Complaint alleges that "[t]he injury is substantial, not outweighed by benefits . . . , and not reasonably avoidable" in this situation. ¶92. Thus, under the FTC-like standard adopted by some courts, the unfair prong is met as well.

The UCL's fraudulent prong requires a business practice that is likely to deceive members of the public. *Lona's Lil Eats, LLC v. DoorDash, Inc.*, 2021 WL 151978, *40-41 (N.D. Cal. Jan. 18, 2021). The Complaint describes how Meta's publication and optimization of the imposter ads were "likely to deceive reasonable consumers by falsely representing that real, licensed financial professionals sponsored or approved the promoted securities (including PTHL)." ¶93. This allegation illustrates the deception: members of the public were led to believe an endorsement existed when it did not. The deception was material because it was "designed to induce immediate trading activity" by those who saw the ads. ¶93. Thus, the misrepresentation was not only likely to mislead,

- 16 –

it was also intended to induce reliance and change consumers' behavior.

Furthermore, the Complaint notes that Meta's conduct "persisted after notice" and Meta continued to disseminate the deceptive ads even after learning they were fake. ¶94. This ongoing conduct could itself be viewed as a fraudulent omission. Meta knew its platform was being used to defraud people, but failed to warn users or to stop the ads, thereby tacitly misrepresenting that the ads were legitimate paid content. Users reasonably assume that ads on major platforms meet basic integrity standards (especially when Meta policies claim to bar false ads). By continuing to serve the ads after notice, Meta effectively misled users into thinking the endorsements were genuine or at least unaddressed by Meta when, behind the scenes, Meta had reason to know they were fake. The Complaint adequately alleges that Meta's practices were likely to deceive the public. ¶¶31, 93-94.

Meta also challenges UCL standing, but Plaintiffs plead that they lost money or property "as a result of" Meta's unfair competition. UCL standing requires that a plaintiff suffered economic injury caused by the unfair practice. Here, Plaintiffs allege loss of money or property in multiple forms: "diversion of prospective clients and engagements; expenditures on mitigation, monitoring, takedowns, and corrective communications; brand and goodwill damage requiring paid remediation; and other business losses." ¶¶36, 95.

Finally, the UCL allows for injunctive relief and restitution. Plaintiffs seek a public injunction to require Meta to implement measures to prevent such scams in the future. The public benefit of such relief would be significant, as the impersonation schemes have undermined investor confidence and market integrity. Therefore, Count II (UCL) should proceed on all prongs.

### 4.    Plaintiffs Adequately Allege a FDUTPA Claim

Count VII asserts a claim under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201 *et seq.*, on behalf of the Florida subclass (which includes Plaintiffs Suddeth and Perkins). FDUTPA is the Florida analogue to the UCL and other consumer protection statutes, prohibiting "[u]nfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.204(1). To plead a FDUTPA claim, a plaintiff generally must allege: (1) a deceptive or unfair practice occurring in trade or commerce; and (2) actual damage to the plaintiff as a result.

*Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.,* 169 So.3d 164 (Fla. Dist. Ct. App. 2015). Plaintiffs meet all these elements.

Meta contends that Plaintiffs were not "consumers" or that the conduct was not in trade or commerce. FDUTPA defines "trade or commerce" broadly to include the advertising or sale of any services or things of value (Section 501.203(8)). The Complaint states that *"Defendants engaged in trade or commerce . . . by selling, delivering, optimizing, and monetizing paid advertisements"* on Facebook/Instagram (including the click-to-WhatsApp funnels) to users in Florida. ¶138 (emphasis added). Meta was carrying out a commercial enterprise in Florida: it sold advertising services that reached Florida residents, and it facilitated communications (through WhatsApp) related to those ads in Florida. Plaintiffs are Florida residents, and the unauthorized ads using their personas were shown to users. Even if the immediate "consumers" deceived by the ads were social media users, FDUTPA is not limited to scenarios where the plaintiff is the direct purchaser of a good. It allows *"any person"* aggrieved by an unfair or deceptive act in trade or commerce to sue (Section 501.211). Plaintiffs maintained a professional presence on Meta's platforms in Florida and were harmed "in trade or commerce" by Meta's practices. ¶¶79, 137-38. Thus, the "trade or commerce" element is satisfied by Meta's conduct of its advertising business in Florida.

