John T. Jasnoch (CA 281605)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: 619-233-4565
Fax: 619-233-0508
jjasnoch@scott-scott.com

*Counsel for Plaintiffs*

[Additional counsel on signature page.]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| JOHN SUDDETH and SARA PERKINS, | Case No. 5:25-cv-08581 |
| Plaintiffs, | |
| v. | **FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| META PLATFORMS, INC., INSTAGRAM, LLC, FACEBOOK OPERATIONS, LLC, and WHATSAPP, LLC, | |
| Defendants. | |

Plaintiffs John Suddeth and Sara Perkins (collectively, "Plaintiffs"), individually and on behalf of all those similarly situated (the "Class"), complain upon knowledge as to themselves and their own actions and upon information and belief as to all other matters against Defendants Meta Platforms, Inc. (the "Company" or "Meta") and its subsidiaries Instagram, LLC ("Instagram"), Facebook Operations, LLC ("Facebook"), and WhatsApp, LLC ("WhatsApp") (collectively, the "Defendants") as follows:

## SUMMARY OF ALLEGATIONS

1.      This action arises from Defendants' unlawful, deceptive, and unauthorized use of financial professionals' names, images, voices, and personas in paid advertisements and related promotional content disseminated on Facebook, Instagram, and/or WhatsApp (collectively, the "Meta Platforms") from at least January 1, 2023 through the present (the "Class Period"), inducing investment in fraudulent, thinly-traded China-based securities (the "Chinese Stock Scams"). Because Defendants materially contributed to the creation of the fraudulent advertisements through their proprietary generative-AI advertising tools, the publisher immunity of 47 U.S.C. §230(c)(1) does not apply.  *See Bouck v. Meta Platforms, Inc.*, No. 25-cv-05194-RS, ECF No. 61 (N.D. Cal. Mar. 24, 2026); *Forrest v. Meta Platforms, Inc.*, 737 F. Supp. 3d 808, 818 (N.D. Cal. 2024); *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016).  Therefore, Defendants' conduct violates, *inter alia*, the Lanham Act §43(a), 15 U.S.C. §1125(a) (false endorsement/association), the California Right of Publicity (Cal. Civ. Code §3344 and common law), the California Unfair Competition Law (Cal. Bus. & Prof. Code §17200), breach of contract, the Florida Right of Publicity (Fla. Stat. §540.08), and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (Fla. Stat. §501.201 *et seq.*), as well as analogous state statutes and common law negligence for failure to warn Plaintiffs of this known conspiracy independent of Defendants' publishing function.

2.      Meta supports, maintains, optimizes, and derives revenue from its integrated advertising and messaging ecosystem.  Principally, Meta uses Facebook and Instagram for ad creation, distribution and targeting, as well as WhatsApp and Facebook Messenger ("Messenger") for group communications.  There, Meta's proprietary algorithms and artificial intelligence ("AI") are the cornerstone of this ecosystem, creating thousands of personalized advertisements based on

- 1 -

FIRST AMENDED COMPLAINT

simple generic marketing statements with the goal of maximizing conversions ("sales") for its advertiser clients.  Next, these personalized Meta-created ads are micro-targeted and delivered to Meta-created audiences using proprietary algorithms that determine which Meta users are most likely to take the bait.  These algorithms draw from Meta's vast data hoard of user information and purchasing patterns harvested by Meta's in-house data gathering code.  Once delivered on either Facebook or Instagram, these victim users are funneled to other websites or applications—including private WhatsApp and Messenger chat groups—via "click-to" links embedded by Meta in the ads.

3.    Throughout the Class Period, a plague of scammers conspired with Defendants to employ this ecosystem for running financial scam ads on Facebook and Instagram impersonating real financial professionals (like Plaintiffs), falsely suggesting those professionals endorse specific securities; the ads then directed users to WhatsApp "investment" groups administered by the scammers.  Defendants' role in the scheme was that of creator, editor, and optimizer.  Specifically, Meta's Dynamic Creative and Advantage+ generative-AI applications took simple generic marketing inputs from scammers, then created the thousands of individualized advertisements— including the text, translations, imagery, and audio variants—that were ultimately delivered to users. Meta did not merely host or amplify the ads; Meta's tools created them.  *See Bouck v. Meta Platforms, Inc.*, No. 25-cv-05194-RS, ECF No. 61, at 7–10 (N.D. Cal. Mar. 24, 2026); *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1167-68 (9th Cir. 2008) (en banc).

4.    Meta's own Terms, Community Standards, and Advertising Policies state impersonation, false or misleading ads, and coordinated scams are prohibited and will be removed or blocked.[1] California and Florida law likewise prohibit the unauthorized commercial use of a person's identity and false endorsements in advertising.[2]  Despite these legal prohibitions and Meta's contractual representations, Defendants systematically created, delivered, and profited from ads and related promotional content that misappropriated Class members' identities to sell fraudulent securities schemes.

---

[1]    *How Meta enforces its policies*, META, https://transparency.meta.com/enforcement/ [https://perma.cc/8RV4-QNZW].

[2]    *See* Cal. Civ. Code §3344; Fla. Stat. §540.08.

FIRST AMENDED COMPLAINT

5.    Class members like Plaintiffs—licensed investment advisers, planners, brokers, and other financial professionals—did not consent to the use of their names, likenesses, voices, or personas in Meta-served ads or WhatsApp solicitations, nor did they authorize any endorsement of the promoted securities.  The impersonation ads and group solicitations were designed to and caused consumer confusion, diverted prospective clients, damaged goodwill, as well as exposed Class members to reputational harm, regulatory inquiries, and lost business opportunities.

6.    On or about June 11, 2025, a bipartisan coalition of state Attorneys General ("AGs") publicly warned Meta that paid impersonation ads and WhatsApp investment groups were being used to perpetrate widespread fraud against U.S. consumers, including through fake endorsements by financial figures.[3] Nevertheless, during July 2025 and thereafter, Meta continued to serve or allow materially identical impersonation ads and funnels to proliferate.  Each placement, delivery, and amplification of an impersonation ad—before and after Meta's notice—constitutes an unauthorized commercial use, false endorsement, and violation of Meta's own stated policies.

7.    During the Class Period, Meta created and delivered these financial scam ads to millions of U.S. users, generating substantial advertising revenues for itself, while inflicting concrete realized injuries on the Class members, including loss of current and prospective clients, diversion of time and resources to counteract the impersonations, reputational and brand dilution, and ongoing risk of future impersonations.  Had they been timely warned, Plaintiffs and many Class members would have taken additional protective measures—or demanded platform-level protections—had they known Meta was knowingly creating and profiting from these investment scams.

8.    The full scope of Defendants' misconduct, including scam advertiser identities, is concealed and lies within Defendants' exclusive possession.  Given the surreptitious and secretive nature of Defendants' conduct, more evidence supporting the allegations in this Complaint will be uncovered after a reasonable opportunity for discovery.

---

[3]    *42 State and Territory Attorneys General Urge Meta to Take Action Against Investment Scam Ads*, N. ASS'N OF ATT'YS GEN. (2025), https://www.naag.org/press-releases/42-state-and-territory-attorneys-general-urge-meta-to-take-action-against-investment-scam-ads/ [https://perma.cc/5YG3-3AHQ].

FIRST AMENDED COMPLAINT

**JURISDICTION AND VENUE**

9.      This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(d) because the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative Class members defined below, and minimal diversity exists because the majority of putative Class members are citizens of a state different than Defendants.

10.      This Court has general personal jurisdiction over Defendants because their principal place of business is in California.  Additionally, Defendants are subject to specific personal jurisdiction in this state because a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in this state.

11.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because a substantial portion of the conduct described in this Complaint was carried out in this district.  Furthermore, Defendants Meta, Instagram LLC, Facebook Operations, LLC, and WhatsApp LLC are headquartered in this district and subject to personal jurisdiction in this district.

I.    **PARTIES**

    A.    **Plaintiffs**

12.      Plaintiff John Suddeth is a natural person and citizen of the State of Florida and a resident of Collier County.

13.      Plaintiff Sara Perkins is a natural person and citizen of the State of Florida and a resident of Collier County.

    B.    **Defendants**

14.      Defendant Meta is a Delaware corporation, organized and existing under the laws of the State of Delaware, with its principal place of business at 1 Meta Way, Menlo Park, California 94025.  Meta is the successor issuer to, and parent holding company of, Facebook.

15.      Defendant Instagram is a Delaware limited liability company, organized and existing under the laws of the State of Delaware, with its principal place of business located at 1 Meta Way, Menlo Park, CA 94025.  Instagram is a wholly owned subsidiary of Meta.

- 4 -
FIRST AMENDED COMPLAINT

16.     Defendant Facebook is a Delaware limited liability company, organized and existing under the laws of the State of Delaware, with its principal place of business located at 1 Meta Way, Menlo Park, CA 94025. Facebook is a wholly owned subsidiary of Meta.

17.     Defendant WhatsApp is a Delaware limited liability company, organized and existing under the laws of the State of Delaware, with its principal place of business at 1 Meta Way, Menlo Park, CA 94025. WhatsApp is a wholly owned subsidiary of Meta.

### SUBSTANTIVE ALLEGATIONS

18.     Meta operates one of the largest integrated social networking and digital advertising ecosystems in the world. Founded in 2004 as Facebook, Meta has since expanded into multiple products and services used by billions of people globally, positioning itself as an indispensable conduit for online communication, content distribution, and paid commercial promotion.

19.     Meta's core consumer products include Facebook and Instagram, which host user profiles, pages, and feeds where paid advertisements can be inserted and algorithmically optimized, and WhatsApp, an end-to-end encrypted messaging service that supports one-to-one chats and large group conversations. Meta centrally controls its paid advertising business by providing a step-by-step process for assisting advertisers in creation, budgeting, targeting, and delivery of marketing campaigns across Facebook, Instagram, and by integrating "click-to-message" placements that intentionally funnel users to other applications and websites (including WhatsApp and Messenger chats and groups).[4]

20.     To maximize Meta's profitability, the Company operates in a symbiotic relationship with those who use its platform providing comprehensive support for its advertiser clients. This support is principally manifested through its (1) Ads Manager, (2) Meta Business Suite, (3) Meta Pixel, and (4) Advantage+ AI software.[5]

    a.     **Ads Manager** – Meta states "Ads Manager is your starting point for running ads on Facebook, Instagram, Messenger or Audience Network. It's an all-in-one tool

---

[4] *Move your business forward with Meta technologies.*, META, https://business.meta.com/.
[5] *Id.*

FIRST AMENDED COMPLAINT

for creating ads, managing when and where they'll run, and tracking how well your campaigns are performing towards your marketing goals."[6]  They go on to provide a detailed 21-step process walking users through how to create an ad and distribute it on the Meta Platforms by selecting various criteria from dropdown menus, checkboxes, and utilization of other in-house applications.[7]  Of particular note is Meta's "Dynamic Creative" application within Ads Manager which allows users to "upload multiple creative elements, like images and headlines, which are automatically combined to generate different ad variations for your audience."[8]  This transfers the material portion of ad creation out of the hands of users and into Meta's. Some examples of this work include "[c]reating videos from images," "[s]wapping text between fields, such as primary text and headline," "[c]reating a Stories carousel ad based on a single image, headline, or product catalog," and "[a]dding songs that match your ad's content" among numerous other features.[9]

b.      **Business Suite** – Meta states, "Meta Business Suite is a one-stop shop where you can manage all of your marketing and advertising activities on Facebook and Instagram. It centralizes tools that help you connect with your customers on all apps and get better business results."[10]  Specifically, from the Business Suite, users can monitor which ads were the most successful, view the demographics of those

---

[6]      *Ads Manager*, META, https://www.facebook.com/business/tools/ads-manager?ref=bmcg (attached as Exhibit A).

