John T. Jasnoch (CA 281605)
SCOTT+SCOTT ATTORNEYS AT LAW LLP
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: 619-233-4565
Fax: 619-233-0508
jjasnoch@scott-scott.com

*Counsel for Plaintiffs John Suddeth and Sara Perkins*

[Additional counsel on signature page.]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| JOHN SUDDETH and SARA PERKINS,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC., INSTAGRAM, LLC, FACEBOOK OPERATIONS, LLC, and WHATSAPP, LLC,<br><br>Defendants. | Case No. 3:25-cv-08581-RS<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**<br><br>Judge: Hon. Richard Seeborg<br>Courtroom: 12, 19th Floor<br>Date: August 6, 2026<br>Time: 1:30 p.m. |

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................1

STATEMENT OF ISSUES TO BE DECIDED ...........................................................................2

STATEMENT OF RELEVANT FACTS ....................................................................................2

I.      META'S AI BUILT THE ADS ........................................................................................2

II.     META KNEW AND PROFITED ......................................................................................4

III.    PLAINTIFFS' INJURIES ................................................................................................4

ARGUMENT ................................................................................................................................5

I.      SECTION 230 DOES NOT PROTECT A PLATFORM FROM LIABILITY FOR
        CONTENT ITS OWN AI CREATED ...............................................................................5

        A.      Meta's AI Generated the Ads and Section 230's Third Prong Is Not Satisfied .........5

        B.      Every Duty Runs to Meta's Own Conduct and None Requires Monitoring Third-
                Party Content ................................................................................................................8

II.     META MADE SPECIFIC SAFETY PROMISES, BROKE THEM KNOWINGLY, AND
        CONTINUED PROFITING AFTER 42 ATTORNEYS GENERAL GAVE NOTICE
        (COUNT II) .....................................................................................................................9

        A.      Unlawful Prong ..........................................................................................................10

        B.      Fraudulent Prong ........................................................................................................10

        C.      Unfair Prong ...............................................................................................................12

III.    META'S    AI-GENERATED    ADS    FALSELY    ATTRIBUTED    PLAINTIFFS'
        PROFESSIONAL ENDORSEMENTS TO META'S OWN ADVERTISING PLATFORM
        (COUNT I) .....................................................................................................................12

        A.      Meta Used Plaintiffs' Identities .................................................................................12

        B.      Plaintiffs' Own Clients Were Targeted and Confused ..............................................14

IV.     META'S    ALGORITHM    SELECTED    AND    AMPLIFIED    ADS    FEATURING
        PLAINTIFFS' CREDENTIALS BECAUSE THEY CONVERTED BETTER—THAT
        COMMERCIAL ADVANTAGE BELONGS TO META (COUNTS III AND IV) ...........15

        A.      Meta Used Plaintiffs' Professional Identities for Its Own Commercial Advantage 15

        B.      No Celebrity Status Is Required .................................................................................16

V.      IN THE ALTERNATIVE, META'S CONDUCT SATISFIES FDUTPA (COUNT VII) ..17

VI.     "META WILL REMOVE" IS NOT AN ASPIRATION—IT IS A CONDITIONAL
        COMMAND META BREACHED TWICE (COUNT VI) .............................................18

- i -

A.    The "Will Remove" Promise Is Specific and Enforceable ....................................18

B.    The Transparency Center Is Incorporated into the Operative TOS and Independently Binding ...................................................................................................................18

C.    Meta's Disclaimer Does Not Defeat the Claim.........................................................19

D.    Breach Is Established; Unconscionability Voids the Liability Cap ..........................20

VII.    THIS COURT HAS ALREADY SUSTAINED AN IDENTICAL NEGLIGENCE THEORY IN *BOUCK* (COUNT VIII)....................................................................................20

A.    Misfeasance: Meta's AI Created the Harmful Content.............................................20

B.    Voluntary Undertaking: Meta's Public Safety Commitments Created an Independent §324A Duty ..............................................................................................................21

C.    Duty to Warn: Known Conspiracy Independent of Publishing Function ................22

D.    Proximate Cause......................................................................................................23

E.    The Economic Loss Rule Does Not Bar the Negligence Claim .............................24

VIII.    META WAS UNJUSTLY ENRICHED WHEN IT RETAINED PROFITS FROM ADS IT GENERATED USING STOLEN PROFESSIONAL IDENTITIES (COUNT V).............24

IX.    THIS COURT CREDITED THE IDENTICAL AI-GENERATION THEORY IN *BOUCK* and DISMISSAL WITH PREJUDICE IS NOT WARRANTED ......................................25

CONCLUSION ............................................................................................................................25

OPPOSITION TO MOTION TO DISMISS                    CASE NO. 3:25-CV-08581-RS

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ambrozewicz v. 6Sense Insights, Inc.*,
   804 F. Supp. 3d 1026 (N.D. Cal. 2025) ................................................................................. 16

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................................. 5

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009) ............................................................................................... 18

*Estate of Barré v. Carter*,
   272 F. Supp. 3d 906 (E.D. La. 2017) ..................................................................................... 15

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................................................. 5

*Bily v. Arthur Young & Co.*,
   3 Cal. 4th 370 (1992) ............................................................................................................. 24

*Brown v. USA Taekwondo*,
   11 Cal. 5th 204 (2021) ........................................................................................................... 20

*Calise v. Meta Platforms, Inc.*,
   103 F.4th 732 (9th Cir. 2024) ......................................................................................... *passim*

*Carson v. Mercury Ins. Co.*,
   210 Cal. App. 4th 409 (2012) ................................................................................................ 20

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Telephone Co.*,
   20 Cal. 4th 163 (1999) ........................................................................................................... 10

*Continental Airlines, Inc. v. McDonnell Douglas Corp.*,
   216 Cal. App. 3d 388 (1989) ................................................................................................. 20

*Cross v. Facebook, Inc.*,
   14 Cal. App. 5th 190 (2017) .................................................................................................. 16

*Dent v. Nat'l Football League*,
   968 F.3d 1126 (9th Cir. 2020) ............................................................................................... 21

*Dhital v. Nissan N. Am., Inc.*,
   84 Cal. App. 5th 828 (2022) .................................................................................................. 24

*Diep v. Apple, Inc.*,
   2024 WL 1299995 (9th Cir. Mar. 27, 2024) ........................................................................... 8

OPPOSITION TO MOTION TO DISMISS                    CASE NO. 3:25-CV-08581-RS

*Doe v. Grindr Inc.*,
    128 F.4th 1148 (9th Cir. 2025).......................................................................................... 8, 9

*Doe v. Internet Brands, Inc.*,
    824 F.3d 846 (9th Cir. 2016)................................................................................................ 22

*dotStrategy Co. v. Facebook Inc.*,
    482 F. Supp. 3d 994 (N.D. Cal. 2020) ................................................................................. 12

*Downing v. Abercrombie & Fitch*,
    265 F.3d 994 (9th Cir. 2001)................................................................................................ 14

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) (en banc)........................................................................ 5, 6, 8

*Foman v. Davis*,
    371 U.S. 178 (1962) ............................................................................................................. 25

*Forrest v. Meta Platforms, Inc.*,
    737 F. Supp. 3d 808 (N.D. Cal. 2024) ...........................................................................*passim*

*FTC v. Neovi, Inc.*,
    604 F.3d 1150 (9th Cir. 2010).............................................................................................. 10

*Gilbert Fin. Corp. v. Steelform Contracting Co.*,
    82 Cal. App. 3d 65 (1978).................................................................................................... 19

*Mayall ex rel. H.C. v. USA Water Polo, Inc.*,
    909 F.3d 1055 (9th Cir. 2018)............................................................................................... 21

*Holley v. Gilead Scis., Inc.*,
    379 F. Supp. 3d 809 (N.D. Cal. 2019) ................................................................................. 23

*In re Apple Inc. App Store Simulated Casino-Style Games Litig.*,
    806 F. Supp. 3d 1015 (N.D. Cal. 2025) ................................................................................. 9

*In re Tobacco II Cases*,
    46 Cal. 4th 298 (2009).......................................................................................................... 11

*Jane Doe No. 1 v. Uber Techs., Inc.*,
    79 Cal. App. 5th 410 (2022).................................................................................................. 21

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003)........................................................................................................ 25

*Kournikova v. Gen. Media Commc'ns Inc.*,
    278 F. Supp. 2d 1111 (C.D. Cal. 2003)................................................................................ 13

*Kowalsky v. Hewlett-Packard Co.*,
    771 F. Supp. 2d 1156 (N.D. Cal. 2011) ............................................................................... 11

- 4 -

*Lemmon v. Snap, Inc.*,
　995 F.3d 1085 (9th Cir. 2021)......................................................................................................... 8

