United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN SUDDETH, et al.,
Plaintiffs,
v.
META PLATFORMS, INC., et al.,
Defendants.

Case No. 25-cv-08581-RS

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**

This is a putative class action filed by a group of financial professionals against Meta for its role in a fraudulent scheme to pump and dump Chinese penny stocks. Plaintiffs aver that Meta contributed to the creation of fraudulent ads on its platforms, which funneled victims into WhatsApp and Messenger groups in which scammers, impersonating Plaintiffs, peddled the worthless securities. Meta moves to dismiss, arguing that the alleged conduct is protected by Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c), and that Plaintiffs have failed to state a claim on the merits.

The motion is granted. Although it is not entirely clear, Plaintiffs' theory appears to be that Meta materially contributed to the creation of ads which themselves did not impersonate Plaintiffs, but which pushed victims to separate fora in which the scammers did impersonate them. As a result, Plaintiffs have conceded that the core illegal content which produced their injury—the impersonations on WhatsApp and Messenger—was created entirely by the scammers. Section 230's liability shield thus applies. Because there remains some ambiguity in Plaintiffs' theory, they are given one more chance to amend their complaint.

## I. BACKGROUND

This case is yet another born out of the endless wave of scams perpetrated on Meta's social media platforms. The scammers, who are not parties to this lawsuit, allegedly posted advertisements on Meta's social media platforms (Facebook and Instagram) which directed victims to investment-focused chat groups on Meta's messaging platforms (WhatsApp and Messenger). The FAC does not specify what exactly these scam ads said, but it does aver that Meta contributed to the creation of the ads through its generative AI tools. In particular, the FAC avers that the scammers fed generic inputs in foreign languages into two tools, Design Creative and Advantage+, and that Meta produced ads adorned with new text, images, and audio overlay.

In the chat groups, scammers posing as Plaintiffs pushed the victims to buy shares of Pheton Holdings Ltd (ticker PTHL). For instance, a scammer posing as John Suddeth, the lead plaintiff in this lawsuit, told a victim that he should "savor every opportunity buy PTHL right now [because] [w]e expect PTHL shares to reach their second price target of $45 to $50 this week, and the earlier you buy, the lower the cost will be." FAC ¶ 43. A scammer impersonating Sara Perkins, another plaintiff, told a victim that he should expect a 150%-350% return on PTHL shares in between 20 and 50 trading days. *See id.* ¶ 48. Neither plaintiff consented to the use of their identities in this scheme.

After Plaintiffs learned of the illegal use of their identities, they attempted to contact Meta but received no response. As a result, they filed this lawsuit, attempting to hold Meta liable for the damage created by the misappropriation of their identities and professional reputations. The FAC asserts eight claims: false endorsement and false association under section 43(a) of the Lanham Act, 15 U.S.C. §1125(a); unfair competition under the California UCL, Cal. Bus. & Prof. Code §17200 *et seq.*; invasion of the right of publicity and misappropriation of name and likeness under Cal. Civ. Code section 3344 and California Common Law; invasion of the right of publicity and misappropriation of name and likeness under Florida law; unjust enrichment; breach of contract; negligence; and a claim under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201 *et seq*.

This is Plaintiffs' second go at advancing a viable theory of liability. In their initial complaint, they alleged that the ads the scammers posted on Facebook and Instagram—that is, the ads that were used to induce the victims to join the messaging groups—impersonated them. However, they failed to aver that Meta materially contributed to the creation of those ads. It blamed the scammers alone for the creation of the ads and argued that Meta's liability arose from its algorithmic amplification of the reach of those ads. *See Suddeth v. Meta Platforms, Inc.*, 2026 WL 810252, at *2 (N.D. Cal., March 24, 2026). That theory is barred by Section 230, which protects the provider of an "interactive computer service," like Meta, from liability stemming from content produced by someone else. *See id.*; 47 U.S.C. § 230. Meta's motion to dismiss was therefore granted, and Plaintiffs were given leave to amend their complaint.