The Complaint sets forth several specific acts by Defendants that constitute unfair or deceptive practices under FDUTPA. These include: (i) approving and monetizing ads that impersonated Florida professionals and falsely suggested their sponsorship or approval of investments; (ii) publishing and amplifying content that misappropriated those professionals' identities without consent; (iii) representing in Meta's Terms and policies that impersonation and deceptive ads are prohibited and will be removed, yet failing to enforce those rules and continuing to profit from the forbidden conduct; and (iv) continuing its practices after having notice from authorities and victims. ¶139.

Under FDUTPA, a "deceptive" practice is one that is likely to mislead consumers acting reasonably, and an "unfair" practice is one that is immoral, unethical, oppressive, or substantially injurious (often evaluated similar to the California tests). *Anthony*, 421 F. Supp. 2d at 1264. Meta's conduct was deceptive because reasonable consumers (Facebook/Instagram users) were likely to be

OPPOSITION TO MOTION TO DISMISS

misled into believing that legitimate financial advisors were involved in these promotions.  Meta's conduct was also unfair: it caused substantial injury (monetary losses by those duped, reputational and business losses by those impersonated) that far outweighed any utility and could not be avoided by the victims (since Plaintiffs could not realistically prevent Meta from running the ads, and consumers could not easily tell the ads were fake).

As the Complaint alleges, "These acts and practices are deceptive because they are likely to mislead reasonable consumers into believing that real, licensed financial professionals endorse or are affiliated with the promoted securities and groups, and are unfair because the resulting injuries to consumers and to the Florida Subclass are substantial, not outweighed by benefits, and not reasonably avoidable."  ¶140.  This mirrors FDUTPA's standards and provides factual foundation for each element of deception/unfairness.  Therefore, the second element of a FDUTPA claim requiring that Meta engaged in unfair or deceptive acts, is satisfied by the well-pled allegations.

FDUTPA requires that the unfair or deceptive practice caused actual harm to the plaintiff.  *TracFone Wireless, Inc. v. GSM Grp., Inc.*, 555 F. Supp. 2d 1331, 1338 (S.D. Fla. 2008) (harm to business reputation, goodwill, and increased likelihood of confusion, mistake and deception are "actual harm" under FDUTPA).  Plaintiffs allege causal harm.  For instance, due to Meta's actions, Plaintiffs suffered "actual damages such as: loss of goodwill and professional brand value; diversion of clients and prospective engagements; lost revenue and opportunities; and out-of-pocket costs for monitoring, takedowns, and corrective communications."  ¶¶36, 95, 141.  The Complaint also notes that Plaintiffs face an "ongoing risk of renewed impersonation and deception absent court-ordered changes," which supports the need for injunctive relief.  ¶¶6, 33, 45, 87, 96, 98, 142.

### 5.     Plaintiffs Adequately Allege Breach of Contract

Count VI alleges breach of contract on behalf of Plaintiffs and a proposed "User Subclass" of Meta account holders.  The elements of breach of contract are: (1) the existence of a contract; (2) plaintiff's performance (or excuse for nonperformance); (3) defendant's breach; and (4) resulting damage.  *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).  Plaintiffs plausibly allege each element.

The Complaint identifies the contracts at issue: when Plaintiffs (and subclass members)

- 19 –

created and maintained Facebook/Instagram/WhatsApp accounts, they entered into Meta's Terms of Service (or Terms of Use) agreements. Those Terms incorporate Meta's Community Standards, Advertising Policies, and other platform rules by reference. ¶¶3, 19, 24. Thus, the contract includes Meta's promises contained in those policies. Under these agreements, Meta prohibits impersonation, fraud, and deceptive practices on its platform and represents that it will remove or restrict content, accounts, and advertisements that violate those rules. Meta also provides users with reporting tools to enforce the rules. ¶¶19, 22, 130.

Defendants argue that these Terms are merely policy statements or grant discretionary rights. Mot. §II.E. However, the Terms create a reasonable expectation that Meta will not knowingly allow blatant impersonation scams to persist. The Terms also imply that if such content is reported or discovered, Meta will take action consistent with the stated rules. In *Calise,* the Ninth Circuit noted that such terms can form the basis of a contract claim and Meta's Terms of Service commitment to "[c]ombat harmful conduct" was enforceable to the extent a plaintiff can prove a breach. 103 F.4th at 736. Here, there is no dispute that a contractual relationship exists between Meta and users like Plaintiffs. The Complaint recites the relevant contractual language, giving Defendants fair notice of the contract's substance. ¶¶3, 19, 22.