[7]      *Create ad campaigns in Meta Ads Manager*, META, https://www.facebook.com/business/help/621956575422138?id=649869995454285 [https://perma.cc/6XMW-JVA8].

[8]      *About dynamic creative*, META, https://www.facebook.com/business/help/170372403538781?id=244556379685063&ref=fbb_ads manager_products [https://perma.cc/PMY6-66XB].

[9]      *Id.*

[10]      *Meta Business Suite*, META, https://www.facebook.com/business/tools/meta-business-suite (attached as Exhibit B).

FIRST AMENDED COMPLAINT

responding to the ads, and provide a central location for users to manage their campaigns across Facebook, Instagram, Messenger, and WhatsApp.[11]

c.      **Meta Pixel** – Meta Pixel is a piece of JavaScript code owned by Meta and attached to advertisements.[12]  This code collects and sends consumer/user data back to Meta to feed its Advantage+, Dynamic Creative, and other AI platforms with information.[13]  This information allows Meta to serve micro-targeted ads to a captive audience resulting in more sales for advertisers, as well as more advertising revenue for Meta due to its superior delivery of ads and unique insight in creating them.

d.      **Advantage+** – Meta states "Meta Advantage+ is a suite of products that can help you enhance and optimize campaign performance through industry-leading AI and automation."[14]  For content creation specifically, the Advantage+ Creative program will "Optimize existing creative[s]" by "animat[ing] a static image into a video," "[g]enerate new backgrounds for product images," and "[a]dd music to your videos."[15]  Additionally, it will "[g]enerate new and diverse text, videos and images" by "produc[ing] new full image, video and text variations inspired by your original ad creative to appeal to new and future audiences."[16]  Finally, it "[t]ranslate[s] text in your ads into multiple languages and your voiceovers in videos"[17]  Meta's Chief Executive Officer ("CEO") Mark Zuckerberg summarized Advantage+'s role in ad creation stating "We're gonna be able to come up with, like, 4,000 different versions

---

[11]     *Id.*

[12]     *Unlock smarter advertising with insights from your website*, META, https://www.facebook.com/business/tools/meta-pixel?ref=bmcg (attached as Exhibit C).

[13]     *Id.*

[14]     *Instantly create ads that are personalized and optimized for your customers*, META, https://www.facebook.com/business/ads/meta-advantage-plus/creative (attached as Exhibit D); *Maximize your campaign performance with AI*, META, https://www.facebook.com/business/ads/meta-advantage-plus (attached as Exhibit E).

[15]     Exhibit D.

[16]     *Id.*

[17]     *Id.*

FIRST AMENDED COMPLAINT

of your creative and just test them and figure out which one works best."[18]   In summary, Advantage+ does the material portion of ad creation by using Meta's wealth of market data to generate and deliver thousands of personalized ads to a targeted audience based on a few basic elements dropped into prefilled templates. These ads are purposefully designed to "make them [(the audience)] convert by instantly producing and enhancing diverse ads in multiple formats (image, video, text and audio)" by "[r]each[ing] customers with exactly the right creative."[19]   Meta represents that these software offerings are intended to help people connect and help legitimate businesses reach customers.[20]   To that end, Meta publishes Terms, Community Standards, and Advertising Policies that prohibit impersonation, false or misleading statements, and fraudulent or deceptive practices.[21]  Meta also states that it will remove or restrict content, accounts, and advertisements that violate these rules, and that it provides reporting tools for swift enforcement.[22]

21.    To this end, Reuters journalist Jeff Horwitz ran an experiment during the Class Period to see just how well Meta enforces its anti-fraud policies, and to see the Company's role in creating financial scam ads like those which stole Plaintiffs' identities.[23]  In his article titled *Meta's "Trusted Experts" helped me run scam ads on Facebook and Instagram*, Horwitz details his experience with Meta's ad creation tools including Advantage+ to perpetrate a pseudo investment

---

[18]    Jeff Horwitz, *Meta's "Trusted Experts" helped me run scam ads on Facebook and Instagram*, REUTERS (Dec. 15, 2025), https://www.reuters.com/investigations/metas-trusted-experts-helped-me-run-scam-ads-facebook-instagram-2025-12-15/.

[19]    Exhibit D.

[20]    *OUR MISSION Build the future of human connection and the technology that makes it possible*, META, https://www.meta.com/about/company-info/ [https://perma.cc/69Q7-LJ6C].

[21]    *Transparency Center*, META, https://transparency.meta.com/ [https://perma.cc/QBK5-JQ9H].

[22]    *Taking action*, META, https://transparency.meta.com/enforcement/taking-action/ [https://perma.cc/45BW-SKKJ].

[23]    Jeff Horwitz, *Meta's "Trusted Experts" helped me run scam ads on Facebook and Instagram*, REUTERS (Dec. 15, 2025), https://www.reuters.com/investigations/metas-trusted-experts-helped-me-run-scam-ads-facebook-instagram-2025-12-15/.

- 8 -

FIRST AMENDED COMPLAINT

"pump-and-dump" fraud.[24]  There, Horwitz detailed how Meta walked him step-by-step through the process, first having him select geographies for his ads to run.  Of note, he details that markets which have strict anti-scam laws, such as Singapore and Taiwan, were unavailable.[25]  From there, substantive work on creating the ads began.

22.    To begin, Horwitz entered a simple marketing phrase about "big returns" into Meta's Advantage+ platform.[26]  From there he details how Advantage+ came up with a litany of "variants that featured new visuals, including AI-generated people of different ethnicities.  It also suggested different text: 'Tired of living paycheck to paycheck?' one asked. 'Break the cycle and start earning a steady weekly income with our proven system.'"[27]  Below is a screenshot displaying the Advantage+ interface and sampling of Meta-created ads from the article:



23.    Horwitz goes on to explain that "[i]nstead of asking me to choose one, Meta suggested I authorize all of the alternates. Its platform would then test each variant, directing my money to those that performed best."[28]  Furthermore, he notes that the "ads felt scammy already, and some of the claims featured in Meta's ads violated Reuters policy against making false

24    *Id.*
25    *Id.*
26    *Id.*
27    *Id.*
28    *Id.*

statements."[29]  Next, "[w]ithin 20 minutes" after "click[ing] publish," the fraudulent ads began circulating without having been subjected to any meaningful screening by Meta.[30]  "After four days," the "ads had logged well over 100 clicks," with Horwitz receiving "more than three dozen inquiries via my website and Facebook Messenger."[31]  He concludes by detailing his interaction with a would-be victim—a North Carolina man who was up all night looking for work—warning him of how ads like these, promising guaranteed returns were "too good to be true" and to be wary of such scams in the future.[32]  During the period relevant to this action, criminal actors acting in the same manner as Horwitz, employed Meta's Ads Manager, Meta Business Suite, Meta Pixel, and Advantage+ software to run the same type of financial scam using the names, images, voices, and personas of Plaintiffs and other financial professionals to pump-and-dump thinly-traded offshore-based microcap securities.  Meta filled the role of co-conspirator, materially contributing to these ads by generating the majority of distributed material through its Dynamic Creative and Advantage+ applications.  Like Horwitz, the fraudsters merely entered simple statements about "big returns" in their native language into the applications which in turn created thousands of personalized advertisements in a variety of languages using data harvested by Meta Pixel.  These ads deceptively endorsed specific thinly-traded, China-based securities and then routed users via links or "send message" buttons into WhatsApp investment groups purportedly run by Plaintiffs and other impersonated financial advisors, but in reality were administered by the scammers.  In these groups additional misrepresentations and pressure tactics were employed to induce victims into buying the promoted stocks.

24.    The fraudulent ads and related WhatsApp group impersonation solicitations were neither isolated nor accidental.  They reflected coordinated marketing campaigns created by Meta and the scammers that repeatedly used the identities of financial professionals without consent, misled users as to source, sponsorship, and approval, and contravened Meta's published prohibitions

---

[29]    *Id.*

[30]    *Id.*

[31]    *Id.*

[32]    *Id.*

on impersonation, fraud, and deceptive practices.  Despite Meta's public commitments and promises on enforcement, these campaigns were knowingly created, optimized, targeted, and delivered by Meta, to users of the Meta Platforms, without being subject to any type of meaningful scrutiny. Meta's only motivation was to generate as many conversions (sales) as possible for its advertiser customers, motivating them to purchase more ad space from Meta, and feed data into its AI algorithm machine.

25.    This motivation is exemplified by the fact Meta permits companies based in China, and elsewhere where local access to the Meta Platforms by citizens is banned, to nonetheless advertise on the Meta Platforms to an exclusively foreign audience.[33]  In the Reuters article titled *Meta tolerates rampant ad fraud from China to safeguard billions in revenue*, Horwitz details how "Meta believed China was the country of origin of roughly a quarter of all ads for scams and banned products on the Meta Platforms worldwide," yet chooses not to take meaningful action in the interest of profit.[34]  Specifically:

> *Though China's authoritarian government bans use of Meta social media by its citizens, Beijing lets Chinese companies advertise to foreign consumers on the globe-spanning platforms. As a result, Meta's advertising business was thriving in China, ultimately reaching over $18 billion in annual sales in 2024, more than a tenth of the company's global revenue.*
>
> *But Meta calculated that about 19% of that money – more than $3 billion – was coming from ads for scams, illegal gambling, pornography and other banned content, according to internal Meta documents reviewed by Reuters.* [35]

26.    The article goes on to explain that "[b]ecause the harmful advertising doesn't target Chinese citizens, . . . China's government generally turns a blind eye," and that "[t]he Chinese government does not interfere when violations target overseas audiences," so "[c]rooked domestic advertisers, therefore, face 'little or no risk.'"[36]  Additionally, the article notes that other social media

---

[33]    Jeff Horwitz & Engen Tham, *Meta tolerates rampant ad fraud from China to safeguard billions in revenue*, REUTERS (Dec. 15, 2025), https://www.reuters.com/investigations/meta-tolerates-rampant-ad-fraud-china-safeguard-billions-revenue-2025-12-15/.

[34]    *Id.*

[35]    *Id.* (emphasis added).

[36]    *Id.*

FIRST AMENDED COMPLAINT

platforms such as Google and TikTok employ stricter requirements of advertisers, including "thorough identity checks," which is why unlawful activities are particularly prevalent on the Meta Platforms when compared to its competition.[37]  To confirm its suspicions, Reuters sent investigators in China to the listed headquarters of Beijing Tengze Technology Co Ltd, one "of Meta's top 200 advertisers worldwide, in the same league as brands such as American Express, BMW and Chanel," finding that it "led to a residential street in a mountain town nearly two hours from Beijing" where any headquarters "turned out not to exist."[38]  Another was Shenzhen Fugaoda Technology Co Ltd, where investigators found "an empty office with trash on the floor" and not a legitimate business.[39]  The article alleges Meta is aware of this obvious abuse.  However, instead of implementing procedures to combat this Chinese fraud—which Meta has done in the past with some success—it simply ignores it in the interest of protecting over 10% of its annual revenue.[40]

27.    The Meta Platforms collectively reach approximately 3.58 billion people per day, including vast audiences in the U.S., delivering its targeted financial scam and impersonation campaigns at scale.[41]  As a result, Plaintiffs and other financial professionals and advisors across the country suffered uniform realized injuries, including unauthorized commercial exploitation of their identities, loss of goodwill, actual diversion of prospective clients and reputational harm from false associations with fraudulent stock schemes.  Additionally, they face a continuing risk of future harm from further impersonations facilitated by Meta and its co-conspirators.

28.    Further, Meta's Terms/Policies promise that impersonation, fraud, and deceptive ads are prohibited, and will be removed or restricted.[42]  These were not vague pie-in-the-sky ideals. They were detailed, specific, contract forming promises Plaintiffs and other financial professionals accepted and/or detrimentally relied upon when they joined, remained, and engaged with clients on

---

[37]    *Id.*

[38]    *Id.*

[39]    *Id.*

[40]    *Id.*

[41]    Meta Platforms, Inc., Annual Report (Form 10-K) at EX-99.1 (Jan. 28, 2026).