*Lichtman v. Siemens Indus. Inc.*,
　16 Cal. App. 5th 914 (2017)........................................................................................................ 22

*Lugtu v. Cal. Highway Patrol*,
　26 Cal. 4th 703 (2001)................................................................................................................. 24

*Margolis v. Apple Inc.*,
　777 F. Supp. 3d 1060 (N.D. Cal. 2025) ...................................................................................... 11

*Marrache v. Bacardi U.S.A., Inc.*,
　17 F.4th 1084 (11th Cir. 2021).................................................................................................... 17

*Martinez v. Pac. Bell*,
　225 Cal. App. 3d 1557 (1990)..................................................................................................... 23

*Midler v. Ford Motor Co.*,
　849 F.2d 460 (9th Cir. 1988)....................................................................................................... 15

*Parducci v. Overland Sols., Inc.*,
　399 F. Supp. 3d 969 (N.D. Cal. 2019) ........................................................................................ 12

*Rattagan v. Uber Techs., Inc.*,
　17 Cal. 5th 1 (2024)..................................................................................................................... 24

*Rodriguez v. Recovery Performance & Marine, LLC*,
　38 So. 3d 178 (Fla. Dist. Ct. App. 2010).................................................................................... 18

*Rollins, Inc. v. Butland*,
　951 So. 2d 860 (Fla. Dist. Ct. App. 2006)................................................................................... 17

*Sambreel Holdings LLC v. Facebook, Inc.*,
　906 F. Supp. 2d 1070 (S.D. Cal. 2012) ...................................................................................... 12

*Shaw v. Regents of Univ. of Cal.*,
　58 Cal. App. 4th 44 (1997)......................................................................................................... 18

*State v. Beach Blvd. Auto., Inc.*,
　139 So. 3d 380 (Fla. Dist. Ct. App. 2014)................................................................................... 17

*Vess v. Ciba-Geigy Corp. USA*,
　317 F.3d 1097 (9th Cir. 2003)..................................................................................................... 11

*Waits v. Frito-Lay, Inc.*,
　978 F.2d 1093 (9th Cir. 1992)..................................................................................................... 13

*Wong v. Fay Servicing, LLC*,
　2017 WL 950863 (N.D. Cal. Mar. 10, 2017) ............................................................................. 25

- 5 -

**Statutes, Rules & Regulations**

United States Statutes

15 U.S.C. §45(a) ................................................................................................................ 10, 12

15 U.S.C. §1125(a)(1)(A) ......................................................................................................... 12

47 U.S.C. §230(c)(1) .................................................................................................................. 5

15 U.S.C. §1117(a) ................................................................................................................... 16

California Code of Civil Procedure

Cal. Civ. Code §1559 ............................................................................................................... 19

Cal. Civ. Code §1668 ............................................................................................................... 20

Cal. Civ. Code §1710(2) ........................................................................................................... 24

Cal. Civ. Code §3344 ........................................................................................................ *passim*

Cal. Civ. Code §3344(a) ........................................................................................................... 15

**Other Authorities**

Restatement (Second) of Torts §324A ......................................................................................... 21

OPPOSITION TO MOTION TO DISMISS                    CASE NO. 3:25-CV-08581-RS

Plaintiffs John Suddeth and Sara Perkins ("Plaintiffs") respectfully submit their opposition to Defendants Meta Platforms, Inc. ("Meta"), Instagram, LLC ("Instagram"), Facebook Operations, LLC ("Facebook"), and WhatsApp, LLC's ("WhatsApp") (collectively, the "Defendants") Motion to Dismiss ("Motion" or "Mot.") (ECF No. 45).

## INTRODUCTION

Meta's social media platforms are teeming with scam advertisements. Americans lost nearly $800 million in 2025 to scam ads on Meta's Facebook platform. This case seeks redress for individuals who did not fall prey to these ads, but who nonetheless were victimized by Meta by having their professional identities hijacked by the scammers. Plaintiffs allege that Meta, through its artificial intelligence ("AI") tools, built these scam ads alongside the scammers. These ads used Plaintiffs' names, photos, and credentials as investment professionals to funnel victims into WhatsApp groups where the scammers pretended to be Plaintiffs to unlawfully extract money from unsuspecting victims who believed they were being given legitimate investment advice. Plaintiffs now bring claims under the Lanham Act and California statutory and common law to recompense them for the injuries to their reputation and goodwill wrought by Meta's misconduct.

In *Bouck v. Meta Platforms, Inc.*, this Court recently held that Meta cannot shield its conduct by resorting to Section 230 because Meta's AI actively assisted in the creation of the offending content, making Meta the information content provider rather than a passive publisher. 2026 WL 810036, at *5 (N.D. Cal. Mar. 24, 2026). This case is no different.

Meta did not merely host or deliver someone else's advertisements. Meta's own AI built the ads. Specifically, Meta's Dynamic Creative and Advantage+ tools took generic seed inputs from scammers and generated the investment-solicitation ad content—text variants, the imagery, the audience targeting, the professional-credentialing architecture—that drove victims into WhatsApp groups where Plaintiffs were impersonated. This Court held that those same tools, on those same allegations, defeated Section 230 immunity and sustained a negligence claim in *Bouck*. The First Amended Complaint ("FAC") (ECF No. 44) pleads the *Bouck* theory in full. The AI-generation theory alone is sufficient to deny the motion, while the safety-promise theory is an independent alternative that survives on its own even if the Court declines to reach AI generation.

- 1 -

Meta's Motion recharacterizes the FAC to resemble the original complaint this Court dismissed.  It insists that the "core illegality" is WhatsApp impersonation and that Paragraph 29 of the FAC concedes Meta played no role.  That misreads the FAC; it describes the off-platform securities-fraud conspiracy (e.g., pre-positioning and coordinated trading), not who generated the ads.  The FAC also answers that question: Meta's AI did.

Meta internally calculated that over $3 billion in annual Chinese advertising revenue came from scam networks.  Plaintiffs are FINRA-licensed financial advisors whose professional identities became raw material for Meta's AI.  After receiving the attorney general ("AG") letter and Plaintiffs' direct reports, Meta continued running the identical campaigns.  It did not stop.  It did not warn.  The Motion should be denied.

<h3 style="text-align:center">STATEMENT OF ISSUES TO BE DECIDED</h3>

The issues to be decided are whether Plaintiffs sufficiently alleged facts, taken as true with all reasonable inferences drawn in their favor, to state claims for relief in the Complaint.

<h3 style="text-align:center">STATEMENT OF RELEVANT FACTS</h3>

Plaintiffs are two Florida-based FINRA-licensed financial advisors whose professional licenses, client relationships, and investment-advisory reputations constitute their commercial livelihood.  ¶¶41, 46.[1]  The FAC's central allegation is direct: "each Plaintiff was impersonated by Meta and its co-conspirators without consent in paid advertisements and related promotional content" on Facebook, Instagram, and WhatsApp.  ¶40.  These ads "falsely suggested Plaintiffs endorsed various thinly-traded Chinese microcap securities."  *Id.*  Plaintiffs never consented to "the use of their names, images, voices, credentials, or professional personas in Meta ads or WhatsApp solicitations."  ¶49.

**I.     META'S AI BUILT THE ADS**

Meta's AI tools (e.g., Advantage+ and Dynamic Creative) "put Meta in the driver's seat, creating thousands of personalized financial scam advertisements" from generic inputs.  ¶87.  The FAC alleges that "criminal actors acting in the same manner as Horwitz, employed Meta's Ads

---

[1] "¶" citations are to the FAC.  Terms not otherwise defined retain the same meaning as defined in the FAC.

Manager, Meta Business Suite, Meta Pixel, and Advantage+ software to run the same type of financial scam using the names, images, voices, and personas of Plaintiffs and other financial professionals." ¶23. Like Horwitz, who supplied only a generic phrase and received an AI-generated investment-solicitation copy in return, ¶22, the scammers supplied a foreign-language seed phrase and Meta's AI generated the content incorporating Plaintiffs' professional identities in the resulting ads. The class definition and the AG letter independently confirm: the class covers identity use "in connection with paid advertisements or related promotional content on Meta's platforms (including Facebook, Instagram, and/or click-to-WhatsApp campaigns and WhatsApp groups)," and the AGs identified "paid impersonation advertisements on Facebook and Instagram" using financial professionals' identities without consent. ¶¶36, 68.