Meta now moves to dismiss the FAC, again invoking the protection of Section 230 and arguing that, in any event, Plaintiffs have failed to state a claim on the merits. Though the theory in the FAC is new, it is no more capable of evading Section 230's liability shield than was the original theory. Therefore, Meta's motion to dismiss the FAC is granted. The only two claims not defeated by Section 230 or derivative of the claims that are defeated by Section 230 are those for breach of contract and for unfair competition under the California UCL's fraudulent prong, but those claims fail on the merits and are dismissed without leave to amend.

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), the complaint must allege sufficient facts which, if accepted as true, "state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

United States District Court
Northern District of California

## III. DISCUSSION

A. Section 230

Section 230(c)(1) of the Communications Decency Act provides that "[no] provider ... of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230. Section 230 is an affirmative defense, so Meta bears the burden of showing it applies. *See Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 738 (9th Cir. 2024). Therefore, Plaintiffs can defeat a motion to dismiss based on Section 230 "simply [by] plead[ing] facts demonstrating a potential factual dispute that could affect whether the defense applies." *Rabin v. Google LLC*, 725 F.Supp.3d 1028, 1031 (N.D. Cal. 2024). "Only when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)." *Durnford v. MusclePharm Corp.*, 907 F.3d 595, 604 (9th Cir. 2018).

The dispute here is over whether Plaintiffs seek to "treat[] [Meta] as the publisher or speaker" of "information provided by" the scammers. 47 U.S.C. § 230. The resolution of that dispute turns on (1) what the offending content was; and (2) who created it.

Plaintiffs' injury stems from the misappropriation of their identities. Therefore, the offending content must be that which contained the misappropriations. According to the FAC, that content is the posts and messages in the WhatsApp and Messenger chats, where scammers posed as Plaintiffs and convinced the victims to purchase PTHL. The FAC does not seem to aver that the scammers misappropriated Plaintiffs' identities in the initial Facebook and Instagram ads which induced the victims to join the messaging groups.

For instance, when describing Meta's role in the scheme, Plaintiffs aver that "[t]he actual sponsored ads that ultimately drove users to the WhatsApp groups *where Plaintiff Suddeth was impersonated* were not uploaded in final form by the scammers . . . [but] were generated, created, or materially transformed [by Meta]." FAC ¶ 42. Similarly, it avers that Perkins was "impersonated in WhatsApp chat groups promoting PTHL displaying her likeness and credentials, falsely claiming exclusive knowledge of an imminent catalyst for PTHL." *Id.* ¶ 47; *see also id.*

¶ 39 ("These groups are purported to be run by Plaintiffs and other legitimate financial advisors, displaying stolen images of themselves, their names, their businesses, professional credentials, and other personally identifying features."). The FAC contains multiple screenshots of messages sent by the scammers in WhatsApp in which they are posing as Plaintiffs. *See, e.g.*, ¶¶ 43, 48.

Plaintiffs dispute this understanding of the offending content, but their theory is hard to pin down. At times, they seem to suggest that the FAC *does* aver that they were impersonated in the ads posted to Facebook and Instagram. They point to paragraphs 42 and 47 of the FAC, but those paragraphs (quoted above) do not plead what Plaintiffs claim. They merely talk about the Facebook and Instagram ads as pushing victims to WhatsApp and Messenger groups in which Plaintiffs were impersonated.

Moreover, Plaintiffs' suggestion that the FAC still avers that they were impersonated in the Facebook and Instagram ads is curious in light of the amendments to the complaint. Their original complaint was unambiguous on this point, averring that "a plague of scammers purchased and ran sponsored ads on Facebook and Instagram *impersonating real financial professionals like Plaintiffs*, falsely suggesting those professionals endorse specific securities." CAC, ¶ 2 (emphasis added). It went on to say that the "*ads* deceptively suggested that the impersonated professionals endorsed specific thinly traded, China-based securities and then routed users via links or 'send message' buttons into WhatsApp investment groups administered by the scammers, where *additional* misrepresentations and pressure tactics induced victims to buy the promoted stocks." CAC, ¶ 24 (emphasis added). That those averments were dropped from the FAC indicates that Plaintiffs are no longer prepared to prove that they were, in fact, impersonated in the Facebook and Instagram ads.