The Complaint details multiple ways in which Meta breached its contractual obligations. In summary, Meta: (i) approved, delivered, optimized, and monetized paid impersonation ads (and related WhatsApp "funnel" groups) that used Plaintiffs' and class members' names, likenesses, and credentials without consent; (ii) failed to remove or timely restrict those ads, pages, channels, and groups after receiving notice; and (iii) systematically under-enforced the impersonation and anti-fraud policies incorporated into its user contracts. ¶¶3, 24, 32, 57-58, 131.

Meta promised not to allow impersonation or fraud (and to remove such content), yet Meta approved and delivered the very impersonation ads that violated the policies allowing precisely what it said it would not allow. That is a direct breach of the promise to prohibit such content. Meta also failed to remove or restrict the ads and accounts even after being put on notice through user reports and regulators. Because the contract incorporates the Community Standards, it implies Meta will act against policy-violating content, especially once it's aware of it. Meta's inaction or delay in

- 20 –

acting is a breach of that duty to enforce its rules. Meta "systematically under-enforced" its impersonation and fraud policies. This systemic failure broadly breached the covenant that Meta would operate the platform in accordance with its stated rules. ¶131.

Additionally, the Complaint alleges a breach of the implied covenant of good faith and fair dealing: Meta had discretion in how it reviewed ads and policed its platform, but it exercised that discretion in bad faith "in a manner that unfairly frustrated Plaintiffs' . . . reasonable contractual expectations," namely the expectation that Meta "would not publish paid ads impersonating them, would police prohibited deception, and would not profit from misappropriations of their identities on Meta's own [platforms]." ¶132. In California, every contract has this implied covenant. *Comunale v. Traders & Gen. Ins. Co.,* 50 Cal. 2d 654, 658 (1958) (recognizing that "there is an implied covenant of good faith and fair dealing in every contract" whereby "neither party will do anything which will injure the right of the other to receive the benefits of the agreement"); *Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 349 (2000). Plaintiffs effectively allege that Meta violated this covenant by willfully turning a blind eye to impersonation scams to boost ad revenue, thereby undermining the contract's core purpose from the users' perspective. *Calise*, 103 F.4th at 742-43 (recognizing that a platform's failure to enforce anti-fraud policies in good faith could breach the implied covenant of good faith and fair dealing without treating the platform as a "publisher" under Section 230).

Meta argues that its Terms did not guarantee removal of all bad content, and that it disclaimed liability for user content. Mot. §II.E. Many terms of service include disclaimers like "we cannot guarantee the platform will be free of misconduct" or "we may, but have no obligation to, remove content." However, the enforceability of such disclaimers is questionable when the platform simultaneously makes explicit promises to combat certain misconduct. *McQuirk v. Donnelley*, 189 F.3d 793, 796-97 (9th Cir. 1999) (holding that contracts cannot exempt a party from liability for its own fraud or willful injury, as such clauses are void against public policy). The Complaint preemptively alleges that "[a]ny contractual limitations or disclaimers asserted by Meta are unconscionable, inapplicable to willful policy violations, or otherwise unenforceable as to the misconduct alleged." ¶134

Plaintiffs allege damages from Meta's breach.  Plaintiffs allege that: "As a direct and proximate result of Meta's breaches, Plaintiffs suffered damages, including loss of goodwill and professional brand value; diversion of clients and prospective business; time and expense spent on monitoring, takedowns, and corrective communications; and other business injuries." ¶¶36, 95, 133. These are tangible harms that can be remedied.  Additionally, Meta obtained "revenues and other benefits" from the campaigns that it would not have gotten but for its breaches.  ¶¶2, 6, 24, 29, 58.

### 6.    Plaintiffs Adequately Allege Unjust Enrichment/Restitution

Count V asserts unjust enrichment (also described as "quasi-contract" or restitution) on behalf of Plaintiffs and the class.  Although some courts have questioned whether unjust enrichment is a standalone cause of action, courts now generally allow it as a claim for restitution.  The Ninth Circuit has held that such claims can be treated as a valid cause seeking quasi-contractual relief. *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015).  Under either California or Florida law, the elements are: (1) the defendant received a benefit; and (2) it would be unjust for the defendant to retain that benefit without paying for it.  *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000) (noting that "the elements for a claim of an unjust enrichment [are the] receipt of a benefit and unjust retention of the benefit at the expense of another").  Plaintiffs satisfy both elements by alleging that Meta profited from the impersonation scheme at Plaintiffs' expense.