[42]    *Policies*, META, https://transparency.meta.com/policies/ [https://perma.cc/5XYZ-RSB3].

FIRST AMENDED COMPLAINT

the Meta Platforms.  Meta's failure to live up to those commitments—especially after notice in the form of explicit complaints from Plaintiffs and the proposed class, as well as direct warnings from 42 state attorneys general ("AGs")—frustrated the Class's reasonably expected benefits, breaching both the terms of their agreement with Meta, the implied covenants of good faith and fair dealing, and failing to warn of a known conspiracy independent of Meta's publishing function by prioritizing ad revenue over safety.

29.    The pump-and-dump conspiracy at issue here is not a conspiracy to publish ads—it is a conspiracy to manipulate the U.S. securities markets.  The criminal scheme has three components that operate independent of Meta's publishing and hosting functions: (i) the pre-positioning of shares in thinly-traded Chinese microcap securities by the scammers and their co-conspirators before any ad is run; (ii) the coordinated trading, scripted 'analyst notes,' coordinated 'buy' signals, and timed 'dumps' executed inside WhatsApp broadcast groups administered by the scammers, using stolen identities, and scripted pressure tactics that Meta did not create, host, or moderate as publisher; and (iii) the coordinated sell-off and wash-trading in U.S. securities markets—conduct that occurs entirely off-platform.  Meta's platforms are the recruitment and delivery channel for victims, but the underlying securities-fraud conspiracy—its planning, share accumulation, coordinated execution, and exit—exists and operates independent of Meta's role as a publisher or host of content.  Meta had actual knowledge of this off-platform conspiracy no later than its receipt of the June 11, 2025, bipartisan state-AG letter, the WSJ and Reuters investigations, and the Plaintiffs' own reports yet chooses to do nothing. *See Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016); *Est. of Bride ex rel. Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1181 (9th Cir. 2024).

30.    Plaintiffs acknowledge that some of the conduct alleged herein overlaps with Meta's role as a publisher of third-party content.  Plaintiffs' claims, however, are not premised on Meta's publishing function but on (i) Meta's own creation and material contribution to the fraudulent ad content through its Dynamic Creative and Advantage+ generative-AI tools, (ii) Meta's breach of a specific, express contractual promise to remove violating content, and (iii) Meta's independent duty

- 13 -
FIRST AMENDED COMPLAINT

to warn Plaintiffs of a known off-platform conspiracy.  To the extent Defendants invoke 47 U.S.C. §230(c)(1), that is an affirmative defense as to which Defendants bear the burden.

## II.   META MATERIALLY CONTRIBUTED TO THE IMPERSONATION SCAMS BY CREATING AND/OR CO-AUTHORING THE ADS, AS WELL AS TARGETING THEIR DELIVERY

31.   Throughout the Class Period, there has been a surge of paid financial scam advertisements on Facebook and Instagram that funnel users into WhatsApp "investment" groups which impersonate financial professionals, and promote thinly-traded, China-based securities. These scams regularly feature the names, images, likenesses, and/or voices of real advisors without consent and misrepresent that those professionals genuinely endorse the promoted stocks.

32.   The impersonators' ad campaigns follow a standardized playbook: scammers purchased ad space on Facebook and/or Instagram through Meta itself or through its foreign agency partners, then collaborated with Meta on the creation of fraudulent ads utilizing Meta's step-by-step instructions and content generation companion applications.  Specifically, they utilized the Dynamic Creative features of Ads Manager, as well as generative AI, audience creation, and targeting using Advantage+.  Advantage+ and Dynamic Creative are not neutral tools; they put Meta in the driver's seat of the ad creation, mass-producing personalized ads from generic inputs and directing them to audiences Meta's Pixel data deems most vulnerable to the scam. From there, Meta Business Suite oversees the scheme, linking the fraudulent ads to WhatsApp or Messenger "investment" groups through "click-to" links embedded in the ads.  These groups are purported to be run by Plaintiffs and other legitimate financial advisors, displaying stolen images of themselves, their names, their businesses, professional credentials, and other personally identifying features.  Within these chats, thinly-traded securities linked to off-shore, Asia-based companies were shelled via scripted "analyst notes," "institutional-grade" research, fabricated testimonials, and coordinated "buy" signals to inflate trading prices.

33.   On May 15, 2025, The Wall Street Journal ("WSJ") published an investigation titled "Criminal Scams Flood Instagram and Facebook --- Meta profits from ads for fake puppies, phony bargains," reporting that regulators, banks, and Meta's own internal documents identify Meta as a

- 14 -
FIRST AMENDED COMPLAINT

cornerstone of the internet-fraud economy.[43]  The article recounts that nearly half of all Zelle scams at JPMorgan in 2023-2024 originated on Meta; UK and Australian regulators have logged similar levels; and a 2022 internal analysis found ~70% of newly active advertisers were promoting scams, illicit goods, or "low quality" products.[44]  It further details how Meta permits eight and 32 automated "strikes" for financial fraud before banning ad accounts.[45]

34.    The WSJ report attributes Meta's persistent under-enforcement to financial incentives.[46]  Employees said the company is reluctant to add impediments for ad-buying clients who drove $160 billion in advertising revenue (22% increase from 2023 to 2024 and Meta's principal revenue source).[47]  Meta also abandoned plans to verify advertisers (akin to political-ad rules) out of concern it would lose revenue from marketers unable or unwilling to pass identity checks.  In short, according to the WSJ report, Meta chose to preserve its advertising juggernaut at the expense of robust scam prevention, even as criminal networks exploited Facebook and Instagram at scale.

35.    In response to mounting complaints and public outcry about impersonation-driven investment scams, Meta acknowledged the existence of fraudulent advertising and WhatsApp abuse, but represented that only a small fraction of ads violated policy, and that detection systems might experience "false negatives."[48]  Despite these assurances, Meta continues to materially contribute to fraudulent investment advertisements through its ad creation software and targeting data.  By failing to take action, more and more victims are funneled into WhatsApp groups exploiting the

---

[43]    Exhibit F.

[44]    *Id.*

[45]    *Id.*

[46]    *Id.*

[47]    *Id.*

[48]    *Id.*

- 15 -

FIRST AMENDED COMPLAINT

misappropriated identities of Plaintiffs and Class members, causing continued harm to financial professionals and investors alike.

36.     On or about June 5, 2025, a bipartisan coalition of state AGs transmitted a detailed written notice and demand letter to Meta's senior leadership (including the company's Chief Legal Officer) warning that Meta's advertising and messaging products were being systematically exploited for securities fraud.[49]  The AGs specifically identified paid impersonation advertisements on Facebook and Instagram that funneled users into WhatsApp investment groups, described the use of well-known financial figures' names and likenesses without consent, and urged Meta to take immediate corrective action—including stricter advertiser verification, proactive screening/takedowns of financial-promotion ads, and adequate restitution pathways for victims.[50] The letter placed Meta on explicit notice that U.S. consumers and professionals were being deceived by impersonation-driven schemes operating on the Meta Platforms.[51]  Despite receiving this multi-state enforcement notice, Meta continued to approve, deliver, and optimize materially identical impersonation ads, and click-to-WhatsApp funnels from July 2025 and beyond.

37.     Continued proliferation of investment scam ads to this day highlights Meta's failure to implement the reasonable, platform-level safeguards requested by state AGs.  In the rare instances ad takedown does occur, substantially similar advertisements and WhatsApp/Messenger groups reappear under new ad accounts and group names.  Meta's Dynamic Creative and Advantage+ platforms make this quick pivot possible by taking the material work out of the hands of fraudsters and into Meta's.  By taking simple generic statements and turning them into thousands of new, personalized, and targeted ads with data accumulated from Meta Pixel, these platforms enabled scammers to quickly regroup and continue their systematic campaigns.  Meta's ongoing creation and profiteering from these impersonation ads after notice further support Plaintiffs' claims for false

[49]     Letter from Letitia James et al. to J. Gillian Newstead (Jun. 5, 2025) https://www.naag.org/wp-content/uploads/2025/06/Letter-to-Meta-re-Scam-Investments-_FINAL.pdf [https://perma.cc/694Q-7QPF].

[50]     *Id.*

[51]     *Id.*

FIRST AMENDED COMPLAINT

endorsement, right of publicity, unfair practices, unjust enrichment, and injunctive relief compelling robust advertiser verification and prompt takedowns of financial impersonation content.

38.    In September 2025, the Securities and Exchange Commission ("SEC") launched a new task force to investigate both foreign issuers and U.S. intermediaries implicated in these Chinese microcap pump-and-dump schemes.[52]  As a result, charges have been levied by the Department of Justice ("DOJ") against individuals and executives affiliated with China Liberal Education Holdings, Ltd. (ticker "CLEU") and Ostin Technology Group, Ltd. (ticker "OST"); these stocks were pumped-and-dumped on the Meta Platforms using the strategy outlined herein.[53]  The release specifically identifies "gatekeepers" like Meta, who enable "'pump-and-dump' and 'ramp-and-dump' schemes" perpetrated by "foreign-based companies" including "China" as targets of the new task force.[54]  Paul S. Atkins, Chairman of the SEC was quoted in the September 5th release stating:

> *[W]e will not tolerate bad actors – whether **companies, intermediaries, gatekeepers** or exploitative traders – **that attempt to use international borders to frustrate and avoid U.S. investor protections**. This new task force will consolidate SEC investigative efforts and allow the SEC to **use every available tool to combat transnational fraud**."*[55]

39.    Overall, the SEC press release reinforces just how omnipresent foreign based microcap Initial Public Offering ("IPO") frauds have been throughout the Class Period.  Again, this demonstrates that Meta was aware that these scams were being perpetrated on the Meta Platforms, and that the Company was materially contributing to them through its ad generation software, yet

---

[52]    Press Release, SEC, *SEC Announces Formation of Cross-Border Task Force to Combat Fraud* (Sept. 5, 2025), https://www.sec.gov/newsroom/press-releases/2025-113-sec-announces-formation-cross-border-task-force-combat-fraud [https://perma.cc/HSN8-GFDB].

[53]    *Co-CEO of Chinese Publicly Traded Technology Company and Financial Advisor Indicted for Over $100M Securities Fraud Scheme*, DOJ (Sep. 12, 2025), https://www.justice.gov/opa/pr/co-ceo-chinese-publicly-traded-technology-company-and-financial-advisor-indicted-over-100m [https://perma.cc/2SQY-YASL]; *United States v. Lim Xiang et al.*, Case No. 1.25-cr-00161 (N.D. Ill. Mar. 20, 2025), https://www.justice.gov/usao-ndil/media/1394106/dl?inline [https://perma.cc/6Y3A-UG7E].

[54]    *SEC Announces Formation of Cross-Border Task Force to Combat Fraud*, SEC (Sep. 5, 2025), https://www.sec.gov/newsroom/press-releases/2025-113-sec-announces-formation-cross-border-task-force-combat-fraud [https://perma.cc/KNE2-HFQ9].

[55]    *Id.*

FIRST AMENDED COMPLAINT

chose to do nothing.  Finally, but critically, the impersonation schemes do not distinguish between professionals based on notoriety or audience size.  Local and regional advisors were, and continue to be, impersonated alongside nationally recognized figures, exposing all to realized and ongoing reputational injury, client confusion, regulatory inquiries, and diversion of prospective business. Plaintiffs and the Class members did not consent to the use of their names, images, likenesses, voices, or professional credentials by Meta, and each unauthorized use constituted a separate publicity violation, act of misappropriation, and false endorsement.