The FAC also establishes that the paid impersonations were on Facebook, Instagram, *and* WhatsApp. For example, the FAC alleges that Perkins WhatsApp groups "were populated by users who followed ads that were substantially created by Meta." ¶47. After users clicked "Message," scammers posing as "Adviser B" or "Adviser B's assistant" issued coordinated buy prompts "on behalf of Ms. Perkins." *Id.* "Meta's creation and delivery of these ads to targeted audiences . . . unlawfully exploited Plaintiff Perkins' persona to solicit trades." *Id.* The causal logic is inescapable: the "Adviser B's assistant" scheme deceives only because victims were already persuaded—in the Meta-generated Facebook or Instagram ad—that "Adviser B" (Perkins) was a real, licensed investment professional. The impersonation and injury were complete at the moment Meta published the ad. The WhatsApp group was where scammers monetized the deception Meta created. The word "similarly" in ¶47 means Perkins was victimized by the same two-phase scheme—ad-level impersonation followed by WhatsApp monetization—not that her impersonation was confined to WhatsApp. Read as a whole with all inferences in Plaintiffs' favor, the FAC unambiguously places identity use in Meta's ads.

Finally, the FAC pleads the AI-generation mechanism in four sub-allegations each: (a) Advantage+'s "Generate new and diverse text" feature produced the investment-advisory language from a foreign-language seed phrase; (b) Dynamic Creative assembled and variant-tested the visual compositions; (c) Meta Pixel—not the scammers—constructed the targeting audiences from U.S.

- 3 -

financial-services behavioral data; and (d) Meta tested creative variants and directed spend to the best-performing impersonation variants.  ¶¶42(a)-(d), 47(a)-(d).  "Meta thus did not merely publish the scammers' content—Meta's tools created, generated and selected the content that injured" Plaintiffs.  ¶42; *see also* ¶47.  When Meta's systems occasionally removed an impersonation campaign, scammers regenerated a materially identical one within days.  ¶37.

## II.   META KNEW AND PROFITED

The scheme was not hidden from Meta.  A 2022 internal analysis found 70% of newly active advertisers were promoting scams, and Meta permitted up to 32 automated strikes for financial fraud before banning an account.  ¶¶33-34.  Meta's own documents calculated $3 billion in annual Chinese advertising revenue from scams and banned content, ¶25, yet Meta abandoned advertiser identity verification to protect that revenue, ¶34.

On June 5 and 11, 2025, 42 state AGs transmitted a detailed letter to Meta identifying the pump-and-dump impersonation scheme, describing the WhatsApp group structure, listing impersonated professionals by category, and demanding immediate corrective action.  ¶¶6, 36.  Meta received the letter and continued running the identical campaigns.  In September 2025, the Securities and Exchange Commission ("SEC") announced a task force targeting the identical scheme.  ¶38.  Both establish that the conspiracy operated independently of any content Meta published or reviewed.

Plaintiff Suddeth reported the impersonation directly to Meta, providing the specific scammer telephone number—+1 (480) 764-0085—that had been embedded in the impersonation materials.  ¶45.  Meta did not respond to any contact.  *Id.*  Plaintiff Perkins was similarly impersonated in WhatsApp groups whose members had been recruited through Meta-generated ads, with scripted "buy" prompts for PTHL issued in her name.  ¶¶47-48.

## III.   PLAINTIFFS' INJURIES

Suddeth holds the Chartered Financial Analyst designation and has over 35 years of experience in investment management.  ¶41.  Perkins is an Investment Advisor Representative registered with the Florida Office of Financial Regulation and FINRA, having passed the Series 65 examination.  ¶46.  Their professional credibility is their livelihood.

- 4 -

Meta's AI-generated ads used Plaintiffs' names, headshots, and fabricated quotes to recruit users into WhatsApp groups where buy-and-dump scripts for PTHL and other Chinese microcap securities were executed under their stolen identities.  ¶¶42, 52-57.  The scheme targeted Plaintiffs' own clients.  The result: client confusion, lost business, FINRA regulatory inquiries, reputational damage, and out-of-pocket remediation costs.  ¶¶60, 174.  Unwitting retail investors suffered securities fraud as well.  ¶60.

<strong>ARGUMENT</strong>

A complaint survives a motion to dismiss if it pleads "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The Court accepts all factual allegations as true and draws all reasonable inferences in Plaintiffs' favor.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Section 230 is an affirmative defense; Meta bears the burden of establishing all three elements at the pleading stage.  *Calise v. Meta Platforms, Inc*., 103 F.4th 732, 738-40 (9th Cir. 2024).

**I.    SECTION 230 DOES NOT PROTECT A PLATFORM FROM LIABILITY FOR CONTENT ITS OWN AI CREATED**

**A.    Meta's AI Generated the Ads and Section 230's Third Prong Is Not Satisfied**

Meta's AI generated the unlawful content.  That defeats Section 230.  Section 230 immunizes interactive computer service providers from liability for content "provided by another information content provider."  47 U.S.C. §230(c)(1).  The immunity does not reach content the platform itself created.  *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162-63 (9th Cir. 2008) (en banc).  A platform "helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct."  *Id.* at 1168.  When a platform's own AI tools generate the unlawful content, the platform is a content provider and Section 230 provides no protection.  *Bouck*, 2026 WL 810036, at *4-5; *Forrest v. Meta Platforms, Inc*., 737 F. Supp. 3d 808, 817-18 (N.D. Cal. 2024).

As in *Bouck*, the Complaint here pleads that the offending ads "were not uploaded in final form by the scammers," but were authored, in part, by Meta itself.  ¶42.  Specifically, Meta's Dynamic Creative and Advantage+ created the ads from generic inputs supplied by the scammers:

- 5 -

"(a) the language was produced or rewritten by Advantage+'s 'Generate new and diverse text' feature from a short foreign-language seed phrase; (b) the visual compositions were assembled, resized, and variant-tested by Dynamic Creative's automated image-combination feature; (c) the targeting audiences for these variants were not supplied by the scammers but were constructed by Meta using Meta Pixel data harvested from U.S. financial-services sites; and (d) Meta tested multiple creative variants against one another and directed spend to the best-performing impersonation variants." ¶42(a)-(d); *see also* ¶47(a)-(d).  Thus, Plaintiffs' claims are "premised on . . . Meta's own creation and material contribution to the fraudulent ad content through its Dynamic Creative and Advantage+ generative-AI tools." ¶30.  This Court credited these identical allegations in *Bouck*. *Bouck*, 2026 WL 810036, at *4-5.

*Forrest* asked whether a factual dispute exists as to whether Meta's advertising tools themselves "contributed to . . . the aspects of the content that are allegedly illegal." 737 F. Supp. 3d at 818.  The FAC answers with specificity: (a) Advantage+ produced the investment-advisory text from a foreign-language seed phrase; (b) Dynamic Creative assembled the visual compositions; (c) Meta Pixel constructed the targeting audiences; and (d) Meta's algorithm directed spend to the best-performing impersonation variants.  ¶42(a)-(d).  The scammers supplied a phrase.  Meta's AI produced the FINRA credentials, advisory titles, and fabricated endorsement quotes—the content that made the ads work.  ¶42(a).  The distinction matters: a neutral tool that merely formats or transmits scammer content might merit Section 230 protection; a tool that *generates* the substantive content from a seed phrase does not.  *Roommates.com*, 521 F.3d at 1168 (material contribution to "the alleged illegality").  Advantage+ contributed not by hosting or distributing, but by *authoring*— transforming a foreign-language phrase into credentialed, English-language investment-advisory content that no scammer supplied.

Meta argues that the FAC somehow concedes that it played no role in the impersonation.  Mot. at 7-9.  But that misreads the FAC.  Paragraph 29 of the FAC, on which Meta's argument relies, describes the off-platform securities-fraud conspiracy—the pre-positioning of shares, the coordinated trading scripts, the coordinated sell-off, all of which occurred after the impersonating ads were deployed to Meta platform users.  Those allegations say nothing about who generated the

OPPOSITION TO MOTION TO DISMISS                                    CASE NO. 3:25-CV-08581-RS

ad content.  As shown above, Paragraphs 42 and 47 of the FAC—which Meta largely ignores—describe in detail Meta's creation of the offending ads.