To the extent there is any suggestion in the FAC that Plaintiffs were impersonated in the ads allegedly created, in part, by Meta, the factual allegations are thin. Plaintiffs aver that they "maintained professional presences on Facebook, Instagram, and/or WhatsApp" and "*there* . . . [were] impersonated by Meta and its co-conspirators without consent in paid advertisements and related promotional content." FAC ¶ 40 (emphasis added). Because that averment references both

the social media platforms and the messaging platform WhatsApp, it is unclear what the word "there" refers to. They also aver that they did not "consent to the use of their names, images, voices, credentials, or professional personas in Meta ads or WhatsApp solicitations," *id.* ¶ 49, implying—without actually claiming—that they were impersonated in the ads posted to Facebook and Instagram.

Therefore, even reading the FAC in the light most favorable to Plaintiffs, it is not plausible that they were impersonated in the ads the scammers disseminated on Facebook and Instagram. The only offending content, therefore, is the posts and messages disseminated by the scammers on WhatsApp and Messenger, but Plaintiffs cannot hold Meta liable for that content directly because they do not aver that Meta "contributed materially" to its creation. *Fair Housing Council of San Fernando Valley v. Roomates.Com, LLC*, 521 F.3d 1157, 1168 (9th Cir. 2008) (en banc).

Instead, Plaintiffs' theory is that Meta is still liable for the injury to their professional reputations because the ads Meta did allegedly help create acted as the "gateway" to the messaging groups in which they were impersonated. Opp., at 7. That is, "[n]o victim entered a WhatsApp impersonation group without first being recruited by an AI-generated ad." *Id.*

The Ninth Circuit has repeatedly held this sort of facilitation theory as precluded by Section 230. In *Doe v. Grindr*, for example, an underage boy sued Grindr, an online dating app, "for facilitating communication among users for illegal activity, including the exchange of child sexual abuse material," by not suppressing matches between adults and children. 128 F.4th 1148, 1152–53 (9th Cir. 2025). By focusing on the features and functions that Grindr concededly created, Doe claimed to be attempting to hold Grindr liable only for *its* content rather than the offending content created by the predators. However, the Ninth Circuit held that theory "necessarily implicate[d] Grindr's role as a publisher of third-party content." *Id.* at 1153. Though Doe attempted to focus on content created by Grindr, his injury still stemmed from the content created by someone else, and Grindr could only have prevented that injury by "monitor[ing] third-party content and prevent[ing] adult communications to minors." *Id.* Therefore, Section 230 barred the claim.

United States District Court
Northern District of California

Similarly, here, Plaintiffs seek to hold Meta liable for content it allegedly created (the ads posted to Facebook and Instagram) because those ads facilitated a separate interaction between the victims and the scammers which caused Plaintiffs' injury. As in *Grindr*, this theory "implicate[s] Meta's role as a publisher of third-party content." 128 F.4th at 1153. Plaintiffs' injury was not complete until the scammers populated the WhatsApp and Messenger chats with the offending posts and messages, and the only way for Meta to have prevented that would have been to "monitor third-party content and prevent" the scammers from posting those messages. *Id.* Here too, then, Section 230 bars the claim.

This result should not come as a surprise to Plaintiffs. They also advanced a facilitation theory in their initial complaint, there averring that Meta ought to be held liable for ads on Facebook and Instagram (where they *did* aver contained their names and likenesses) even though they were created exclusively by the scammers because Meta algorithmically amplified the ads' reach. That was insufficient to escape Section 230 under *Grindr* and related precedent for precisely the same reason—it sought to hold Meta accountable for not doing something about content it did not create. *See Suddeth*, 2026 WL 810252, at *2–3; *see also Dyroff v. Ultimate Software Group,* 934 F.3d 1093, 1098 (9th Cir. 2019) (rejecting facilitation theory premised on internet company's creation of "features and functions"). Though their theory has evolved in the FAC, it retains the core defect identified in Meta's first motion to dismiss. The same result follows.