The Complaint details the benefits Meta obtained from the impersonation ads in that Meta received and retained monetary benefits "including advertising fees, increased engagement/traffic, data-monetization value, and associated revenues" as a result of approving, delivering, and optimizing the impersonation ads that misappropriated Plaintiffs' identities.  ¶122.  Meta got paid for the ads, every time a scammer ran an ad using Plaintiffs' name, Meta earned ad revenue.  ¶¶6, 24, 29.  Additionally, Meta gained user engagement (people clicking or joining groups, which helps Meta's metrics) and valuable user data from the interactions with those ads.  ¶¶20, 122.  These benefits have concrete economic value to Meta (advertising is Meta's core business model).  They were directly tied to the wrongful use of Plaintiffs' personas: "These benefits were conferred upon Defendants by virtue of the unauthorized use of Plaintiffs' [identities] in commercial promotions . . . and by the resulting diversion of investor attention and business opportunities premised on that

- 22 –

misappropriation and false endorsement." ¶¶36, 58, 123.

The second element asks whether it would be unjust for Defendants to keep those benefits. *Id.* Defendants' retention of these benefits is unjust and inequitable because the revenues were generated by unlawful and deceptive campaigns that violated Plaintiffs' statutory and common-law rights, contravened Defendants' own policies, and persisted after Defendants had notice of impersonation-driven scams. Allowing Defendants to keep money made by facilitating fraud and theft of Plaintiffs' goodwill would reward wrongdoing. Plaintiffs also plead that they lack an adequate remedy at law to recover all of Meta's unjust enrichment. ¶127.

### 7.      Plaintiffs State a Valid Declaratory Judgment Claim

Count VIII seeks declaratory relief under the federal Declaratory Judgment Act (28 U.S.C. §2201, *et seq.*) and related equitable powers. Meta argues this count is unnecessary or fails to state a claim. Mot. §II.G. However, the Complaint establishes an actual controversy and a need for declaratory and injunctive relief that is not fully duplicative of the other claims. *See Siino v. Foresters Life Ins. & Annuity Co.*, 133 F.4th 936, 944 (9th Cir. 2025) (declaratory judgment claim not duplicative where it addresses "future obligations" beyond the scope of other claims, thus "serv[ing] a useful purpose in clarifying legal relations") (citation modified). Given the ongoing nature of the harm, the declaratory judgment claim is well-founded. *Sands v. Wynn Las Vegas, LLC*, 2010 WL 2348633, at 2 (D. Nev. June 9, 2010).

The Declaratory Judgment Act requires an actual, present controversy between the parties. Here, there is a live dispute over Meta's conduct and legal obligations. 28 U.S.C. §2201. Plaintiffs allege that "an actual, justiciable controversy exists regarding Defendants' approval, delivery, optimization, and monetization of paid impersonation advertisements . . . that misappropriate financial professionals' identities and falsely suggest endorsement/affiliation." ¶148.

The controversy is ongoing. 28 U.S.C. §2201. The Complaint notes that "Plaintiffs and Class members continue to suffer injury . . . because materially similar impersonation ads and funnels persist or are reasonably likely to recur absent judicial relief." ¶149. Meta's continued conduct or is thus in question. This satisfies the requirement for a declaratory judgment: there's a substantial likelihood of future harm and a need to clarify the parties' rights and duties going forward.

The declaratory relief sought is not redundant of damages. Plaintiffs ask the Court to declare, for example, that "Defendants' publication and monetization of paid advertisements and related content that use financial professionals' [identities] without consent and that falsely imply endorsement/affiliation violate [various laws] . . . [and that] Defendants' failure to enforce their [policies]—after notice . . . —constitutes breach of [contract] and/or . . . the implied covenant of good faith." ¶150. These declarations would have value beyond the immediate case: they would clarify Meta's legal obligations to refrain from such conduct in the future. They would also form the predicate for injunctive relief (under the DJA and general equitable powers) ordering Meta to take specific steps, like verification of advertisers. The Complaint lists proposed injunctive measures in detail, which correspond to declarations of what the law requires of Meta. ¶151.