## III.    THE INVESTMENT SCAM UNLAWFULLY MISAPPROPRIATED PLAINTIFFS' IDENTITIES

40.     Plaintiffs are licensed financial professionals who, during the Class Period, maintained professional presences on Facebook, Instagram, and/or WhatsApp.  There, each Plaintiff was impersonated by Meta and its co-conspirators without consent in paid advertisements and related promotional content.  This content falsely suggested Plaintiffs endorsed various thinly-traded Chinese microcap securities—Pheton Holdings Ltd ("Pheton" or ticker "PTHL") being one—and steered users into WhatsApp "investment" groups used to perpetrate a pump-and-dump scheme.

41.     Plaintiff Suddeth is a Florida-based financial and investment professional who maintains a professional presence on the Meta Platforms.  Plaintiff Suddeth has over 35 years of experience in investment management, holding the Chartered Financial Analyst ("CFA") designation since 1996.  The CFA designation is globally recognized and attests to a charterholder's success in a rigorous and comprehensive study program in the field of investment management and research analysis.  Plaintiff Suddeth is registered with the Florida Office of Financial Regulation and with the Financial Industry Regulatory Authority ("FINRA").

42.     Multiple sponsored ads were substantially created by Meta using the Dynamic Creative and Advantage+ software, run on the Meta Platforms, and funneled victims to Meta's WhatsApp and Messenger groups.  There, Plaintiff Suddeth's name, headshot, and fabricated quotes invited users to "join my WhatsApp research group."  The actual sponsored ads that ultimately drove users to the WhatsApp groups where Plaintiff Suddeth was impersonated were not uploaded in final form by the scammers.  Rather, on information and belief, these ads were generated, created, or

- 18 -
FIRST AMENDED COMPLAINT

materially transformed, by Meta's Dynamic Creative and Advantage+ applications from generic inputs supplied by the scammers—in the same manner demonstrated by the Reuters experiment described above.  Specifically, and consistent with Meta's own documented capabilities: (a) the language was produced or rewritten by Advantage+'s 'Generate new and diverse text' feature from a short foreign-language seed phrase; (b) the visual compositions were assembled, resized, and variant-tested by Dynamic Creative's automated image-combination feature; (c) the targeting audiences for these variants were not supplied by the scammers but were constructed by Meta using Meta Pixel data harvested from U.S. financial-services sites; and (d) Meta tested multiple creative variants against one another and directed spend to the best-performing impersonation variants, in the same manner Meta offered to Mr. Horwitz when it "suggested [he] authorize all of the alternates."  Meta thus did not merely publish the scammers' content—Meta's tools created, generated and selected the content that injured Mr. Suddeth.

43.    Below is a screenshot from one of the WhatsApp groups impersonating Plaintiff Suddeth:



FIRST AMENDED COMPLAINT

44.    In addition to materially contributing to their creation, Meta delivered these scam ads to targeted audiences the Company created using data mined with its proprietary Meta Pixel code and accompanying algorithms.  This demonstrates that not only did Meta materially contribute to investment scam ads enabling identity theft; it fully created the audience through targeted delivery, thereby misappropriating Plaintiffs' and class members' identities on multiple levels to advance PTHL and numerous other pump-and-dump stock schemes.

45.    During the Class Period, Plaintiff Suddeth received notice on LinkedIn from a U.K. based investment professional that his professional likeness was being used in WhatsApp's chatroom for a pump-and-dump scheme.  Plaintiff Suddeth attempted to contact Meta multiple times regarding the illegal activity, with no response.  Additionally, he identified at least one U.S. telephone number that was associated with the impersonator(s).  Plaintiff Suddeth called the number itself—+1 (480) 764-0085—which returned as not available.  Again, Plaintiff Suddeth reported this number to Meta but received no response.

46.    Plaintiff Sara Perkins is another Florida-based financial and investment professional who maintains a professional presence on the Meta Platforms.  Plaintiff Perkins has over a decade of experience as a financial professional and has worked since 2017 as a client advisor.  Plaintiff Perkins is an Investment Advisor Representative of Naples Global Advisors, LLC, registered with the Florida Office of Financial Regulation and FINRA; an accreditation granted for passing the Series 65 Exam.

47.    Plaintiff Perkins was similarly impersonated in WhatsApp chat groups promoting PTHL displaying her likeness and credentials, falsely claiming exclusive knowledge of an imminent catalyst for PTHL.  These WhatsApp groups were populated by users who followed ads that were substantially created by Meta using the Dynamic Creative and Advantage+ software.  After users clicked "Message," they were auto-routed to WhatsApp chats where scammers—posing as "Adviser B" or "Adviser B's assistant"—issued coordinated "buy" prompts for PTHL on behalf of Ms. Perkins.  Meta's creation and delivery of these ads to targeted audiences, which incorporated funnels to WhatsApp scam groups, unlawfully exploited Plaintiff Perkins' persona to solicit trades.  The actual sponsored ads that ultimately drove users to the WhatsApp groups where Plaintiff Perkins

was impersonated were not uploaded in final form by the scammers.  Rather, on information and belief, these ads were created, generated, or materially transformed, by Meta's Dynamic Creative and Advantage+ applications from generic inputs supplied by the scammers—in the same manner demonstrated by the Reuters experiment described above.  Specifically, and consistent with Meta's own documented capabilities: (a) the language was produced or rewritten by Advantage+'s "Generate new and diverse text" feature from a short foreign-language seed phrase; (b) the visual compositions were assembled, resized, and variant-tested by Dynamic Creative's automated image-combination feature; (c) the targeting audiences for these variants were not supplied by the scammers, but were constructed by Meta using Meta Pixel data harvested from U.S. financial-services sites; and (d) Meta tested multiple creative variants against one another and directed spend to the best-performing impersonation variants, in the same manner Meta offered to Mr. Horwitz when it "suggested [he] authorize all of the alternates."  Meta thus did not merely publish the scammers' content—Meta's tools generated and selected the content that injured Ms. Perkins.

48.    Below is a screenshot from one of the WhatsApp groups impersonating Plaintiff Perkins:



FIRST AMENDED COMPLAINT

49.     At no time did Plaintiffs Suddeth or Perkins consent to the use of their names, images, voices, credentials, or professional personas in Meta ads or WhatsApp solicitations, nor did they authorize any endorsement of PTHL.  Plaintiffs notified Meta of the impersonations when discovered, but nonetheless substantially similar creatives and group funnels reappeared.

50.     Plaintiffs wish to continue maintaining professional accounts on Facebook and Instagram.  However, absent equitable relief, including an injunction prohibiting Meta from creating, delivering, or optimizing impersonation ads and WhatsApp funnels, Plaintiffs remain at ongoing risk of identity theft, reputational harm, client confusion, and diversion of prospective business tied to future manipulative campaigns (including, without limitation, schemes modeled on the Pheton scheme described herein).

51.     To date, Meta's failure to timely remove or block scam ads that it is on notice of is consistent with knowingly materially contributing to/co-conspiring in a coordinated identity theft scheme by Meta itself.

52.     The operation leveraged broadcast-only groups (where "only admins can send messages") to push synchronized instructions and promotional talking points, while one-to-one chats were used to apply individualized pressure and "coach" victims through order entry.

53.     Members were repeatedly asked to disclose portfolio positions and screenshots to verify compliance and to facilitate coordination across the group—an approach consistent with a pump-and-dump orchestration rather than bona fide investment research.

54.     The channels invoked manufactured credibility through faux technical analysis and purported corporate "developments," designed to convey inevitability of price appreciation and to suppress concerns about volatility or risk.

55.     The impersonation content cross-promoted across chats carried both Plaintiffs' identities, reinforcing the false impression of a professional investment "team" and directing users to scheduled "updates" intended to time buying and selling of PTHL.

56.     The materials include two distinct U.S. telephone numbers embedded next to the impersonated profiles—further evidencing a domestic contact point used to administer or legitimize the scheme, thus demonstrating that the operation targeted U.S. investors on the Meta Platforms.

57.    Collectively, the screenshots demonstrate a standardized playbook: paid Meta-created scam ads to recruit members, scripted direct messages misappropriating Plaintiffs' identities to drive coordinated purchases of PTHL and other thinly-traded Chinese microcap securities. Using Plaintiffs' and the Class's stolen identities as leverage and authority, the schemes induce investor victims to reveal personal account information. The campaigns are systematically structured to inflate the price and volume of targeted securities in advance of a coordinated exit, all while intentionally causing reputational, business, and brand harm to Plaintiffs and members of the proposed class.

58.    This is an ongoing pervasive problem affecting hundreds to thousands of financial professionals, not just the Plaintiffs here. For example, on December 9, 2024, the Washington State Department of Financial Institutions put out a consumer alert notifying that Kevin Simpson, the founder of Capital Wealth Planning LLC, was being impersonated pursuant to this scam.[56] Thereafter, on February 18, 2025, the Washington state regulator issued an update advising that advisors associated with Circle Advisors, Inc., WealthMark Advisory Group, LLC, and Sequoia Financial Group were being impersonated.[57] The June 11, 2025 state AG letter highlights that Joe Kernen of CNBC, Joshua Brown of Ritholtz Wealth Management, Andrew Ross Sorkin of the New York Times, Tom Lee of Fundstrat, Deven McLaughlin of Park Avenue Securities, Joe Terranova of Virtus Investment, Cathie Wood of ARK Investment Managements, Chamath Palihapitiya of Social Capital, Liz Ann Sonders of Charles Schwab & Co., Inc., Savita Subramanian of Bank of America Merrill Lynch, and Karen Finerman of CNBC and Metropolitan Capital were all being impersonated on the Meta Platforms.[58]

---

[56]    *WhatsApp group impersonating Capital Wealth Planning, LLC appears to be engaged in fraud*, WASH. STATE DEP'T OF FIN. INSTS. (2024) https://dfi.wa.gov/consumer/alerts/whatsapp-group-impersonating-capital-wealth-planning-llc-appears-be-engaged-fraud [https://perma.cc/8TC8-MX4A].

[57]    *WhatsApp groups impersonating Registered Investment Advisor firms, appears to be engaged in fraud*, WASH. STATE DEP'T OF FIN. INSTS. (2025), https://dfi.wa.gov/consumer/alerts/whatsapp-groups-impersonating-registered-investment-advisor-firms-appears-be [https://perma.cc/7D5F-WV4A].

[58]    Letter from Letitia James et al. to Jennifer Gillian Newstead (Jun. 11, 2025), https://ag.ny.gov/sites/default/files/letters/letter-to-meta-re-investment-scams-on-facebook-and-whatsapp-letter-2025.pdf [https://perma.cc/6KWX-BMH2].

FIRST AMENDED COMPLAINT

59.     The website StopNasdaqChinaFraud.com similarly provides examples where Meta materially contributed to impersonations of financial professionals.  On that website, investors and victims have provided hundreds of screenshots of investment professionals being impersonated to promote numerous Chinese companies.  For example, screenshots show that financial professionals Aleks Spellman of Summer Street Capital[59] and Ryan Burbach of Friday Financial[60] were also impersonated to promote the fraudulent PTHL stock.

60.     Again, Defendants' material, knowing contributions to the misappropriation of financial advisor identities has inflicted concrete and continuing harms on Plaintiffs—licensed financial professionals whose livelihoods depend on credibility, candor, and client trust.  By hijacking Plaintiffs' names, images, and professional personas to peddle fraudulent investment "strategies," PTHL being one example, Defendants have falsely associated Plaintiffs with unlawful promotions; diverted prospective clients; triggered client confusion, complaints, and lost business; forced costly mitigation efforts (monitoring, takedowns, reputational repair, and counsel); exposed Plaintiffs to regulatory and brand risk; and diluted the hard-won goodwill they built over years of compliant practice.  Beyond the individual damage, the scheme has eroded public confidence in the advisor-client relationship, and in market integrity itself: investors who encounter counterfeit "advice" bearing real professionals' identities are less able to distinguish legitimate guidance from manipulation, undermining efficient price formation, compliance cultures, and the fair functioning of U.S. securities markets.