Myopically focusing on Plaintiffs' allegations about the second stage of the fraud, which occurred in WhatsApp chat groups, Meta contends that the "core illegality" is impersonation in those chat groups, and the ads on Facebook and Instagram merely "facilitated" that downstream harm.  Mot. at 8-9.  This ignores what is actually pled.  The FAC pleads that the ads on Facebook and Instagram were the gateway.  No victim entered a WhatsApp impersonation group without first being recruited by an AI-generated ad.  Every dollar of advertiser revenue Meta earned flowed through an ad transaction.  Advantage+'s "Generate new and diverse text" feature produced the FINRA designations, investment-advisory titles, and fabricated endorsement quotes that no scammer supplied—the content that made the scheme credible and investors click.  ¶42(a).  Moreover, the FAC alleges that the Lanham Act, Cal. Civ. Code §3344, and contract injuries occurred when Meta published an AI-generated ad bearing Plaintiffs' FINRA credentials without their consent—before any WhatsApp message was ever sent.  ¶¶40, 81, 87.  The California Unfair Competition Law ("UCL") injuries arose when Meta made false safety representations, not from WhatsApp content.  ¶¶62-65, 157.  The negligence duty derives from misfeasance (Meta creating harmful content) and independently-acquired conspiracy knowledge—neither requires examining a single WhatsApp message.  ¶¶29, 81, 134-135.[2]

Meta argues that *Dyroff v. Ultimate Software Grp., Inc.* controls because the ads "facilitated" the WhatsApp impersonation.  934 F.3d 1093 (9th Cir. 2019); Mot. at 8-9.  But this Court rejected a substantively identical argument in *Bouck*, holding that, in contrast to platform actions that "enhance the efficacy of its service," plaintiffs in that case alleged that Meta "created the offending information."  2026 WL 810036, at *5 (citing *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119,

---

[2] Meta frames the FAC as a retreat from the original complaint's allegation that scammers "uploaded creative assets."  Mot. at 6.  It is not.  The FAC replaces that allegation with a more specific one: (a) the scammers supplied a foreign-language seed phrase; (b) Advantage+ produced the investment-advisory language through its "Generate new and diverse text" feature; (c) Dynamic Creative assembled and variant-tested the visual compositions; and (d) Meta directed spend to the best-performing impersonation variants.  ¶42(a)-(d); *see also* ¶47(a)-(d).

- 7 -

1125 (9th Cir. 2003)).  The same is true here.  Meta's reliance on *Doe v. Grindr Inc.*, 128 F.4th 1148 (9th Cir. 2025) fares no better.  *Grindr*'s age-verification failure was "not independent of" its publisher role because discharging the duty would require monitoring third-party content.  *Id.* at 1153.  But *Grindr* expressly preserved liability where a plaintiff seeks "to hold the defendant accountable for a specific promise or representation."  *Id.* at 1154.  More fundamentally, *Grindr* involved a matching algorithm that connected third parties who then caused harm—not a platform whose AI generated the harmful content itself.  Applying *Grindr*'s facilitation analysis to Meta's content-creation conduct inverts the rule.  Section 230's third prong is not satisfied.

### B. Every Duty Runs to Meta's Own Conduct and None Requires Monitoring Third-Party Content

Meta argues each claim would "impose liability on Meta as a publisher."  Mot. at 9-12.  The governing test is whether discharging a duty would "require [the defendant] to monitor third-party content."  *Grindr*, 128 F.4th at 1153.  But Plaintiffs' allegations target Meta's *own* conduct, not third-party content.

Section 230 does not apply when the platform is the primary information-content provider for its own statements.  *Diep v. Apple, Inc.*, 2024 WL 1299995, at *2 (9th Cir. Mar. 27, 2024) (Section 230 did not bar claims arising from Apple's "representations concerning [its] process for reviewing" apps; "Apple is the primary 'information content provider' with respect to those statements").  When a platform's AI creates content, it functions as a content provider, not a publisher.  *Roommates.com*, 521 F.3d at 1167-68; *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092 (9th Cir. 2021) (a platform's own AI feature is not immunized because the platform could satisfy its duty without changing the publication of third-party content).  This Court confirmed that this "degree of participation is not protected by section 230."  *Bouck*, 2026 WL 810036, at *4.

Moreover, the relevant duty on which each of Plaintiffs' claims is based does not implicate Meta's monitoring of third-party content:

*Lanham Act and Cal. Civ. Code §3344*: Meta discharges these duties by not generating impersonation ads—authoring nothing, monitoring nothing.

- 8 -

*Contract*: Meta discharges the "will remove" duty by honoring it when its own AI completes the generation of policy-violating content; no user-message review required.

*Negligence misfeasance*: Meta discharges this duty by not creating harmful content.  UCL: Meta discharges these duties by not making false safety representations.  Each of these duties runs to Meta's own conduct and not to the actions of third parties in WhatsApp chats.  That dooms Meta's Section 230 argument.

Meta argues that even if the "will remove" promise escapes Section 230 under *Calise*, performing it would require monitoring encrypted WhatsApp content, reimporting Section 230 immunity.  Mot. at 11 n.4.  That argument fails on its own logic.  The "will remove" duty is triggered by—and discharged against—Meta's own AI-generated ad content, not WhatsApp messages.  Meta honors the promise by not generating impersonation ads in the first place.  No monitoring is required or even relevant.  The *Calise* promise-exception applies precisely because "the source of the duty" is "[t]he promise, not the publishing activity."  *In re Apple Inc. App Store Simulated Casino-Style Games Litig.*, 806 F. Supp. 3d 1015, 1031 (N.D. Cal. 2025).  A duty that can be discharged by refraining from one's own conduct — not by screening anyone else's — is not a publishing duty and is not immunized by Section 230.

The Ninth Circuit's own benchmark confirms this.  *Est. of Bride v. Yolo Techs., Inc.*—which *Grindr* cited as the model of a specific promise that survives Section 230—sustained a platform's commitment to "unmask the identity of any user who sent harassing messages" because plaintiffs sought to hold the platform accountable for that promise, not for failure to take moderation actions.  112 F.4th 1168, 1173, 1178-79 (9th Cir. 2024) (citation modified).  The "will remove" command is identical in structure: a specific, conditional commitment whose breach is Meta's own act of generating impersonation content, not any failure to review encrypted chats it cannot read.  The UCL fraudulent prong and contract claims rest on this independent Section 230 pathway, which the AI-generation theory does not need to carry and that survives regardless of how the Court resolves the ICP question.

II.    **META MADE SPECIFIC SAFETY PROMISES, BROKE THEM KNOWINGLY, AND CONTINUED PROFITING AFTER 42 ATTORNEYS GENERAL GAVE NOTICE (COUNT II)**

- 9 -

Meta built the ads.  That fact drives each UCL prong.  The unlawful prong borrows the Lanham Act and Section 3344 violations established below.  The fraudulent prong rests on Meta's own safety representations, which it made while generating the very impersonation content it promised to remove.  The unfair prong rests on conduct that caused career-ending harm to licensed financial advisors with no legitimate business justification.  Each prong is independently satisfied.

### A.    Unlawful Prong

The UCL unlawful prong "borrows violations of other laws and treats them as unlawful practices" independently actionable under the UCL.  *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Telephone Co.*, 20 Cal. 4th 163, 180 (1999) (citation modified).  Three independent predicates survive.  *First:* the Lanham Act and Section 3344 violations established below.  *Second:* Meta's breach of its own "will remove" promise is independently actionable as a UCL unlawful predicate.  *Third:* 15 U.S.C. §45(a).  A platform that facilitates fraud through inadequate verification while on notice of high fraud rates faces UCL liability regardless of whether it perpetrated the underlying fraud.  *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1157-58 (9th Cir. 2010).  *Gilbert v. MoneyMutual, LLC* confirms that a platform connecting consumers to unlicensed operators has UCL liability for its "assisting" conduct—the court certified a UCL class against a lead-generation platform that connected borrowers with unlicensed lenders.  318 F.R.D. 614, 624 (N.D. Cal. 2016).  Meta did the same.

### B.    Fraudulent Prong

Meta argues Plaintiffs have not satisfied Rule 9(b)'s particularity requirement and have not alleged actual reliance.  Mot. at 16-17.  Both arguments fail.

*Particularity*: Plaintiffs challenge Meta's own public representations, not WhatsApp chat contents.  The who, what, when, and why are all pleaded with specificity.  Who: Meta.  What: (1) the Transparency Center's "will remove" promise (¶65); (2) Meta's Transparency Center commitment to protect users by "*removing content and combatting behavior that purposefully employs deceptive means - such as wilful misrepresentation, stolen information and exaggerated claims - to either scam or defraud*" (¶63); and (3) the Community Standards' express prohibition on "Investment or Financial Fraud and Scams" (¶64).  When: continuously during the Class Period,

- 10 -

specifically including the period after the June 5, 2025 AG letter, when Meta continued approving materially identical campaigns. ¶¶36-37.  Why: Meta approved, generated, and re-generated impersonation ads after the AG letter, after Suddeth's direct reports, and after Reuters published its investigation.  That is not a conclusory fraud allegation—it is a specific course of conduct with identified dates, actors, and content. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

Meta further argues that the UCL's fraudulent prong requires Meta to have had "knowledge" of the deceptive content in the encrypted WhatsApp chats.  Mot. at 16-17.  Plaintiffs do not rely on the WhatsApp chat contents for the fraudulent prong.  The deceptive acts are Meta's own representations—the "will remove" promise and the safety certification claims—which Meta made and maintained with actual knowledge that investment impersonation campaigns were operating on its platforms.  ¶¶36, 45; *Kowalsky v. Hewlett-Packard Co.*, 771 F. Supp. 2d 1156, 1161 (N.D. Cal. 2011).