The defect in Plaintiffs' complaint also makes this case distinguishable from two other investment fraud cases against Meta that recently survived Section 230 challenges raised in motions to dismiss. The first of those cases, *Forrest v. Meta Platforms, Inc.*, was brought by a prominent businessman who averred that his identity and professional reputation were co-opted in a scheme to sell cryptocurrency and other fraudulent investment products. *See* 737 F.Supp.3d 808 (N.D. Cal. June 17, 2024). Meta moved to dismiss the complaint under Section 230, but the district court rejected that defense because it determined that the averments created a factual dispute over whether Meta contributed materially to the offending ads. *See id.* at 818. Although

the plaintiff did not "clearly allege how Meta's ad tools work or contribute to the challenged ads," he did "allege that the tools affect ad content in a manner that could at least potentially contribute to their illegality." *Id.* Crucial to the court's analysis was, of course, the plaintiff's allegation that his name and likeness were being used *in the challenged ads. See id.* at 813 ("Beginning in 2019, Dr. Forrest learned that ads using his name and likeness to endorse cryptocurrency and other fraudulent investment products were appearing on Facebook. Some were accompanied by fake testimonials from investors who said they turned $250 into millions in a matter of months. Others included doctored 'deepfake' videos of Dr. Forrest."). As explained, Plaintiffs have not made an analogous claim here, so *Forrest* offers them no support.

Similar problems render *Bouck v. Meta Platforms, Inc.*, 2026 WL 810036 (N.D. Cal. Mar. 24, 2026), inapplicable. In that case, a putative class of investors sued Meta over its role in a scheme to pump and dump Chinese penny stocks. *See id.*, at *1. They averred that they were induced to buy the stocks through Facebook and Instagram ads, which fraudulently impersonated celebrities endorsing stock trading groups on Meta's messaging platforms. That was enough to survive a Section 230 challenge because the core illegality about which the plaintiffs complained and from which their injuries flowed was contained in the ads that Meta allegedly helped create. *See id.* at *4 ("The alleged illegality stems from the advertisements' content—*i.e.*, the false statements made to Facebook and Instagram users that induced them to click on the ads. Plaintiffs have averred that Meta participated in the construction of the ads by literally *generating*, using artificial intelligence, the images and text in the advertisements.") (emphasis in original). By contrast, the alleged illegality here does not stem from the content of the advertisements posted to Facebook and Instagram—it stems from the dealings in the messaging groups alone. Therefore, this court's conclusion in *Bouck* that Section 230 does not apply if the plaintiffs aver plausibly that Meta materially contributed to the ads on Facebook and Instagram does not aid Plaintiffs here. Because the source of the injuries are different, the content to which Meta must have materially

United States District Court
Northern District of California

contributed is as well.[1]

The conclusion that Section 230 applies to the core of Plaintiffs' allegations resolves the bulk of its claims. Its claim under the Lanham Act, for unfair competition under the UCL's unlawful and unfair prongs, for invasion of the right to publicity and misappropriation of name and likeness (under both California and Florida law), for violation of the FDUTPA, and for negligence all seek to treat Meta "as the publisher or speaker of [] information provided by another information content provider," 47 U.S.C. § 230. Because all of those claims seek to hold Meta accountable for the WhatsApp and Messenger posts created by the scammers, they are all dismissed.

B. Remaining Claims

The only two claims that remain in substance are for breach of contract and for unfair competition under the UCL's fraudulent prong. Plaintiffs also advanced a breach of contract claim in the original complaint, which was dismissed because Plaintiffs failed to point to any specific promises in Meta's Terms of Service that obligated Meta to counteract fraudulent content. Rather, the Terms of Service spoke in aspirational terms about Meta's intention to fight fraud on its platforms by removing offending content, and their principal function was to impose obligations on users not to litter the platforms with fraudulent content. *See Suddeth*, 2026 WL 810252, at *4.