While Defendants argue that declaratory judgment is duplicative because if Plaintiffs win on the substantive claims, we'll know those laws were violated. Mot. §II.G. The injunctive relief claim here serves to explicitly request an order declaring rights that might not automatically flow from a simple verdict on damages. Additionally, Plaintiffs seek a public injunction (e.g., requiring changes in Meta's platform policies) which can be grounded in the declaratory relief count. ¶97. The Complaint emphasizes that without declaratory/injunctive relief, Plaintiffs will suffer irreparable injury (loss of control over their identities, continued erosion of trust, etc.) because the threat of future impersonation remains. ¶¶82, 152. It also states that the balance of hardships and public interest favor such relief because Meta's burden to implement safeguards is minimal compared to the harm of ongoing scams. ¶154. These allegations support the Court's exercise of its equitable power to declare the parties' rights and issue corresponding injunctive orders.

## C. Leave to Amend Should be Freely Given

Meta's request for dismissal with prejudice is unwarranted. Plaintiffs' claims are well-pled and should not be dismissed at all. Even if the Court were to find some element lacking in any claim, the remedy would be to grant Plaintiffs leave to amend, not to dismiss the claims with prejudice. Under Rule 15(a), leave to amend should be "freely give[n] . . . when justice so requires." There is no history of repeated failure to cure deficiencies, no undue delay, no bad faith, and no prejudice that would result from allowing amendment.

- 24 –

Since the filing of the Complaint, additional facts supporting Plaintiffs' claims have come to light through a series of reports by Reuters. Internal Meta documents reviewed by Reuters show that the company exposes users to approximately 15 billion high-risk scam ads each day, bans advertisers only when its systems are at least 95 percent confident they are committing fraud, and allows high-value accounts to accumulate hundreds of fraud-related violations without consequence. Meta reportedly projected it would earn $16 billion annually from scam ads.[2] Meta's own tools, including its Advantage+ system, generated scam ads with AI-generated imagery and text promoting get-rich-quick schemes that violated its policies.[3] In 2024, after internal teams raised concerns about scam ads originating from China, Meta executives halted enforcement efforts in order to protect advertising revenue, which coincided with a surge in scam content.[4] Meta also modified its public Ad Library to make it harder for regulators and journalists to track scam ads, then expanded that tactic to other markets in an effort to reduce oversight and avoid regulatory reforms.[5]

**CONCLUSION**

For the foregoing reasons, the Motion to dismiss should be denied. If any claim is deemed deficient, Plaintiffs respectfully request leave to amend.

Dated: January 23, 2026                    **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

                                           /s/ John T. Jasnoch
                                           John T. Jasnoch (CA 281605)
                                           600 W. Broadway, Suite 3300
                                           San Diego, CA 92101
                                           Tel.: 619-233-4565

---

[2] Jeff Horwitz, *Meta is earning a fortune on a deluge of fraudulent ads, documents show*, REUTERS (Nov. 6, 2025), https://www.reuters.com/investigations/meta-is-earning-fortune-deluge-fraudulent-ads-documents-show-2025-11-06/.

[3] Jeff Horwitz, *Meta's "Trusted Experts" helped me run scam ads on Facebook and Instagram*, REUTERS (Dec. 15, 2025), https://www.reuters.com/investigations/metas-trusted-experts-helped-me-run-scam-ads-facebook-instagram-2025-12-15/.

[4] Jeff Horwitz, *Meta tolerates rampant ad fraud from China to safeguard billions in revenue*, REUTERS (Dec. 15, 2025), https://www.reuters.com/investigations/meta-tolerates-rampant-ad-fraud-china-safeguard-billions-revenue-2025-12-15/.

[5] Jeff Horwitz, *Meta created 'playbook' to fend off pressures to crack down on scammers, documents show*, REUTERS (Dec. 31, 2025), https://www.reuters.com/investigations/meta-created-playbook-fend-off-pressure-crack-down-scammers-documents-show-2025-12-31/.

- 25 –

Fax: 619-233-0508
jjasnoch@scott-scott.com

Tom Grady (*pro hac vice forthcoming*)
**GradyLaw**
720 Fifth Avenue South, Suite 200
Naples, Florida 34102
tgrady@gradylaw.com

*Attorneys for Plaintiffs*

- 26 –

OPPOSITION TO MOTION TO DISMISS

## CERTIFICATE OF SERVICE

I hereby certify that on January 23, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List.

Executed on January 23, 2026, at San Diego, California.

/s/ John T. Jasnoch
John T. Jasnoch

- 1 -

CERTIFICATE OF SERVICE