**IV.     META FAILED TO ABIDE BY CONTRACTUAL PROMISES MADE IN ITS TRANSPARENCY CENTER AND COMMUNITY STANDARDS TO REMOVE PROHIBITED CONTENT IT IS AWARE OF**

61.     The promises Meta makes to protect its users are clear, unambiguous, and contract forming.  The headline on the opening page of Meta's Transparency Center states, "At Meta, we're

---

[59]     Edwin Dorsey, THE BEAR CAVE (2025) https://www.stopnasdaqchinafraud.com/sncf/ffd77bf6-aaef-4ac1-9367-b631cd601639 [https://perma.cc/7T3U-53WW].

[60]     Edwin Dorsey, THE BEAR CAVE (2025) https://www.stopnasdaqchinafraud.com/sncf/664b5b19-29a2-423b-84fc-aaf6816f3919 [https://perma.cc/975C-PLVG].

- 24 -

FIRST AMENDED COMPLAINT

committed to giving people a voice and keeping them safe."[61]  This same opening page goes on to explain Meta's promises to "keep people safe and *let people hold us accountable*."[62]  Furthermore, it explains Meta's strategy to protect users:

> *Since 2016, we've used a strategy called "remove, reduce, inform" to manage content across Meta technologies.*
>
> *This means we remove harmful content that goes against our policies, reduce the distribution of problematic content that doesn't violate our policies, and inform people with additional context so they can decide what to click, read or share.*
>
> *To help with this strategy, we have policies that describe what is and isn't allowed on our technologies. Our teams work together to develop our policies and enforce them.*

Here, Plaintiffs created professional accounts on the Meta Platforms relying on these clear, unambiguous promises and now seek to "hold [Meta] accountable" for not living up to them.[63]

62.    Drilling down into the "Policies" section of the Transparency Center, Meta's "Community Standards outline what is and isn't allowed on Facebook, Instagram, Messenger and Threads."[64]  There, Meta explains its role as regulator and enforcer on the Meta Platforms. Specifically, how "we take our role seriously in keeping abuse off the service."[65]  Meta goes on to explain that "Our Community Standards apply to everyone, all around the world, and to all types of content, including AI-generated content."[66]  These are not passive guidelines Meta hopes users of its platforms will follow.[67]  They are duties assumed by Meta to actively protect those on the Meta Platforms from abuse and exploitation.  Furthermore, by explicitly "including AI-generated

---

[61] *At Meta, we're committed to giving people a voice and keeping them safe*, META, https://transparency.meta.com/ [https://perma.cc/46EU-LCG9].

[62] *Id.* (emphasis added).

[63] *Id.*

[64] *Community Standards*, META, https://transparency.meta.com/policies/community-standards/ [https://perma.cc/5RP5-MSAE].

[65] *Id.*

[66] *Id.*

[67] *Id.*

content," the investment scam ads Meta created/materially contributed to on its Dynamic Creative and Advantage+ platforms are within the scope of these Community Standards.[68]

63.     Digging further down into the Community Standards, Meta devotes an entire policy section titled "Frauds, Scams, and Deceptive Practices," detailing Meta's role in regulating content on the Meta Platforms:

> *We aim to protect users and businesses from being deceived out of their money, property or personal information. We achieve this by removing content and combatting behavior that purposefully employs deceptive means - such as wilful misrepresentation, stolen information and exaggerated claims - to either scam or defraud users and businesses, or to drive engagement. This includes content that seeks to coordinate or promote those activities using our services.[69]*

Again, these are not pie-in-the-sky ideals for users to follow.  These are clear promises that Meta will act "by removing content and combatting behavior" that violates its policies.[70]  Plaintiffs relied on these promises when they created professional accounts on the Meta Platforms and were subsequently injured when Meta failed to act as promised.  Specifically, Meta co-authored—at a minimum—financial scam ads via its Dynamic Creative and Advantage+ software pumping thinly-traded Chinese microcap securities with Plaintiffs' stolen identities and failed to act when it became aware of these investment frauds.

64.     Driving these promises home, Meta's Frauds, Scams, and Deceptive Practices policies detail the specific types of scam/fraud content "[w]e do not allow."[71]  Specifically, "Investment or Financial Scams" and "Inauthentic Identity Fraud and Scams" are detailed, putting the facts at bar squarely within the scope of Meta's duties and promises to "remove" offending content and/or "inform" impacted users:

**Investment or Financial Fraud and Scams**

- *Investment Opportunities. Content that:*

---

[68]     *Id.*

[69]     *Fraud,        Scams,        and        Deceptive        Practices*,        META, https://transparency.meta.com/policies/community-standards/fraud-and-scams/ [https://perma.cc/PW8G-FELN].

[70]     *Id.*

[71]     *Id.*

- 26 -

FIRST AMENDED COMPLAINT

- *Offers investment opportunities where <u>returns on investment are guaranteed or risk-free.</u>*

- *Offers investment opportunities where returns on investment or compensation is partly or fully based on recruitment of others to participate in the scheme.*

- *Offers investment opportunities where the <u>opportunity is of a "get-rich-quick" nature and/or claims that a small investment can be turned into a large amount.</u>*

**Inauthentic Identity Fraud and Scams**

*Content that:*
- *Attempts to <u>scam or defraud users by misrepresenting the identity of the poster</u> or nature of a request:*

- *Charity Fraud and Scam, which are fraudulent requests for money or donations for charitable causes together with claims that the donation is urgent and includes information, such as bank accounts, where money can be sent.*

- *Romance Fraud and Scam, which are fraudulent attempts to establish online romantic relationships by seeking non-sexual companionship or relationship and offering or asking for money or its equivalent in exchange.*

- *<u>Established Business/Entity Fraud and Scams, which involve falsely claiming to represent, or speak in the voice of, an established business or entity, in an attempt to scam or defraud.</u>*[72]

65. Another section of the Transparency Center is dedicated to "Enforcement" with the subsection "Taking action" detailing how Meta "remove[s]" offending content and "inform[s]" users impacted by said content.[73] The "Remove" section highlights that the Community Standards govern the criteria for what content is removed. From there, a "Deep Dive" subsection breaks Meta's obligations down into specific actions.[74] Of most relevance to the present facts is "Taking down violating content" which states "If your content goes against the Community Standards, *Meta*

---

[72] *Id.* (emphasis added).

[73] *Taking action*, META, https://transparency.meta.com/enforcement/taking-action/ [https://perma.cc/45BW-SKKJ].

[74] *Id.*

*will remove it***.**[75]  This is a straightforward promise.  When applied to the identity theft and financial scam policies detailed above, any reasonable user of the Meta Platforms would understand instances of these frauds Meta becomes aware of would be promptly removed.  Unfortunately, this was not the case for the financial scam ads which injured Plaintiffs and the proposed class.

66.    The Inform subsection highlights how and when Meta warns users of misleading content it becomes aware of.[76]  Specifically:

> *One way Meta promotes a safe, authentic community is by <u>informing people that content might be sensitive or misleading</u>, even if it doesn't explicitly violate the Community Standards. In this instance, we'll include additional context about the content to help people decide what to read, trust or share.*[77]

As the investment scam ads were in clear violation of Meta's Community Standards, removal was appropriate, not a warning.[78]  However, at a minimum, Meta had a duty to warn those impacted by known misleading content of instances it was aware of, and to be vigilant for similar content.  Failure to do so violates Meta's clear and binding promise to warn.  Furthermore, it constitutes negligence for unreasonably failing to warn Plaintiffs and the class of a known conspiracy, operating independent of Meta's publishing function, that Plaintiffs and other financial professionals using the Meta Platforms for professional purposes were having their identities stolen to legitimize Chinese pump-and-dump stock scams.

67.    In summary, Defendants' liability arises from: (a) commercial advertising it created, sold, delivered, optimized, and monetized; (b) the Lanham Act §43(a) false-endorsement claim and the California and Florida right-of-publicity claims, which rest not on Defendants' role as publisher but on Defendants' own participation in creating the offending ad content through their Dynamic Creative and Advantage+ generative-AI tools.  *See Bouck v. Meta Platforms, Inc.*, 2026 WL 810036

---

[75]    *Taking down violating content*, META, https://transparency.meta.com/enforcement/taking-action/taking-down-violating-content/ [https://perma.cc/8UP9-QP3W].

[76]    *Providing context on sensitive or misleading content*, META, https://transparency.meta.com/enforcement/taking-action/context-on-sensitive-misleading-content/ [https://perma.cc/7ZH6-N9UU].

[77]    *Id.*

[78]    *See Fraud, Scams, and Deceptive Practices*, META, https://transparency.meta.com/policies/community-standards/fraud-and-scams/ [https://perma.cc/PW8G-FELN].

- 28 -
FIRST AMENDED COMPLAINT

(N.D. Cal. Mar. 24, 2026), at *4 (*quoting Forrest v. Meta Platforms, Inc.*, 737 F. Supp. 3d 808, 818 (N.D. Cal. 2024)); *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1169 n.24 (9th Cir. 2008); (c) Meta's violations of its own promises—including its Terms, Community Standards, and Advertising Policies—breached by knowingly creating, optimizing, and targeting delivery of scam ads and funnels to chats impersonating Plaintiffs and the proposed class; and (d) negligent failure to warn Plaintiffs and the class of a  known conspiracy operating independent of Meta's publishing function that Plaintiffs and other financial professionals using the Meta Platforms for professional purposes were having their identities stolen to legitimize Chinese pump-and-dump stock scams.  *See Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016).

## CLASS ACTION ALLEGATIONS

68.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

> All financial professionals in the United States whose names, identities, images, voices, likenesses, credentials, branding, or professional personas were used without consent in connection with paid advertisements or related promotional content on Meta's platforms (including Facebook, Instagram, and/or click-to-WhatsApp campaigns and WhatsApp groups) to promote securities or investment opportunities during the period from at least January 1, 2023 through the present (the "Class Period").[79]

69.    "Financial Professional" means any natural person who, during the Class Period, held themselves out to the public and/or was engaged for compensation in providing investment, securities, or financial-planning related advice or services, including, but not limited to, investment adviser representatives, principals or owners of registered investment advisers, broker-dealer registered representatives, portfolio managers, financial planners (e.g., CFP), charterholders acting in an advisory capacity (e.g., CFA), CPAs or attorneys providing investment advisory services, research analysts whose opinions are marketed to investors, insurance producers or agents selling

---

[79]    Plaintiffs have defined the Class based on currently available information and hereby reserve the right to amend the definition of the Class, including, without limitation, the Class Period.

FIRST AMENDED COMPLAINT

variable/registered products, and persons publishing paid investment recommendations or model portfolios.

70.     Excluded from each Class are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

71.     **Ascertainability:** Membership of the Class is defined based on objective criteria, and individual members will be identifiable from Defendants' records.

72.     **Numerosity:** The exact number of members of the Class is unknown and unavailable to Plaintiffs at this time, but individual joinder in this case is impracticable.  The Class likely consists of hundreds to thousands of individuals, and their membership can be identified through Defendants' records.

73.     **Predominant Common Questions:** The Class's claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members.  Common questions for the Class include, but are not limited to, the following:

a.      whether Meta created, delivered, optimized, and/or monetized paid advertisements and related promotional content that impersonated financial professionals on Facebook, Instagram, and/or WhatsApp (including click-to-WhatsApp funnels);

b.      whether Meta's creation and/or material contribution to the ads overcomes the publisher immunity principles of 47 U.S.C. §230(c)(1);

c.      whether the challenged ads, pages, channels, and groups used Class members' names, images, likenesses, voices, credentials, or branding without consent;

d.      whether Meta's conduct constitutes false endorsement/association under the Lanham Act §43(a);

- 30 -
FIRST AMENDED COMPLAINT

e.    whether Meta's conduct violates right-of-publicity/misappropriation laws (e.g., Cal. Civ. Code §3344 and common law; Fla. Stat. §540.08) and/or unfair and deceptive practices statutes (e.g., California Unfair Competition Law ("UCL"), FDUTPA);

f.    whether Meta breached its Terms of Service, Community Standards, and Advertising Policies by allowing impersonation, fraud, or deceptive practices.

g.    whether Meta was unjustly enriched by revenues from the impersonation ads and whether disgorgement/restitution is appropriate on a class-wide basis; and

h.    whether injunctive and declaratory relief requiring enhanced advertiser verification, proactive impersonation filtering, prompt takedowns, and related safeguards is appropriate for the Class as a whole.