Meta's conduct here is more specific: the AG letter established the date and content of notice; the Reuters investigation identified the ad-generation mechanism; and Plaintiff Suddeth's direct report to Meta pinpointed the scammers' specific contact information.  Meta continued generating impersonation campaigns after each of those notices.  This is a dated, documented pattern of false safety representations maintained in the face of specific, named, particularized knowledge.

*Reliance*: *Key v. Qualcomm Inc*. requires that Plaintiffs have been "motivated to act or refrain from acting based on the truth or falsity of a defendant's statement."  129 F.4th 1129, 1141 (9th Cir. 2025) (citation modified).  That standard is met.  The FAC pleads reliance directly: "Plaintiffs created professional accounts on the Meta Platforms relying on these clear, unambiguous promises."  ¶61.  Meta's sustained representations (i.e., the "will remove" promise and the safety-certification campaign) constituted an ongoing course of conduct that was "an immediate cause of the injury-producing conduct."  *In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009) (long-term campaign sufficient; no specific communication required).  The statements, dates, and mechanism of reliance are identified in the FAC. *Margolis v. Apple Inc.*, 777 F. Supp. 3d 1060, 1072 (N.D. Cal. 2025).  Had Plaintiffs known Meta was generating impersonation advertisements using their

- 11 -

credentials, they would not have maintained the professional presences that gave the scheme its credibility.  ¶7.

### C.     Unfair Prong

Meta argues the unfair prong cannot survive because it "overlap[s] entirely" with the other two prongs.  Mot. at 17.  This is wrong because the unfair prong is independently tethered.  *Parducci v. Overland Sols., Inc.*, 399 F. Supp. 3d 969, 982 (N.D. Cal. 2019).  Three statutory anchors apply: Cal. Civ. Code §3344, Lanham Act §43(a), and 15 U.S.C. §45(a).  *Cel-Tech*, 20 Cal. 4th at 187.  The balancing test is not close.  Career destruction, FINRA regulatory proceedings, and permanent reputational damage for licensed financial advisors substantially outweigh any legitimate utility of generating professional-impersonation ads through AI tools.  ¶60.  *Murphy v. LinkedIn Corp.* and similar cases involved only aspirational monitoring language.  2026 WL 881710, at *3 (N.D. Cal. Mar. 30, 2026).  The tethers here are anchored to Meta's specific, conditional command ("Meta will remove it") and the AI-generation of the very content Meta promised to prevent—the kind of specific undertaking *Calise* recognizes as enforceable.  ¶139; 103 F.4th at 743.

### III.     META'S AI-GENERATED ADS FALSELY ATTRIBUTED PLAINTIFFS' PROFESSIONAL ENDORSEMENTS TO META'S OWN ADVERTISING PLATFORM (COUNT I)

### A.     Meta Used Plaintiffs' Identities

The Lanham Act imposes liability on any person who "uses in commerce any word, term, name, symbol, or device" in a way "likely to cause confusion . . . as to the . . . sponsorship[] or approval of his or her goods, services, or commercial activities."  15 U.S.C. §1125(a)(1)(A).  Meta's goods are advertising impressions.  *See Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070, 1073 (S.D. Cal. 2012) (stating "Facebook makes money by selling display advertising on its site"); *dotStrategy Co. v. Facebook Inc.*, 482 F. Supp. 3d 994, 996 (N.D. Cal. 2020) ("Facebook makes money by selling advertising. In exchange for placing ads on Facebook's platform, advertisers pay for the number of clicks or the number of impressions their ads receive from Facebook users.").  The AI-generated ads (which displayed Plaintiffs' FINRA credentials, investment-advisory titles, and fabricated endorsement language as paid placements on Meta's platforms) made Meta's commercial ecosystem appear to be a trustworthy conduit for

- 12 -

professionally-credentialed investment advice.  The false suggestion is not merely that Plaintiffs endorse Pheton Holdings.  It is that Plaintiffs endorse Meta's advertising platform as a reliable vehicle for professional investment guidance—false endorsement of Meta's commercial activities squarely within Section 1125(a)(1)(A).  *Kournikova v. Gen. Media Commc'ns Inc.*, 278 F. Supp. 2d 1111, 1120 (C.D. Cal. 2003); *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1110 (9th Cir. 1992), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

Meta argues it did not "use" Plaintiffs' identities because the scammers deployed them in WhatsApp.  Mot. at 13-14.  That argument ignores the AI-generation allegations.  When Meta's Advantage+ tool ingests a seed phrase and generates ad content incorporating a named financial professional's FINRA credentials, investment-advisory framing, and fabricated endorsement language, Meta is the author of that content.  Meta cannot simultaneously claim credit for the content its software generates when selling the product to advertisers (e.g., "Meta's tools created them" (¶3)), while denying authorship of that same content for purposes of Lanham Act liability.  Further, the FAC pleads "use" in terms that require no inference.  Paragraph 40 alleges that "each Plaintiff was impersonated by Meta and its co-conspirators without consent in paid advertisements and related promotional content."  Paragraph 49 alleges that Plaintiffs did not consent to the use of their identities "in Meta ads or WhatsApp solicitations."  Paragraph 23 alleges that scammers used Advantage+ and Dynamic Creative "using the names, images, voices, and personas of Plaintiffs" in the same AI-generation process the Horwitz experiment demonstrated.  The class definition covers identity use "in connection with paid advertisements . . . on Meta's platforms (including Facebook, Instagram . . .)."  ¶68.  The 42-state AG letter—incorporated at ¶36—specifically identified "paid impersonation advertisements on Facebook and Instagram" using financial professionals' identities without consent.  These are direct allegations of ad-level use, not inferences.  The AI-generation that defeats Section 230's third prong also establishes the "use in commerce" element of this claim.  Meta's AI generated the professional-credentialing architecture; the scammers triggered it, but did not write it.  The creator of the content is its user.  Meta cannot avoid that rule by pointing to the advertiser who clicked "publish."

- 13 -

Meta's invocation of *Cairns v. Franklin Mint Co.*, for the proposition that the Act "prohibits only *false endorsement*, not mere use of an image or name" (Mot. at 13-14) confirms, rather than defeats, the claim.  107 F. Supp. 2d 1212 (C.D. Cal. 2000).  The FAC does not allege mere display of Plaintiffs' photographs.  It alleges that Meta's AI generated FINRA designations, investment-advisory titles, fabricated quotes, and produced a finished advertisement that falsely attributed financial endorsements to Plaintiffs.  That is false endorsement, not mere display.  *Cairns* itself distinguished false endorsement claims where "the celebrities' images were used in commercial advertising to promote a product" from incidental-use cases.  107 F. Supp. 2d at 1215.  The ads here are the opposite of incidental: Meta's algorithm *selected* Plaintiffs' credentials precisely because they maximized conversion rates among Plaintiffs' own clients.  ¶¶42(c), 44.  *Cairns* supports the claim.

*Forrest* is directly controlling on the use element.  There, the Court sustained a Lanham Act claim where Meta's advertising tools generated content incorporating a public figure's likeness, finding that Meta's role in creating and distributing the ad content constituted "use" within the meaning of the Act.  737 F. Supp. 3d at 819.  The principle is the same here: an entity that authors content is the entity that uses it in commerce.  Meta authored the impersonation ads.  Meta used Plaintiffs' identities.  The Lanham Act claim survives.

### B.    Plaintiffs' Own Clients Were Targeted and Confused

The question is whether the AI-generated ads that displayed Plaintiffs' names, credentials, headshots, and fabricated investment endorsements were likely to cause investors to believe that Suddeth and Perkins sponsored, approved, or were affiliated with the promoted investment opportunities.  ¶89.  The answer is self-evident: the ads were specifically designed to generate exactly that confusion, and they succeeded in doing so.  ¶¶52-57.

Meta argues Plaintiffs are not "nationally recognized figures" and therefore no inference of confusion arises.  Mot. at 15.  The Lanham Act does not require national fame.  It requires likelihood of confusion among the relevant purchasing public.  *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1007-08 (9th Cir. 2001).  The relevant public here is Florida investors who were Plaintiffs' existing clients—the precise audience for whom the impersonation was effective.  ¶¶42(c), 44.

- 14 -

Recognition within the targeted segment is what the Lanham Act measures, not recognition at large. *See e.g., Estate of Barré v. Carter*, 272 F. Supp. 3d 906, 933 (E.D. La. 2017) (finding that regional celebrity status within a specific geographic and cultural community was sufficient to allege likelihood of confusion).