The current iteration of Plaintiffs' breach of contract claim keys in on one phrase in the Terms of Service, its warning to users that "[i]f your content goes against the Community Standards, Meta will remove it." This, Plaintiffs claim, is a specific, enforceable promise to take action when Meta learns of offending content, and Meta breached that obligation by failing to respond to Plaintiffs' outreach as well as by ignoring widespread media reports regarding the proliferation of fraud on their platforms.

This language does not create an enforceable promise. Read in full, it is clear that this

[1] The complaint in *Bouck* was later dismissed on jurisdictional grounds unrelated to the Section 230 issue. *See Bouck v. Meta Platforms, Inc.*, 2026 WL 1697631 (N.D. Cal. June 11, 2026).

language serves as a warning to users that post offending content of the consequences for doing so. It says that "[i]f *your* content goes against the Community Standards, Meta will remove it," and it promises to "notify *you* so *you* can understand why we removed the content and how to avoid posting violating content in the future." The remainder of the language explains the strike system Meta uses to "hold *you* accountable for the content *you* post" and explains the process for appealing a decision to remove content "[i]f *you* believe we made a mistake by removing *your* content." The "you" and "your" in that language can only refer to one individual—the one who created the offending content. Nowhere does this provision indicate any intention to protect Meta's other users from the ills of the offending content. Plaintiffs' claim that Meta violated the covenant of good faith and fair dealing also rests on this language constituting a binding promise. Because it does not, that claim is dismissed as well.

Plaintiffs' claim for unfair competition under the UCL's fraudulent prong hinges on the alleged falsity of Meta's public representations that it would remove offending content from its sites. In that way, this claim is really just a repackaged breach of contract claim, and it fails for the same reasons. As explained, these representations were not promises to its community of users; they were warnings to potential offenders. Therefore, Meta did not make any statements that were "likely to deceive the public." *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1380, 137 Cal. Rptr. 3d 293, 324 (2012), *as modified on denial of reh'g* (Feb. 24, 2012).[2]

Finally, as in its original complaint, Plaintiffs' claim for unjust enrichment can only survive if one of the other substantive claims survives. *See Suddeth*, 2026 WL 810252, *6. None

[2] This analysis reflects the characterization of the UCL claim under the fraudulent prong that Plaintiffs advanced in their opposition to Meta's motion to dismiss. *See* Opp., at 10 ("Plaintiffs challenge Meta's own public representations, not WhatsApp chat contents."). However, that does not seem to be theory advanced in the FAC, which avers that Meta "engaged in fraudulent business acts and practices" through its "creation and optimization of imposter professional endorsements and scripted WhatsApp funnels" as those activities "were likely to deceive reasonable consumers by falsely representing that real, licensed professionals sponsored or approved the promoted securities (including PTHL)." FAC ¶ 102. Whatever Plaintiffs' theory really is, it fails. The version articulated in the opposition fails for the reasons explained above. The version articulated in the FAC fails under Section 230, as that is simply another version of Plaintiffs' attempt to hold Meta liable for the content in the WhatsApp and Messenger groups.

do, so the unjust enrichment claim fails.

## IV. CONCLUSION

For the foregoing reasons, Meta's motion to dismiss the FAC is granted. Because there remains a sliver of ambiguity about whether Plaintiffs aver that they were impersonated in the ads posted to Facebook and Instagram that they contend Meta participated in creating, Plaintiffs are given leave to amend their complaint. Any amended complaint must be filed within 21 days of the date of this order. No further amendment will be given. Plaintiffs' claim for breach of contract and their claim under the UCL's fraudulent prong are similarly dismissed.

**IT IS SO ORDERED**.

Dated: August 13, 2026

RICHARD SEEBORG
United States District Judge

United States District Court
Northern District of California