74.    **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the proposed Class.  Plaintiffs and Class members' claims arise from the same course of conduct by Meta—namely, creating, delivering, optimizing, and monetizing paid impersonation ads and related WhatsApp funnels that misappropriated financial professionals' identities to promote securities. Like all Class members, Plaintiffs were subjected to unauthorized use of their names, images, likenesses, voices, credentials, and professional personas.

75.    **Adequate Representation:** Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class.  They have retained competent counsel, who are experienced in complex litigation and class actions, including privacy violations.  Plaintiffs have no interest that is antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so.  Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Class.

76.    **Substantial Benefits:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable.  This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single

adjudication, economies of scale, and comprehensive supervision by a single court.  Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

77.    Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## **CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS**

78.    California's substantive law applies to the claims of Plaintiffs and the Class.  Meta's user agreements for Facebook, Instagram, and WhatsApp contain governing-law and forum-selection clauses (for U.S. users) that select California law and a California forum for disputes arising out of use of the services.

79.    By choosing California law for the resolution of disputes in the agreement, Meta concedes that it is appropriate for this Court to apply California law to the instant dispute.

80.    Further, California's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Class under the Due Process Clause, U.S. CONST. amend. XIV, §1, and the Full Faith and Credit Clause, U.S. CONST. art. IV, §1.  California has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs and all Class members, thereby creating state interests that ensure that the choice of California state law is not arbitrary or unfair.

81.    Defendants' U.S. headquarters and principal place of business is in California.  Defendants also own property and conduct substantial business in California.  Therefore, California has an interest in regulating Defendants' conduct under its laws.  Defendants' decision to reside in California and avail itself of California's laws, and to engage in the challenged conduct from and emanating out of California, renders the application of California law to the claims herein constitutionally permissible.

82.    California is also the state from which Defendants' alleged misconduct emanated.  This conduct similarly injured and affected Plaintiffs and all other Class members.

83.    The application of California laws to the Class is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiffs and the

- 32 -
FIRST AMENDED COMPLAINT

proposed Class, and California has a greater interest in applying its laws here than any other interested state.

## FRAUDULENT CONCEALMENT

84.    Any applicable limitation periods are tolled due to Defendants' concealment of their creation and optimization of impersonation ads and the identity of scam advertisers; by the ephemeral nature of WhatsApp broadcasts and ad accounts; and by the asymmetric information within Meta's exclusive custody (Ad Library incompleteness; internal enforcement logs).  Plaintiffs acted diligently upon discovery of the impersonations and seek equitable tolling until Defendants produce the concealed data.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**False Endorsement/False Association**
**Lanham Act §43(a) - 15 U.S.C. §1125(a)**
**(On Behalf of Plaintiffs and the Class)**

85.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

86.    Plaintiffs and Class members are financial professionals who maintain goodwill, professional personas, and source-identifying attributes (including names, images, voices, credentials, and branding) that signify to consumers the source, sponsorship, or approval of advisory services and investment content.

87.    During the Class Period, Defendants, created and/or co-authored financial scam ads through its Dynamic Creative and Advantage+ applications.  Specifically, the AI-generative features of these applications put Meta in the driver's seat, creating thousands of personalized financial scam advertisements and promising unrealistic returns based on simple, generic marketing phrases.  Additionally, Meta created an audience for these ads through its Meta Pixel and other data mining algorithms purposefully delivering and targeting the fraudulent ads to those most likely to fall for the scheme.  These paid advertisements and related promotional content funneled victims to other Meta Platforms (WhatsApp and Messenger) where Plaintiffs' and Class members' identities were used without consent, falsely suggesting that Plaintiffs and Class members sponsored, approved,

were affiliated with, or endorsed the promoted investment opportunities, including, but not limited to, Pheton and other thinly-traded offshore securities.

88.    The acts alleged were interstate commerce: Meta's ads were bought and paid for; targeted users across state lines; and were designed to induce purchases of securities or related services.

89.    The use of Plaintiffs' and Class members' names, likenesses, voices, credentials, and professional branding in the alleged pump-and-dump scam was likely to cause, and did cause, consumer confusion, mistake, or deception as to the affiliation, connection, association, sponsorship, or approval of the advertised securities, promotions, groups, or services, within the meaning of 15 U.S.C. §1125(a)(1)(A).

90.    Defendants knew or should have known that the ads it created and/or co-authored and related messaging misappropriated real financial professionals' identities and created a false impression of endorsement, including after receiving specific notice from state AGs, user complaints, and media reports concerning impersonation-driven investment schemes on the Meta Platforms.  Nevertheless, Defendants continued to create, deliver, optimize, and monetize scam ads and click-to-WhatsApp funnels impersonating financial professionals to specially crafted audiences.

91.    Plaintiffs and Class members have suffered irreparable harm to their professional and brand reputations; goodwill; suffered diversion of prospective clients and business opportunities; client confusion and increased compliance risk; and have expended time and money on identity monitoring, initiating ad takedowns, and remediation efforts.  Plaintiffs and Class members have also suffered economic damages, including lost revenue and corrective advertising expenses to clear up client confusion and rebuild professional reputations.

92.    Defendants have been unjustly enriched by obtaining advertising revenues and other commercial benefits from the false-endorsement campaigns.  Defendants' conduct was willful and in bad faith, warranting enhanced and exemplary relief.

93.    Defendants' conduct constitutes false endorsement/association and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

FIRST AMENDED COMPLAINT

94.    Pursuant to 15 U.S.C. §1116, Plaintiffs and the Class are entitled to injunctive relief, including but not limited to orders requiring Defendants to: (a) cease creating, delivering, or optimizing advertisements or content that uses financial professionals' identities without verified consent; (b) implement advertiser identity verification for financial-promotion ads; (c) update or remove the Dynamic Creative and Advantage+ applications to deploy pre-publication impersonation filters for ads that use personal names, headshots, voices, or professional credentials; (d) maintain effective notice-and-takedown and repeat-offender policies; and (e) undertake corrective notices to mitigate consumer confusion.

95.    Pursuant to 15 U.S.C. §1117(a), Plaintiffs and the Class seek Defendants' profits, actual damages (including the cost of corrective advertising), and costs of the action; and, because this is an exceptional case given Defendants' willful misconduct, reasonable attorneys' fees. Plaintiffs also seek pre- and post-judgment interest as allowed by law.

96.    Plaintiffs and the Class have no adequate remedy at law for the ongoing loss of control over their professional identities and goodwill.  They therefore request entry of appropriate equitable and injunctive relief to prevent further violations.

**SECOND CLAIM FOR RELIEF**
**Unfair Competition – Cal. Bus. & Prof. Code §17200, *et seq.***
**(On Behalf of Plaintiffs and the Class)**

97.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

98.    An "unlawful" business act is an act that violates some other law or regulation.[80] Thus, the "unlawful" prong of the UCL borrows violations of other laws and makes those unlawful practices actionable under the UCL.[81]  Virtually any law or regulation—federal or state, statutory or common law—can serve as the predicate for an "unlawful" business act claim under the UCL.[82]

99.    Here, Meta has engaged in unlawful business acts and practices within the meaning of the UCL by failing to warn Plaintiffs and the proposed class that the Meta Platforms were

---

[80]    *Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1383.

[81]    *Id.*

[82]    *Id.*

- 35 -
FIRST AMENDED COMPLAINT

misusing Plaintiffs' identities without their consent.  Specifically, among other things, by creating, delivering, optimizing, and monetizing paid investment scam advertisements and related promotional content that misappropriates financial professionals' identities and falsely implies endorsement or affiliation.  These acts are "unlawful" because they violate other laws that the UCL borrows and makes independently actionable, including the Lanham Act §43(a), 15 U.S.C. §1125(a) (false endorsement/association), California's statutory and common-law right of publicity (Cal. Civ. Code §3344), and, for subclass members as pled, FDUTPA (Fla. Stat. §501.201 *et seq.*) and analogous state statutes.

100.    Meta also engaged in unlawful acts by violating its own Terms of Service, Community Standards, and Advertising Policies that prohibit impersonation, fraud, and deceptive practices—policies incorporated into user agreements and constituting enforceable promises— while continuing to profit from the very ads these policies forbid.  Meta's violations are independently actionable under the UCL's "unlawful" prong as predicate contract breaches and as unfair/deceptive practices.

101.    Meta further engaged in unfair business acts and practices under any recognized test of "unfairness":

(a) **Tethering test:** Meta's conduct contravenes the legislative policies embodied in Cal. Civ. Code §3344, the Lanham Act, and state consumer-protection statutes that protect the public and professionals from impersonation, false endorsement, and deception;

(b) **Balancing test:** The gravity of harm—widespread deception of investors, reputational injury to licensed advisors, diversion of clients, and erosion of market integrity—far outweighs any countervailing utility of Meta's challenged conduct; and

(c) **FTC/consumer-injury test:** The injury is substantial, not outweighed by benefits to consumers or competition, and not reasonably avoidable where Meta's paid ads and WhatsApp funnels masqueraded as authentic professional guidance.

102.    Meta also engaged in fraudulent business acts and practices.  Meta's creation and optimization of imposter professional endorsements and scripted WhatsApp funnels were likely to deceive reasonable consumers by falsely representing that real, licensed financial professionals

FIRST AMENDED COMPLAINT

sponsored or approved the promoted securities (including PTHL). The deception was material and systematic, designed to induce immediate trading activity.

103.    Meta's misconduct persisted after notice, including the multi-state AG notice and repeated complaints by impersonated professionals and users. Yet, as materially identical ads and funnels reappeared, Meta failed to act. Meta's continued creation and monetization of impersonation ads after such notice further supports liability under the UCL's unlawful, unfair, and fraudulent prongs.

104.    Plaintiffs and Class members lost money and/or property as a result of Meta's UCL violations, including, but not limited to: realized diversion of prospective clients and engagements; expenditures on mitigation, monitoring, takedowns, and corrective communications; brand and goodwill damage requiring paid remediation; and other business losses proximately caused by Meta's co-authoring of the investment scam ads, and failure to warn Plaintiffs and the proposed class about the theft of their identities once on notice.

105.    Public interest is best served by enjoining Meta's practices. The impersonation-driven schemes undermine investor protection, the advisor-client relationship, and confidence in U.S. markets. Injunctive relief will prevent ongoing and future harm to the public and to the professional community.

106.    Plaintiffs, individually and on behalf of the Class, seek all relief authorized by the UCL, including a public injunction requiring Meta to at a minimum: (i) implement advertiser identity verification for financial-promotion ads; (ii) update Meta's Dynamic Creative, Advantage+, and other AI-generative applications to deploy pre-publication impersonation filters and human review for ads using personal names, headshots, voices, or professional credentials; (iii) enforce repeat-offender and prompt takedown protocols for impersonation content and click-to-WhatsApp funnels; (iv) issue corrective notices and improve Ad Library transparency for financial ads; and (v) restitution/disgorgement of all monies wrongfully obtained by Meta from the challenged impersonation campaigns, with pre- and post-judgment interest and costs as permitted by law.

FIRST AMENDED COMPLAINT

107.    Plaintiffs have no adequate remedy at law for the ongoing loss of control over their identities, goodwill, and client relationships and therefore request broad equitable and injunctive relief in addition to restitution to prevent further violations.