Meta separately argues no circuit court has recognized contributory false endorsement. Mot. at 14. But Plaintiffs plead direct liability, not contributory. Meta authored the ads; Meta is the user. Even if contributory theory applied, Meta's "no specific knowledge" argument is defeated by the AG letter, Reuters, and Suddeth's direct reports that provided Meta with specific, particularized notice of the PTHL scheme. *Lepore v. NL Brand Holdings LLC* predates *Forrest* and *Bouck*, both of which sustained direct liability claims on this precise theory—Meta's AI generated the content. 2017 WL 4712633 (S.D.N.Y. Sept. 28, 2017). The WhatsApp argument is irrelevant to ads Meta generated before any WhatsApp interaction occurred.

## IV. META'S ALGORITHM SELECTED AND AMPLIFIED ADS FEATURING PLAINTIFFS' CREDENTIALS BECAUSE THEY CONVERTED BETTER—THAT COMMERCIAL ADVANTAGE BELONGS TO META (COUNTS III AND IV)

### A. Meta Used Plaintiffs' Professional Identities for Its Own Commercial Advantage

The same FAC allegations that establish ad-level identity use for the Lanham Act also establish the use and commercial-advantage elements of Plaintiffs' California misappropriation claims. Paragraph 40 places the impersonation "in paid advertisements." Paragraph 23 places the use of Plaintiffs' "names, images, voices, and personas" in Meta's AI-generation process. Paragraph 49 treats "Meta ads" as an independent channel for the unauthorized identity use. These are the use allegations.

The elements of Cal. Civ. Code §3344 and California common law are: (1) use of identity; (2) to defendant's commercial advantage; (3) without consent; and (4) resulting injury. *Downing,* 265 F.3d at 1001. Each is satisfied. Section 3344's protection extends to name, voice, and all identity elements Meta's AI incorporated; not photographs alone. Cal. Civ. Code §3344(a); *Midler v. Ford Motor Co.*, 849 F.2d 460, 463 (9th Cir. 1988). California's October 2025 SB 683 amendment expressly extends Section 3344 to AI-generated digital replicas of voices, likenesses,

- 15 -

and personas—precisely what Advantage+ produced.  On remedies, Section 3344(a) entitles Plaintiffs to Defendant's profits attributable to the unauthorized use, with the burden shifting to Meta to prove deductible costs, the same favorable burden shift as the Lanham Act.  15 U.S.C. §1117(a).

Meta's AI generated the ad content; the creator is the user.  The "aimed at" commercial advantage standard asks whether the use was deployed to produce a commercial advantage for the defendant instead of the scammers' subjective purpose.  *Cross v. Facebook, Inc.*, 14 Cal. App. 5th 190, 210-11 (2017).  Meta's Advantage+ system maximizes advertiser conversion rates because higher conversions drive Meta's advertising revenue.  ¶20(d).  Meta Pixel identified Plaintiffs' own clients as the highest-conversion audience and targeted them specifically.  ¶¶42(c), 44.  Plaintiffs' credentials were selected by Meta's algorithm because they drove higher conversions among Plaintiffs' own clients, identified via Meta Pixel data.  That selection mechanism is commercial advantage aimed at Meta, not the scammers.  *Cross* is satisfied.

*Forrest* resolved the commercial-advantage question on materially identical facts: "[Meta] profited more from ads that included his likeness than it would have if the ads had not."  737 F. Supp. 3d at 819-20.  The same principle applies here.  Meta argues Plaintiffs are not "nationally recognized figures."  Mot. at 15.  *Forrest* forecloses that argument: the commercial-advantage element requires only that Meta derived incremental benefit from the use of Plaintiffs' identities within the targeted segment.  Recognition among Plaintiffs' own clients, which was precisely the audience Meta Pixel identified and targeted (*see* ¶44), is sufficient.  *Ambrozewicz v. 6Sense Insights, Inc.*, 804 F. Supp. 3d 1026, 1032 (N.D. Cal. 2025).

### B.    No Celebrity Status Is Required

Meta's celebrity-status argument (Mot. at 17) fails under *Cross* and *Forrest*.  The commercial-advantage element does not require that the defendant profit from the plaintiff's fame broadly.  *Cross*, 14 Cal. App. 5th at 210-11.  What matters is whether the defendant derived commercial benefit from the use of the plaintiff's identity within the targeted segment—not whether the plaintiff is nationally recognized.  *Forrest*, 737 F. Supp. 3d at 819-20.  Here, Meta's own algorithm identified Plaintiffs' existing clients as the highest-value targets and used Plaintiffs'

- 16 -

FINRA credentials and advisory titles to reach them.  ¶¶42(c), 44.  The impersonation worked because Plaintiffs *were* known and trusted by those specific investors.  That targeted recognition is precisely the commercial advantage Section 3344 captures.  No celebrity is required.

## V.     IN THE ALTERNATIVE, META'S CONDUCT SATISFIES FDUTPA (COUNT VII)[3]

On the merits, both Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") tests are satisfied.  FDUTPA prohibits acts "likely to mislead consumers acting reasonably in the circumstances" (*State v. Beach Blvd. Auto., Inc.*, 139 So. 3d 380, 387 (Fla. Dist. Ct. App. 2014)) and "unfair" acts causing substantial, not reasonably avoidable injury (*Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006)).  Meta's representations that it would remove impersonation content and subject ads to meaningful review are likely to mislead licensed financial professionals who, like Plaintiffs, read the Transparency Center and Community Standards before maintaining a professional presence on Meta's platforms in reliance on Meta's promise to remove exactly the content that harmed them.  Had they known Meta was generating impersonation ads using their credentials, they would not have done so—and would not have suffered the reputational, regulatory, and business harms that followed.

The injury is substantial and not reasonably avoidable.  Florida licensed professionals rely on Meta's platforms for client communications and professional marketing.  The platforms are effectively unavoidable for practitioners seeking to maintain modern professional presences.  The impersonation injury is not reasonably avoidable for a professional who has no way to learn that Meta's AI is generating investment-scam advertisements in their name until clients begin calling to complain.  ¶¶45, 60.

On actual damages, Plaintiffs allege loss of goodwill and professional brand value, diversion of clients and prospective business engagements, and out-of-pocket expenditures for monitoring, takedowns, and corrective communications.  ¶151.  The market-value differential test the Motion invokes applies to consumer product defect claims.  *Marrache v. Bacardi U.S.A., Inc*., 17 F.4th 1084,

---

[3] To be clear, Plaintiffs do not press the FDUTPA claim as a primary ground for relief.  Should the Court find that California law applies and the FAC sufficiently alleges a UCL claim, Plaintiffs request that the FDUPTA claim be dismissed as moot.

- 17 -

1097-98 (11th Cir. 2021).  Plaintiffs are professional-services providers, not consumer product purchasers.  Florida courts apply a broader actual-damages measure to business plaintiffs: proven business losses including diverted clients, lost advisory engagements, and mitigation costs. *Rodriguez v. Recovery Performance & Marine, LLC*, 38 So. 3d 178, 180 (Fla. Dist. Ct. App. 2010). Plaintiffs plead all three with specificity.  ¶151.

## VI. "META WILL REMOVE" IS NOT AN ASPIRATION—IT IS A CONDITIONAL COMMAND META BREACHED TWICE (COUNT VI)

### A. The "Will Remove" Promise Is Specific and Enforceable

Meta promised to remove impersonation content.  It generated impersonation content instead, then it refused to take it down.  Meta breached this promise.

The controlling question is whether "will remove" manifested "intent to be legally obligated to" take a specific action.  *Calise*, 103 F.4th at 743.  "If your content goes against the Community Standards, *Meta will remove it*."  ¶65.  It does not say "aim to," "work to," or "may."  It says, "will remove."  That is a conditional command.  Under *Calise*, it is enforceable.

The *Calise* remand reached the same conclusion: "take appropriate action" and "remove content that purposefully deceives" were "unambiguous and well-defined" enforceable obligations. 810 F. Supp. 3d at 1044-47.  If "take appropriate action" is enforceable, "will remove" is sufficient. *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1108 (9th Cir. 2009) ("as clear and well defined as a promise that could serve as an offer").

Meta argues its *Bouck* holding is dispositive because this Court already found Meta's Terms of Service ("TOS") language unenforceable.  Mot. at 19-20.  *Bouck* addressed a different TOS provision.  In dismissing the contract claim, this Court found that the *Bouck* plaintiff failed to allege that the TOS "impose[d] a binding contractual obligation on Meta to do anything."  *Bouck*, 2026 WL 810036, at *7.  The FAC points to specific language—the "will remove" conditional—that is a specific, action-triggering promise. Thus, *Bouck* is distinguishable on this issue.