### THIRD CLAIM FOR RELIEF
**Right of Publicity / Misappropriation of Name and Likeness**
**Cal. Civ. Code §3344 and California Common Law**
**(On Behalf of Plaintiffs and the Class)**

108.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

109.    Plaintiffs and Class members are financial professionals whose names, photographs, voices, credentials, branding, and professional personas carry commercial value and signify source, sponsorship, approval, and professional goodwill.

110.    During the Class Period, Defendants—through paid advertisements on Facebook, Instagram, click-to-WhatsApp funnels, and related WhatsApp channels—knowingly used Plaintiffs' and Class members' names, images, likenesses, voices, credentials, and branding without consent for commercial purposes, including advertising and promoting securities, investment "groups," and related services.

111.    Defendants' unauthorized uses were directly connected to advertising or solicitation, including sponsored placements, ad creatives, landing flows, and admin-controlled WhatsApp broadcasts designed to induce users to transact in the promoted securities and to join fee-generating groups or services.

112.    Plaintiffs and Class members did not authorize any of the foregoing uses and did not consent to endorse, sponsor, or be affiliated with the promoted securities, groups, or services. Defendants' conduct misappropriated Plaintiffs' and Class members' identities and traded on their goodwill for Defendants' and third parties' commercial benefit.

113.    Defendants' conduct does not fall within any statutory or common law exception or defense, including Cal. Civ. Code §3344(d).    The challenged uses were paid commercial advertisements and solicitations, not news, public affairs, sports broadcasts, or expressive works, and were not incidental or de minimis.

- 38 -
FIRST AMENDED COMPLAINT

114. As a direct and proximate result of Defendants' misappropriation, Plaintiffs and Class members have suffered injury, including realized loss of control over their identities, reputational and brand harm, diversion of clients and prospective business, increased compliance and regulatory risk, and expenditures for monitoring, takedowns, and corrective communications. Furthermore, Defendants have been unjustly enriched by revenues and other benefits derived from the unauthorized uses.

115. Defendants' violations were willful and intentional. Defendants created, delivered, optimized, and monetized materially identical scam ads and funnels after receiving notice from 42 state AGs, victims, and public reporting. Nonetheless, Defendants continued creating, profiting from and perpetuating the fraud campaigns despite repeated complaints.

116. Defendants' conduct constitutes violations of Cal. Civ. Code §3344(a) and California common law misappropriation.

117. Pursuant to Cal. Civ. Code §3344(a), Plaintiffs and the Class seek: (a) statutory damages (no less than $750 per violation under §3344); (b) actual damages, including corrective advertising costs; (c) Defendants' profits attributable to the violations; (d) punitive/exemplary damages for willful misconduct; and (e) costs and reasonable attorneys' fees as permitted by law, together with pre- and post-judgment interest.

118. Plaintiffs and the Class further seek injunctive relief, including orders requiring Defendants to: (i) cease creating, delivering, or optimizing advertisements and content that use financial professionals' identities without verified, written consent; (ii) implement advertiser identity verification and pre-publication impersonation filters for Meta's Dynamic Creative, Advantage+, and other AI-generative applications using personal names, headshots, voices, or professional credentials; (iii) enforce repeat-offender and prompt takedown protocols; and (iv) issue corrective notices sufficient to dispel confusion and mitigate ongoing harm. Plaintiffs and the Class have no adequate remedy at law for the continued loss of control over their identities and goodwill.

- 39 -
FIRST AMENDED COMPLAINT

**FOURTH CLAIM FOR RELIEF**
**Right of Publicity / Misappropriation of Name or Likeness**
**Fla. Stat. §540.08 (Florida Subclass)**

119.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

120.    Plaintiffs and the Florida Subclass members are financial professionals whose names, portraits/photographs, voices, credentials, branding, and professional personas have independent commercial value and signify source, sponsorship, approval, and professional goodwill in the marketplace.

121.    During the Class Period, Defendants—through paid advertisements on Facebook, Instagram, click-to-WhatsApp funnels, and related WhatsApp groups—knowingly used and published Florida Subclass members' names, portraits/photographs, likenesses, voices, credentials, and branding for purposes of trade and advertising without consent, including to promote securities, "investment groups," and related services such as the Pheton scheme.

122.    Defendants' challenged uses were commercial in nature and directly connected to advertising or solicitation, including sponsored placements, ad creatives, landing flows, "admin-only" broadcast channels, and scripted direct messages designed to induce users to transact and to join fee-generating groups—activities squarely within Fla. Stat. §540.08(1)'s prohibition on publishing a person's name or likeness for trade or advertising purposes without consent.

123.    Plaintiffs and the Florida Subclass members did not authorize any such uses and did not consent to endorse, sponsor, or be affiliated with the promoted securities, groups, or services. Defendants' conduct misappropriated their identities and traded on their goodwill for Defendants' and third parties' commercial benefit.

124.    No statutory exception applies.    The challenged uses were paid commercial advertisements and solicitations, not news reporting, public-affairs coverage, or incidental uses protected by Fla. Stat. §540.08(3).  Nor were they part of an expressive work or transformative use; they were straightforward marketing and sales inducements.

- 40 -

FIRST AMENDED COMPLAINT

125.    Defendants acted willfully and intentionally, continuing to create, deliver, optimize, and monetize materially identical impersonation ads and funnels after receiving notice from 42 state AGs, impersonated professionals, and users that such ads and WhatsApp channels were exploiting real advisors' identities.

126.    As a direct and proximate result of Defendants' violations of Fla. Stat. §540.08, Plaintiffs and the Florida Subclass have suffered injury, including (a) loss of control over their names and likenesses; (b) reputational and brand harm; (c) diversion of clients and prospective business; (d) increased compliance and regulatory risk; and (e) out-of-pocket expenditures for monitoring, takedowns, and corrective communications.  Defendants have been unjustly enriched by advertising revenues and related benefits derived from the unauthorized impersonations.

127.    Pursuant to Fla. Stat. §540.08, Plaintiffs and the Florida Subclass seek injunctive relief enjoining Defendants from creating, delivering, optimizing, or otherwise using financial professionals' names, portraits/photographs, voices, likenesses, or credentials for trade or advertising purposes without verified, written consent; and requiring Defendants to implement advertiser identity verification, pre-publication impersonation filters for ads using personal identifiers, robust notice-and-takedown and repeat-offender policies, and corrective notices sufficient to dispel confusion.

128.    Plaintiffs and the Florida Subclass further seek damages for losses and injuries resulting from the unauthorized uses, including actual damages and an amount that would have been a reasonable royalty for lawful licensing of their identities, together with disgorgement of profits attributable to the violations, punitive/exemplary damages for willful misconduct as permitted by law, and costs.  Plaintiffs also seek pre- and post-judgment interest.

129.    Plaintiffs and the Florida Subclass have no adequate remedy at law for the continuing loss of control over their identities and goodwill and therefore request entry of appropriate equitable and injunctive relief in addition to monetary relief.

FIRST AMENDED COMPLAINT

**FIFTH CLAIM FOR RELIEF**
**Unjust Enrichment/Restitution**

130.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

131.    Through the approval, delivery, optimization, and monetization of paid impersonation advertisements and related click-to-WhatsApp funnels that misappropriated financial professionals' identities and falsely suggested their endorsement or affiliation, Defendants received and retained monetary benefits—including advertising fees, increased engagement/traffic, data-monetization value, and associated revenues—at the expense of Plaintiffs and the Class.

132.    These benefits were conferred upon Defendants by virtue of the unauthorized use of Plaintiffs' and Class members' names, images, likenesses, voices, credentials, and professional personas in commercial promotions created by Defendants, disseminated across the Meta Platforms, and by the resulting diversion of investor attention and business opportunities premised on that misappropriation and false endorsement.

133.    Defendants' retention of these benefits is unjust and inequitable because the revenues were generated by unlawful and deceptive campaigns that violated Plaintiffs' statutory and common-law rights (including false endorsement and right of publicity), contravened Defendants' own Terms, Community Standards, and Advertising Policies, and persisted after Defendants had notice—from AGs, victims, and public reporting—of impersonation-driven investment scams on its platforms.

134.    Equity and good conscience require that Defendants disgorge all sums unjustly obtained from the challenged impersonation campaigns and any appreciation, proceeds, or other traceable benefits derived therefrom, and that such amounts be restored to Plaintiffs and the Class or held in constructive trust for their benefit.

135.    The measure of restitution includes, without limitation: (a) advertising fees and other direct revenues paid to Defendants for the impersonation ads and funnels; (b) the value of incremental impressions, clicks, conversions, and data harvested from those campaigns; and (c) any downstream monetization reasonably attributable to the impersonation-driven engagement.

136.    Plaintiffs and the Class lack an adequate remedy at law for Defendants' unjust retention of these benefits because legal damages do not fully address Defendants' wrongful enrichment, the loss of control over Plaintiffs' identities and goodwill, or the public interest in preventing platforms from profiting from impersonation-based fraud.

137.    Accordingly, Plaintiffs and the Class seek restitution and disgorgement of all monies and benefits unjustly retained by Defendants, the imposition of a constructive trust over such funds, accounting as necessary to identify and quantify the ill-gotten gains, pre- and post-judgment interest, and such other equitable relief as the Court deems just and proper (including public-injunctive measures to prevent further unjust enrichment from impersonation advertising).

## <u>SIXTH CLAIM FOR RELIEF</u>
### Breach of Contract
### On Behalf of Plaintiffs and a User Subclass

138.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

139.    Plaintiffs and members of a User Subclass (financial professionals who maintained Facebook, Instagram, and/or WhatsApp accounts during the Class Period) accepted Meta's Terms of Service, which incorporate by reference the Community Standards and Advertising Standards. Among the provisions so incorporated is Meta's specific, mandatory 'Taking Down Violating Content" promise in the Transparency Center: "If your content goes against the Community Standards, Meta will remove it."  Meta's Community Standards in turn expressly prohibit both "Inauthentic Identity Fraud and Scams"—including "Established Business/Entity Fraud and Scams, which involve falsely claiming to represent, or speak in the voice of, an established business or entity"—and "Investment Opportunities" that offer "guaranteed or risk-free" returns or are "of a 'get-rich-quick' nature."  Unlike aspirational "aim to" language, this is a specific promise by Meta—not the advertiser—to take a specific action (removal) upon a specific triggering condition (content that violates the Community Standards).  Each Plaintiff, when she or he created a professional account on Meta's platforms, relied on this specific removal promise in deciding to maintain a professional presence there.

- 43 -

140.    Meta breached this specific "will remove" promise in two ways.  First, Meta failed to remove the ads, pages, and group chats impersonating Plaintiffs and members of the User Subclass after Meta had actual notice of them—notice from Plaintiffs themselves, from victims, from the bipartisan June 11, 2025 state-AG letter, and from the Reuters and WSJ investigations. Second, and more fundamentally, Meta breached the promise at the moment of ad creation: because Meta's own Dynamic Creative and Advantage+ tools generated the offending creatives, Meta was the source of the very content it had promised to remove when it violated the Community Standards. This is not a "general monitoring policy," *cf. Lloyd v. Facebook, Inc.*, 2022 WL 4913347, at *9 (N.D. Cal. Oct. 3, 2022) (citation omitted), but a specific, defined, action-triggering promise of the kind *Lloyd* identified as distinct from monitoring generalities.

141.    Meta breached its contractual obligations by creating, delivering, optimizing, and monetizing paid investment scam advertisements and related click-to-WhatsApp funnels that used Plaintiffs' and Class members' names, images, likenesses, voices, credentials, and branding without consent; by failing to remove, warn, or timely restrict the challenged ads, pages, channels, and groups after notice (including regulatory notice from 42 state Attorneys General and user reports); and by systematically under-enforcing the very impersonation and anti-fraud policies Meta incorporates into its contracts with users.