### B. The Transparency Center Is Incorporated into the Operative TOS and Independently Binding

Meta argues the Transparency Center is not part of the operative TOS.  Mot. at 20.  That argument fails under California's three-part incorporation test.  *Shaw v. Regents of Univ. of Cal*., 58

- 18 -

Cal. App. 4th 44, 54 (1997).  The TOS expressly references the Community Standards in the context of Meta's enforcement obligations.  TOS §1.5 commits Meta to "take appropriate action . . . [including] removing content" for policy violations; TOS §3.2 requires users to comply with "these Terms, the Community Standards, or other terms and policies that apply to your use of our Products"; and TOS §5 lists the Community Standards as applicable policies.  ECF No. 29-4 at 3, 6, 12-13.  The Community Standards are one click away—exactly the accessibility *B.D. v. Blizzard Entm't, Inc*. held sufficient.  76 Cal. App. 5th 931, 947 (2022).

*Corner Computing Sols. v. Google LLC* found no incorporation only because the TOS nowhere mentioned the referenced policies—the precise allegation missing from *Bouck* and present here.  750 F. Supp. 3d 1208, 1216 (W.D. Cal. 2024).

Even if the Transparency Center stood entirely outside the operative TOS, Plaintiffs have independent standing as third-party beneficiaries.  Cal. Civ. Code §1559.  The "will remove" promise serves one purpose: protecting identifiable individuals from impersonation content on Meta's platforms.  Plaintiffs are that class.  A general anti-third-party-beneficiary boilerplate cannot override a specific, affirmative, first-person promise to remove content that purposefully defrauds users.  *Gilbert Fin. Corp. v. Steelform Contracting Co*., 82 Cal. App. 3d 65, 68 (1978).

### C.    Meta's Disclaimer Does Not Defeat the Claim

Meta's TOS §4.3 disclaimer—that it "makes no guarantees" and is not responsible for third-party content—does not reach the "will remove" promise.  ECF No. 29-4 at 10-11.  The disclaimer addresses Meta's responsibility for content third parties create and share.  The "will remove" promise addresses Meta's own enforcement conduct.  These are categorically different obligations. The *Calise* remand made this clear: while Meta disclaims responsibility for what third parties post, it "maintains responsibility for its own [enforcement] promise."  810 F. Supp. 3d at 1046.

*Isgur v. Meta Platforms, Inc.* dismissed contract claims resting on Meta's statements that it "promote[s] safety, security and integrity" and "work[s] to … verify accounts"—goals that "cannot rise to the level of a contractual duty."  2026 WL 194640, at *7 (N.D. Cal. Jan. 26, 2026).  The "will remove" conditional is different in kind.  It is a specific operational commitment: when content violates the Community Standards, Meta will remove it.  That is a promise, not an aspiration.

- 19 -

The TOS §4.3 disclaimer also cannot override a specific promise under Cal. Civ. Code §1668, which voids contracts exempting a party from liability for its own fraud.  Meta's "will remove" promise, made while its AI generated policy-violating impersonation content, is a misrepresentation Section 1668 reaches.  *Continental Airlines, Inc. v. McDonnell Douglas Corp.*, 216 Cal. App. 3d 388, 403-04 (1989).

### D.      Breach Is Established; Unconscionability Voids the Liability Cap

Breach occurred on two independent grounds.  *First*, Meta accepted advertising from scammers running PTHL impersonation campaigns after the AG letter, after Plaintiffs' direct reports, and after Reuters published its investigation—with actual knowledge that the campaigns violated the Community Standards it had promised to enforce.  ¶¶36, 37, 45.  *Second*, and more fundamentally, the "will remove" promise was breached at the moment of ad creation: Meta's own AI generated the content that triggered the removal obligation.  Meta created—and then declined to remove—its own policy-violating content.  That is not a monitoring failure.  It is a contractual breach by the promisor of the very conduct the promise governed.

Meta exercised its ad-approval discretion in bad faith: it approved impersonation campaigns its own tools generated, after specific notice that those campaigns violated the Community Standards Meta had promised to enforce.  ¶142.  The implied covenant prohibits exactly that.  Meta invokes *Kroetch v. BAC Home Loan Servs*. for the proposition that the covenant cannot create obligations the contract lacks.  2011 WL 4502350, at *3 (N.D. Cal. Sept. 27, 2011); Mot. at 21.  But Plaintiffs invoke the covenant for the opposite purpose: not to create a new promise, but to prevent Meta from exercising discretion to nullify the specific promise it already made.  *Carson v. Mercury Ins. Co.*, 210 Cal. App. 4th 409, 429 (2012).  *Kroetch* is inapposite; the *Calise* remand sustained this exact theory.  810 F. Supp. 3d at 1048.

## VII.    THIS COURT HAS ALREADY SUSTAINED AN IDENTICAL NEGLIGENCE THEORY IN *BOUCK* (COUNT VIII)

### A.      Misfeasance: Meta's AI Created the Harmful Content

The no-duty-to-protect rule "derives from the common law's distinction between misfeasance and nonfeasance."  *Brown v. USA Taekwondo*, 11 Cal. 5th 204, 214 (2021) (citation

- 20 -

omitted).  Where the defendant's own conduct "increased the risk of harm," the rule yields.  *Id.* at 216.  *Bouck* resolved this on identical facts: Meta "actively assisted in the creation of the fraudulent advertisements," constituting misfeasance that sustains a negligence claim without any special relationship.  2026 WL 810036, at *9.  Meta's AI generated the professional-credentialing architecture that made the PTHL scheme credible.  Without those AI-generated ads, the scheme had no recruitment mechanism.  *Jane Doe No. 1 v. Uber Techs., Inc.*, 79 Cal. App. 5th 410, 422 (2022).

Meta argues the claim is "premised exclusively" on a duty to warn.  Mot. at 22.  That conflates duty with *breach*—two separate negligence elements.  The duty source is the FAC's misfeasance allegations: Paragraphs 42 through 47 specifically allege that Meta's Dynamic Creative and Advantage+ tools generated the investment-scam advertisements, identifying the specific AI features, seed-phrase input mechanism, and professional-credentialing output.  Active content creation is misfeasance.  *Brown*, 11 Cal. 5th at 215.  No special relationship is required.  *Bouck*, 2026 WL 810036, at *9.  Paragraph 168's failure-to-warn language describes the breach—one specific way Meta violated the misfeasance duty it had already incurred—not the duty's source.

**B.    Voluntary Undertaking: Meta's Public Safety Commitments Created an Independent §324A Duty**

Meta's "will remove" promise and safety  representation constitute a voluntary undertaking for the protection of financial professionals who relied on those commitments in maintaining professional presences on Meta's platforms.  Restatement (Second) of Torts §324A.  Courts distinguish a specific undertaking from a general policy aspiration by "mandated" and "required" language—precisely the language the FAC uses.  *Dent v. Nat'l Football League*, 968 F.3d 1126, 1133 (9th Cir. 2020).  Meta's ad review system and Advantage+ tools evidence  the kind of specific rule-making and safety enforcement infrastructure that the Ninth Circuit found sufficient to allege an undertaking.  *Mayall ex rel. H.C. v. USA Water Polo, Inc.*, 909 F.3d 1055, 1067 (9th Cir. 2018).  Meta's choice not to use that capability is negligent performance of the undertaking.

Each prong of Section 324A is satisfied.  *First*, Meta's negligent performance increased the risk of harm: by generating and approving impersonation ads after the AG letter and Plaintiffs' direct reports, Meta actively worsened Plaintiffs' situation.  *Second*, Meta's undertaking displaced the

- 21 -

independent protective steps Plaintiffs would otherwise have taken (e.g., client notification, FINRA filings, emergency injunctive relief), with each available only after reputational damage had compounded. *Third*, Plaintiffs relied on those commitments in maintaining professional presences that gave the impersonation scheme its credibility. ¶¶50, 61. Either one suffices. *Lichtman v. Siemens Indus. Inc.*, 16 Cal. App. 5th 914, 926 (2017).

Meta's special-relationship argument—citing *Dyroff*, *Bogard v. TikTok Inc.*, *Pirozzi v. Apple Inc.*, and *Delgado v. Trax Bar & Grill*—addresses only the nonfeasance theory. 2025 WL 604972 (N.D. Cal. Feb. 24, 2025); 913 F. Supp. 2d 840 (N.D. Cal. 2012); 36 Cal. 4th 224 (2005); Mot. at 22-23. It has no application to: (a) the misfeasance theory, which requires no special relationship under *Brown*; or (b) the Section 324A theory, which imposes duty based on the undertaking itself. *Delgado*'s catalog is relevant only when the plaintiff relies on nonfeasance; the FAC does not.

### C.      Duty to Warn: Known Conspiracy Independent of Publishing Function

The duty-to-warn theory is an alternative to the misfeasance theory. The Court need not reach it if misfeasance is established, but it provides an independent ground for denying the motion. The Ninth Circuit's *Internet Brands* framework permits a duty-to-warn claim where a defendant has acquired knowledge of a third-party scheme through channels entirely independent of content creation or monitoring. *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016). Critically, such a duty does not require the defendant to monitor, moderate, or remove any user content. It requires only that the defendant communicate existing knowledge to potential victims. *Id.* That is what Plaintiffs allege here: Meta had specific, named, dated knowledge of the PTHL scheme from the AG letter and Suddeth's direct report, and communicated nothing.