142.    Meta also breached the implied covenant of good faith and fair dealing by exercising its express contractual discretion—the "sole discretion" Meta reserved in its Terms over whether to "reject, approve or remove any ad"—in a manner that deprived Plaintiffs of the benefits of Meta's express "will remove" promise.  Meta exercised that discretion to approve, deliver, and re-publish materially identical impersonation ads even after receiving actual notice that those ads violated the Community Standards Meta had promised to enforce, thereby frustrating Plaintiffs' right to receive the benefit of Meta's express removal promise.  Plaintiffs invoke the covenant not to create new obligations but to make effective the specific "will remove" promise already in the contract. *See Carson v. Mercury Ins. Co.*, 210 Cal. App. 4th 409, 429 (2012).

143.    As a direct and proximate result of Meta's breaches, Plaintiffs and the User Subclass suffered damages, including loss of goodwill and professional brand value; diversion of clients and

FIRST AMENDED COMPLAINT

prospective business; time and expense spent on monitoring, takedowns, and corrective communications; and other business injuries. Plaintiffs also face ongoing risk of renewed impersonation absent injunctive relief. In addition, Meta obtained revenues, user data, and other benefits from the challenged campaigns that would not have accrued but for its contractual breaches.

144. Plaintiffs and the User Subclass have performed all conditions precedent or their performance has been excused. Any contractual limitations or disclaimers asserted by Meta are unconscionable, inapplicable to willful policy violations, or otherwise unenforceable as to the misconduct alleged.

145. Plaintiffs, on behalf of themselves and the User Subclass, seek: (a) compensatory damages; (b) specific performance/injunctive relief requiring Meta to implement advertiser identity verification for financial-promotion ads, pre-publication impersonation filters for Meta's Dynamic Creative, Advantage+, and other AI-generative applications using personal identifiers (names, headshots, voices, credentials), robust repeat-offender and prompt takedown protocols, and corrective notices; (c) restitution/disgorgement of benefits Meta obtained as a result of its breaches; (d) pre- and post-judgment interest; and (e) costs and any other relief the Court deems just and proper.

**SEVENTH CLAIM FOR RELIEF**
**Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**
**Fla. Stat. §501.201 *et seq.***
**(Asserted on behalf of Plaintiffs and Florida Subclass)**

146. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

147. Plaintiffs and members of the Florida Subclass are "persons" within the meaning of Fla. Stat. §501.203(7) who, during the Class Period, maintained professional presences on Facebook, Instagram, and/or WhatsApp and were harmed in trade or commerce by Defendants' acts and practices.

148. Defendants engaged in trade or commerce within the meaning of Fla. Stat. §501.203(8) by creating, delivering, optimizing, and monetizing paid advertisements and related

- 45 -
FIRST AMENDED COMPLAINT

promotional content on Facebook and/or Instagram (including click-to-WhatsApp funnels) to users in Florida and by operating WhatsApp channels used to solicit Florida users.

149. Defendants committed unfair or deceptive acts or practices in violation of Fla. Stat. §501.204(1), including but not limited to:

a. creating, delivering, optimizing, and monetizing paid advertisements that impersonated Florida Subclass members and falsely suggested their sponsorship, approval, or affiliation with securities promotions (including PTHL);

b. creating and amplifying promotional content that misappropriated the Florida Subclass members' names, images, likenesses, voices, credentials, and branding without consent;

c. representing through Terms, Community Standards, and Advertising Policies that impersonation and deceptive ads are prohibited and will be removed, while failing to enforce those rules and continuing to profit from the very conduct those rules forbid; and

d. continuing the foregoing practices after notice from 42 state AGs, victims, and public reporting that impersonation-driven financial scams were operating on the Meta Platforms.

150. These acts and practices are deceptive because they are likely to mislead reasonable consumers into believing that real, licensed financial professionals endorse or are affiliated with the promoted securities and groups, and are unfair because the resulting injuries to consumers and to the Florida Subclass are substantial, not outweighed by countervailing benefits, and not reasonably avoidable.

151. Defendants' FDUTPA violations proximately caused injury to Plaintiffs and the Florida Subclass, including actual damages such as: loss of goodwill and professional brand value; diversion of clients and prospective engagements; lost revenue and opportunities; and out-of-pocket costs for monitoring, takedowns, and corrective communications.

152. Plaintiffs and the Florida Subclass also face ongoing risk of renewed impersonation and deception absent court-ordered changes to Defendants' ad verification, review, and enforcement practices.

FIRST AMENDED COMPLAINT

153. Pursuant to Fla. Stat. §501.211(1), Plaintiffs and the Florida Subclass seek injunctive and declaratory relief to enjoin Defendants' unfair and deceptive practices, including orders requiring: (a) advertiser identity verification for financial-promotion ads; (b) pre-publication impersonation filters and human review for Meta's Dynamic Creative, Advantage+, and other AI-generative applications using personal identifiers (names, headshots, voices, credentials); (c) robust repeat-offender and prompt takedown protocols for impersonation content and click-to-WhatsApp funnels; and (d) corrective notices to mitigate confusion.

154. Pursuant to Fla. Stat. §501.211(2), Plaintiffs and the Florida Subclass seek actual damages caused by Defendants' FDUTPA violations, together with pre- and post-judgment interest.

155. Under Fla. Stat. §501.2105, Plaintiffs and the Florida Subclass are entitled to an award of reasonable attorneys' fees and costs as prevailing parties.

156. Plaintiffs and the Florida Subclass have no adequate remedy at law for the continued loss of control over their identities, goodwill, and client relationships and therefore request the equitable and injunctive relief described above in addition to monetary relief.

## EIGHTH CLAIM FOR RELIEF
### Negligence
### (On Behalf of Plaintiffs and the Class)

157. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

158. Defendants had actual knowledge its Dynamic Creative, Advantage+ and other generative AI ad creation software was creating and/or materially contributing to the creation of investment scam ads promising unrealistic "get-rich-quick" returns.

159. Defendants had actual knowledge that these investment scam ads features "click-to-WhatsApp" links where victims were funneled to "exclusive" investment chat groups purported to be run by Plaintiffs and other legitimate financial advisors.

160. Defendants had actual knowledge these WhatsApp and Messenger chat groups were not run by Plaintiffs or members of the proposed class.

- 47 -
FIRST AMENDED COMPLAINT

161.    Defendants had actual knowledge that these chats featured Plaintiffs and members of the classes' identities including their images, names, professional credentials, licenses and other intellectual property protected by state publicity rights in California and Florida.

162.    Defendants had actual knowledge Plaintiffs and members of the proposed class did not consent to the use of their images, names, professional credentials, licenses and other protected intellectual property.

163.    Defendants, due to their position as owners and managers of the Meta Platforms, had superior knowledge of the scheme used to misappropriate Plaintiffs identities and orchestrate a pump-and-dump of thinly-traded Chinese microcap securities.

164.    Defendants controlled Meta and had the means and ability to warn Plaintiffs and protect them from a known harm.

165.    Defendants had a duty to disclose to, or warn Plaintiff, and other platform users, of the dangers that were known to Defendants from reports made by Plaintiffs, members of the proposed class and other impacted users that the Meta Platforms and software were materially contributing to the scheme.

166.    Critically, the conspiracy Defendants had a duty to warn Plaintiffs about operated independent of Defendants' publishing function.  The scheme consists of pre-positioning and coordinated dumping of thinly-traded Chinese microcap securities in U.S. exchanges, execution of coordinated "buy" scripts in off-platform WhatsApp investment groups administered by the scammers themselves, and off-platform trading activity in U.S. securities markets.  Defendants' platforms serve as the recruitment funnel, but the underlying securities-fraud conspiracy—its planning, its execution inside administered WhatsApp groups, and its exit through coordinated trading—exists and operates entirely separate from Defendants' role as a publisher or host of third-party content.  Defendants were accordingly subject to a duty to warn Plaintiffs of that known, independent conspiracy once they had actual knowledge of it, regardless of Section 230's publisher immunity.

167.    Defendants owed Plaintiffs and members of the proposed class a duty of protection from reasonably foreseeable harm.

FIRST AMENDED COMPLAINT

168.    Defendants breached their duty to warn Meta users, including Plaintiffs, by choosing not to warn them about the danger of online predators perpetrating pump-and-dump schemes using the stolen identities of legitimate financial advisors.

169.    As a result, Plaintiffs and the proposed class were injured by these schemes.

170.    With willful and wanton disregard for safety of its users, Defendants, upon information and belief, were purposely silent to their users in an effort to maximize their advertising revenue, evade or limit negative publicity and civil claims and liabilities arising from the acts and conduct of its Dynamic Creative, Advantage+, Meta Pixel, and other generative AI software.

171.    Defendants breached their duty to Plaintiffs and the proposed class by failing to make any disclosure or warning that would have placed Plaintiffs on notice of the danger and prevented the harm co-perpetrated by Meta's Dynamic Creative, Advantage+, Meta Pixel, and other generative AI software with the fraudsters.

172.    Defendants' failure to warn Plaintiffs and the proposed class, of the danger presented by an ongoing epidemic of "get-rich-quick" pump-and-dump ads using their stolen identities and targeted delivery to lure victims, demonstrates an egregious failure to exercise reasonable care.

173.    As a direct result of Defendants negligent breach of its duty to warn, Plaintiffs were unknowing and helpless victims to the fraudulent solicitation, and theft co-authored by Meta and the scammers.

174.    As a direct and proximate result of Defendants' negligence, Plaintiffs suffered and will continue to suffer have suffered irreparable harm to their professional and brand reputations and goodwill, diversion of prospective clients and business opportunities, client confusion and increased compliance risk, expense of time and money on identity monitoring, initiating ad takedowns and remediation efforts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and the proposed Class respectfully request that the Court enter an order:

A.    certifying this case as a class action on behalf of the Class defined above, appointing Plaintiffs as representatives of the Class, and appointing their counsel as class counsel;

- 49 -
FIRST AMENDED COMPLAINT

B.      declaring that Defendants' actions, as set out above, violate the Lanham Act;

C.      declaring that Defendants' actions, as set out above, violate California's Business & Professions Code cited herein;

D.      declaring that Defendants' actions, as set out above, violate California's and Florida's right of publicity laws;

E.      declaring that Defendants' actions, as set out above, breached contractual obligations and the implied covenant of good faith and fair dealing;

F.      requiring Defendants to cease creating, delivering, optimizing, or monetizing any advertisement or content that uses a financial professional's name, image, likeness, voice, credentials, branding, or persona without verified, written consent;;

G.      awarding damages, including nominal, statutory, and punitive damages where applicable, to Plaintiffs and the Class in the amount to be determined at trial;

H.      awarding Plaintiffs and the Class their costs of suit, including reasonable attorneys' and experts' fees and expenses;

I.      awarding Plaintiffs and the Class pre-and post-judgment interest, to the extent allowable;

J.      awarding such other further injunctive and declaratory relief as is necessary to protect the interests of Plaintiffs and the Class; and

K.      awarding such other and further relief as the Court deems reasonable and just.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all issues so triable.


Dated:  April 21, 2026                               **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

                                                     */s/ John T. Jasnoch*
                                                     John T. Jasnoch (CA 281605)
                                                     Mollie E. Chadwick (CA 329524)
                                                     600 W. Broadway, Suite 3300
                                                     San Diego, CA 92101
                                                     Tel.: 619-233-4565
                                                     Fax: 619-233-0508
                                                     jjasnoch@scott-scott.com
                                                     mchadwick@scott-scott.com

- 50 -
FIRST AMENDED COMPLAINT

Tom Grady (*pro hac vice forthcoming*)
**GradyLaw**
720 Fifth Avenue South, Suite 200
Naples, Florida 34102
tgrady@gradylaw.com

*Counsel for Plaintiffs*

- 51 -
FIRST AMENDED COMPLAINT