The securities-manipulation conspiracy (i.e., pre-positioning of Chinese microcap shares, coordinated buy-and-dump scripts, and coordinated exits in U.S. markets) operates entirely independent of Meta's publishing function. ¶29. Meta acquired knowledge of that conspiracy through channels entirely external to any content-review activity: the AG letter (¶36), Reuters and WSJ reporting (¶¶21-22, 33), and Suddeth's direct reports providing the scammers' specific telephone number (¶45). None of those channels required Meta to monitor, review, or remove any user-generated content. *Internet Brands*, 824 F.3d at 851; *Est. of Bride*, 112 F.4th at 1181. The AG

- 22 -

letter named the PTHL scheme, identified specific WhatsApp group structures, and listed impersonated professionals by name. ¶36. Suddeth provided the scammers' specific phone number to Meta directly. ¶45. That is knowledge of "the particular illegal conduct that injured the plaintiff." *Bouck*, 2026 WL 810036, at \*6. The duty to warn required no content-moderation action—only communication with identifiable licensed professionals.

### D.    Proximate Cause

Meta argues Plaintiffs do not explain how a warning would have prevented their injuries. Mot. at 23. The FAC answers directly: had Meta warned Plaintiffs upon receiving the AG letter and Suddeth's reports, Plaintiffs could have: (a) notified their client communities before the PTHL scheme extracted maximum investor harm; (b) sought emergency injunctive relief to block the impersonation ads before the scheme's peak activity; (c) filed FINRA complaints earlier, before regulatory inquiries materialized; and (d) implemented corrective communications before reputational damage compounded. ¶7. These are specific steps any licensed financial professional would take upon learning a pump-and-dump scheme was operating under their stolen identity. Proximate cause at the pleading stage requires only that plaintiff would have acted differently to reduce harm, not that every injury would have been avoided. *Holley v. Gilead Scis., Inc.*, 379 F. Supp. 3d 809, 830 (N.D. Cal. 2019). Meta relies on *Novak v. Cont'l Tire N. Am.* for the proposition that failure-to-warn causation can be resolved on a motion to dismiss. 22 Cal. App. 5th 189, 197 (2018). But *Novak* applies only where "the only reasonable conclusion is an absence of causation." *Id.* That standard is not met here.

Meta's superseding-cause argument also fails on two grounds. *First*, a third party's crime is a superseding cause only where the defendant's conduct was not itself "the proximate cause" of the injury-producing decision. *Martinez v. Pac. Bell*, 225 Cal. App. 3d 1557, 1566 (1990). The injury-producing decision here was Plaintiffs' choice to maintain professional presences in reliance on Meta's "will remove" promise—that reliance exposed their identities to the scheme. *Second*, and independently, scammer exploitation of Meta-generated impersonation infrastructure is not a superseding cause at all. It is the *foreseeable result* of that infrastructure. A defendant who creates a defective product cannot escape liability by arguing that a third party used the defect to cause

- 23 -

harm. *Lugtu v. Cal. Highway Patrol*, 26 Cal. 4th 703, 724 (2001) (intervening act is not superseding where it was reasonably foreseeable). Investment scammers exploiting Meta's AI-generated financial-professional impersonation ads is precisely what made those ads commercially valuable to the scammers—and precisely what the AG letter warned Meta was happening.

### E.    The Economic Loss Rule Does Not Bar the Negligence Claim

Meta's ELR argument relies on *Sheen v. Wells Fargo Bank, N.A.* and *Moore v. Centrelake Med. Grp., Inc.* for the proposition that the rule bars claims where parties "are in contractual privity" and the claim is "not independent of" the contract. 12 Cal. 5th 905, 922-23 (2022); 83 Cal. App. 5th 515, 535 (2022); Mot. at 23-24. Meta is wrong for two reasons.

*First*, the misfeasance duty is independent of any contract as a matter of law. The Transparency Center's "will remove" promise and safety checks certification are pre-contractual representations made through public marketing channels before any TOS relationship arose. Pre-sale representations are separate and distinct from contractual performance obligations. *Dhital v. Nissan N. Am., Inc.*, 84 Cal. App. 5th 828, 843 (2022). No TOS provision allocates the risk that Meta would AI-generate FINRA-credential impersonation advertising. A duty no contract addresses cannot be "not independent of" that contract.

*Second*, the ELR does not reach negligent misrepresentation regardless of privity. That tort is "a separate and distinct tort, a species of the tort of deceit" under Cal. Civ. Code §1710(2). *Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 407 (1992); *Rattagan v. Uber Techs., Inc.*, 17 Cal. 5th 1, 13 (2024). A claim sounding in deceit is not a negligence claim; the rule does not reach it. *Cont'l Airlines, Inc. v. McDonnell Douglas Corp.*, 216 Cal. App. 3d 388, 403-04 (1989) ("negligent misrepresentation is included within the meaning of the word 'fraud' in section 1668"). Meta's TOS §4.3 disclaimer therefore cannot bar this claim: it purports to exempt Meta from responsibility for its own representations, which Section 1668 forbids.

### VIII.    META WAS UNJUSTLY ENRICHED WHEN IT RETAINED PROFITS FROM ADS IT GENERATED USING STOLEN PROFESSIONAL IDENTITIES (COUNT V)

The *Isgur* court permitted quasi-contract claims in the alternative where plaintiffs plead facts suggesting the contract may be unenforceable. 2026 WL 194640, at *10. The FAC does so: Meta's

- 24 -

TOS is an adhesion contract and its $100 liability cap is unconscionable. ¶144; *Calise*, 810 F. Supp. 3d at 1048-49. The cap's unconscionability is precisely the unenforceability condition *Isgur* requires. *Bouck* separately held that unjust enrichment may be pleaded in the alternative. 2026 WL 810036, at *11. Meta's footnote conceding that *Bouck* "did not address the failure to allege the invalidity" (Mot. at 25 n.5) confirms that Plaintiffs here have alleged invalidity. Meta received advertising revenues traceable directly to the impersonation campaigns—revenues earned by using Plaintiffs' professional identities as the conversion mechanism. The measure of Meta's unjust enrichment is the premium Meta earned above what generic investment solicitations would have generated. Equity and good conscience require disgorgement. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1151 (2003). The underlying claims survive.

## IX.    THIS COURT CREDITED THE IDENTICAL AI-GENERATION THEORY IN *BOUCK* AND DISMISSAL WITH PREJUDICE IS NOT WARRANTED

This is not Plaintiffs' second attempt at the same theory. The original complaint alleged scammers "uploaded creative assets falsely depicting or quoting a known advisor." ECF No. 1 at 6. This Court dismissed because that framing attributed content creation to the scammers. The FAC's four specific AI-generation sub-allegations (¶¶42, 47) directly respond to that deficiency by alleging Meta's AI as the content creator. That is curative amendment responding to judicial guidance, not futile repetition. *Wong v. Fay Servicing, LLC*, 2017 WL 950863, at *6 (N.D. Cal. Mar. 10, 2017)—which Meta invokes for the "prior opportunity to cure" standard (Mot. at 25-26)— applies where a plaintiff repleads the same failed theory. Here, the FAC pleads a materially different theory of liability that *Bouck* sustained on the same day the original complaint was dismissed. Should the Court dismiss any claim, Plaintiffs respectfully request leave to amend. The five *Foman* factors each cut against with-prejudice dismissal: no bad faith, no undue delay, no prejudice to Meta, no futility given *Bouck*, and only one prior amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in its entirety. In the alternative, Plaintiffs respectfully request leave to amend.

- 25 -

Dated: June 22, 2026

Respectfully Submitted,
SCOTT+SCOTT ATTORNEYS AT LAW LLP

*/s/ John T. Jasnoch*
John T. Jasnoch (CA 281605)
Mollie E. Chadwick (CA 329524)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: 619-233-4565
Fax: 619-233-0508
jjasnoch@scott-scott.com
mchadwick@scott-scott.com

Sean T. Masson (*pro hac vice*)
SCOTT+SCOTT ATTORNEYS AT LAW LLP
230 Park Avenue, 24th Floor
New York, NY 10169
Tel.: 212-223-6444
Fax: 212-223-6334
smasson@scott-scott.com

*Counsel for Plaintiffs John Suddeth and Sara Perkins*

- 26 -

**CERTIFICATE OF SERVICE**

I hereby certify that on June 22, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List.

Executed on June 22, 2026, at San Diego, California.

*/s/ John T. Jasnoch*
John T. Jasnoch

CERTIFICATE OF SERVICE                                         CASE NO. 3:25-CV-08581-RS